**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

CITY OF MURFREESBORO, TENNESSEE    )
           )
       Plaintiff,          )
           )
v.                          )
           )    Case No. _____
BFI WASTE SYSTEMS OF TENNESSEE,  )    JURY DEMAND
LLC, REPUBLIC SERVICES OF       )
TENNESSEE, LLC, and REPUBLIC     )
SERVICES, INC.,               )
           )
       Defendants.       )

## COMPLAINT

Plaintiff, City of Murfreesboro, Tennessee, ("City" or "Plaintiff"), by and through counsel, files this Complaint for nuisance, negligence, punitive damages, and breach of contract against Defendants BFI Waste Systems of Tennessee, LLC, ("BFI"), Republic Services of Tennessee, LLC, and Republic Services, Inc. (both referred to as "Republic") (collectively, "Defendants"), relating to Defendants' management and operations of Middle Point Landfill ("MPL" or "the landfill") in Rutherford County, Tennessee.

### STATEMENT OF THE CASE

1.      This action is brought on behalf of Plaintiff, City of Murfreesboro, Tennessee, to address tortious and otherwise unlawful conduct by Defendants in connection with their management and operation of MPL, including: (1) the ongoing and unlawful noxious odorous gases released daily from the landfill into the surrounding community; and (2) the ongoing unlawful discharges of toxic landfill leachate[1] from the landfill to surface waters and to

---

[1] "Leachate" is a technical term referring to the liquids that pass through and/or emerge from solid waste containing soluble, suspended or miscible materials leached out of the waste. In common terms, it is also referred to as a "witch's brew" of toxic chemicals. It typically has a distinctly harsh and noxious odor.

groundwater flowing directly into the East Fork Stones River, all of which is creating a public and private nuisance and damage to infrastructure and property managed and/or owned by the City. MPL is owned and operated by Defendants BFI and Republic. Plaintiff seeks abatement of the nuisance, declaratory judgment, compensatory and punitive damages, and all other appropriate relief.

2. Between September 2021 and late April 2022, alone, more than 2,000 odor complaints from the community surrounding the landfill have been reported to the City. MPL is located a few hundred feet from the City of Murfreesboro's corporate limits and is immediately across the East Fork Stones River from the Walter Hill Recreation Area, which is a public park owned and operated by the City. Thousands of City residents live within a few miles of the landfill. They, as well as nearby schools, places of worship, businesses, and various City-owned facilities and public infrastructure, are directly affected by the noxious odors. Recent air sampling and observations confirm that the landfill is the source of these odors. The odors are caused by, among other things, failed and delayed site management, uncontrolled landfill gas emissions, ongoing leachate outbreaks, and an ongoing exothermic reaction from industrial secondary aluminum smelting ("SAS") waste.

3. The landfill has long had problems with leachate outbreaks and releases. Recent sampling confirms two ongoing discharges of leachate from MPL into the East Fork Stones River. One discharge is directly to surface water, and the other is to groundwater, which then discharges to surface water in a manner functionally equivalent to a direct discharge. Both contain a chloride profile characteristic of landfill leachate, and both contain similar concentrations of toxic chemicals, including, but not limited to, toxic per- and polyfluoroalkyl substances ("PFAS"). PFAS include perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"), two

2

compounds for which the United States Environmental Protection Agency ("EPA") has set drinking water health advisory levels requiring no detection in drinking water.

4.      In addition to its claims for public nuisance and private nuisance, Plaintiff also sues for negligence arising from the Defendants' operation and maintenance of the landfill, including their failure to manage, contain, and diminish the effects of the aluminum waste reaction ("AWR") admittedly occurring at MPL. These failures exacerbate gas, odors, and leachate, all of which is and has been proximately causing damages to the City and its residents.

5.      Additionally, Plaintiff sues for breach of contract with Defendants, pursuant to which the City allows Defendants to discharge concentrated leachate from MPL into the City's sanitary sewer system. Defendants have breached this contract by failing to comply with all City ordinances and policies as an industrial discharger to the City sewer system, as required by the contract, and by breach of its obligation of good faith and fair dealing.

6.      Finally, Plaintiff claims punitive damages for Defendants' intentional, willful, wanton and reckless business practices and reckless disregard of public health and safety in the operation and management of MPL in favor of increased revenue, reduced expenses, and increased profits.

7.      As a result of Defendants' intentional, willful, wanton, reckless, and negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff seeks an injunction ordering Defendants to abate the public and private nuisance that substantially interferes with the common rights of the public and Plaintiff's own use and enjoyment of property. Among other things, such an injunction would require Defendants to remediate and cease the release of noxious odorous gases, the discharge of toxic leachate and pollutants to surface and groundwaters,

including into the East Fork Stones River. Plaintiff seeks to recover past and future economic damages as a result of the nuisance and Defendants' negligence.

8.      With regard to Defendants' breach of contract, Plaintiff seeks a declaration from the Court that the City is entitled to enforce the provisions of its contract and to enforce its sewer use ordinance without terminating Defendants' obligations under the contract. Plaintiff also seeks an award of damages for the breach, including past and future economic damages.

9.      In addition, based on the Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, including a pattern of knowing disregard for the unique threats posed by the exothermic AWR caused by the industrial wastes in this landfill and Defendants' ongoing and willful failure to spend monies adequate to control it, Plaintiffs are seeking recovery of punitive damages.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over the parties, pursuant to 28 U.S.C. §1332, because there is diversity of citizenship and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.  Additionally, Plaintiff intends to amend this Complaint to include claims under the Federal Clean Water Act, Solid Waste Disposal Act, and the Federal Clean Air Act after the statutory notice period has expired for citizen suit notices to be served on Defendants.

11.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because all of the events and omissions alleged giving rise to the claims herein occurred in this District, the contract at issue was entered into and breached in this District, and the City is a citizen of this District.

## PARTIES

12.      Plaintiff City of Murfreesboro is municipal corporation located within Rutherford County and properly organized under the laws of Tennessee. Plaintiff owns and maintains property

used by the public, including citizens of the City, and property used by the City for the benefit of the public. This property includes the public streets, sidewalks, and rights-of-way, as well as schools, an airport, and recreational facilities, including the park, swimming areas, and boat ramp at the Walter Hill Recreation Area. The City's property also includes infrastructure, including a drinking water treatment plant and distribution system, and a wastewater treatment plant and sewer system. The Walter Hill Recreational Area is located at the northwest corner of the MPL and is within a few hundred yards of the landfill operations. MPL releases noxious odorous gases that linger at the recreation area. MPL also discharges toxic landfill leachate directly into the East Fork Stones River across from the boat ramp used by the public to access the river. The City operates a drinking water treatment plant south of the landfill and across the East Fork Stones River, which utilizes an intake pipe at that location for potable water drawn from the river. Approximately 1.2 miles upstream the City recently discovered a location where MPL is continuously discharging toxic landfill leachate through groundwater into the river. The releases of noxious odorous gases and the discharges of toxic landfill leachate directly, substantially, and unreasonably interfere with the City's use and enjoyment of property as well as interfere with rights common to the public.

13. Defendant BFI Waste Systems of Tennessee, LLC, is a for-profit limited liability company organized under the laws of the state of Delaware doing business in Tennessee with its principal office in Phoenix, Arizona. BFI's registered agent for service of process is CT Corporation System which is located at 300 Montvue Road, Knoxville, TN 37919.

14. Defendant Republic Services of Tennessee, LLC, is a for-profit limited liability company organized under the laws of the state of Delaware doing business in Tennessee with its principal office in Phoenix, Arizona. Defendant's registered agent for service of process is CT Corporation System which is located at 300 Montvue Road, Knoxville, TN 37919.

15.     Defendant Republic Services, Inc. is a corporation registered in Delaware doing business in Tennessee with corporate headquarters in Phoenix, Arizona. Defendant controls wholly-owned subsidiaries in Tennessee, including Defendants BFI Waste Systems of Tennessee, LLC, and Republic Services of Tennessee, LLC. Defendant can be served at its corporate headquarters or through its registered agent for service of process—Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

16.     Defendants' and their engineers and consultants have exclusive control over the design, installation, and operation of the infrastructure of this landfill, including the gas collection, management and extraction system, and the leachate collection and removal systems.

## FACTUAL ALLEGATIONS

**Middle Point Landfill Location and General History.**

17.     Middle Point Landfill is located on East Jefferson Pike in Rutherford County, Tennessee.  It was first permitted in 1988 as a municipal solid waste landfill ("MSWL"). At the time, it was named "Jefferson Pike Landfill."  Shortly thereafter, the permit was transferred to BFI and the site was renamed Middle Point Landfill. Originally, the permit authorized landfilling on 130 acres within a larger 200-acre parcel.

18.     The landfill has expanded to 207 acres of fill space located inside a total 803-acre parcel with support facilities.

6



19.    MPL is bounded to the north by East Jefferson Pike. The western and southern boundaries are generally the East Fork Stones River.  The river flows around the lower portion of the landfill, west and then north to Walter Hill Dam. MPL is bounded to the east by Landfill Road. BFI owns approximately 350 acres immediately to the east of Landfill Road, which is undeveloped and comprised of wetlands, streams, ponds, and an area referred to as "Matthews Lake."  Directly south of the "Matthews Lake" area is the East Fork Stones River. Defendants generally use the undeveloped acreage for cover soil and stormwater drainage.

20.    The Matthews Lake area drains south into the river approximately 1.2 miles upstream from the City's drinking water treatment intake pipe.  The City's water treatment facility is located on Sam Jared Road south and across the river.

21.    Murfreesboro's city limits are within 1 mile of MPL to the west and south. In fact, the Walter Hill Recreation Area is approximately 250 feet from MPL. The embedded screenshot

below from the City's GIS system generally depicts the City limits in yellow and the relation of City property to the location of MPL.



22.     Defendants built a tank farm on the west side of MPL next to the river.  The tank farm includes treatment infrastructure for gas and leachate. These facilities are located approximately 1,200 feet from the Walter Hill Recreation Area.

23.     At the tank farm, leachate collected from a pipe system under the landfill is pre-treated and discharged to the City of Murfreesboro sewer system.  In 1995, the City entered into a contract with Defendants (via their predecessor entity) to accept and treat leachate from MPL as an industrial discharger.   In exchange, Defendants agreed to accept municipal solid waste generated within and collected by the City without charge.  The relevant obligations of the contract are further described below.

24.     Another system at the tank farm handles landfill gas.  Two enclosed flare stacks operate continuously, ostensibly to combust and destroy at each flare approximately 5,000 cubic

8

feet per minute of landfill gas. The gas is collected from a complex network of vertical and underground horizontal pipes constructed throughout the landfill. Defendants claim the flares are fully compliant with all regulations and "destroy" the gas, thus removing it as a risk to the community.

25. Stormwater runoff is generated from rain and snowmelt that flow over land and/or impervious surfaces and do not soak into the ground. To manage stormwater, Defendants generally divided the landfill into three basic watersheds with sediment ponds intended to reduce discharge of mud and sediment into the East Fork Stones River. Sediment Pond 2 in the northwest corner utilizes a designated outfall area on the river to discharge treated stormwater. Pond 3 on the east side drains to a culvert under Landfill Road toward the Matthews Lake acreage.

26. The outfall for Sediment Pond 2 is referred to as "Outfall 2." Outfall 2 is located directly across the river from the boat ramp and Walter Hill Recreation Area managed by the City.

27. Defendants do not have a permit to discharge leachate into the river through Outfall 2 or any other location. Leachate discharges to groundwater and a surface stream or river are illegal discharges not covered or authorized by either a solid waste or stormwater permit. Leachate must be collected in the leachate collection system and pretreated before being discharged to the City's sewer system.

**Leachate Discharges to East Fork Stones River and Walter Hill Recreation Area.**

28. In the spring of 2022, the City sampled two locations along the river for leachate from the landfill. One location discharged directly to the river at or next to Outfall 2 across from the Walter Hill boat ramp. It appeared to be a discharge point connected to Sediment Pond 2 ("NW/Outfall2"). The other location discharged leachate directly into the river through groundwater at a point southeast of MPL and south of Matthews Lake area ("SE/GW"). The

groundwater leachate discharge enters the river approximately 1.2 miles upstream of the City's drinking water intake pipe.

29.     Lab results from samples at both locations, NW/Outfall2 and SE/GW, show characteristics of landfill leachate, including a close match in typical leachate chloride constituents even though the locations are well over a mile away from one another, at opposite corners of the landfill site.   Both sample results showed exceptionally high levels of toxic per- and polyfluoroalkyl substances ("PFAS"), which are well-known constituents of landfill leachate and not likely present at such levels in surface water or groundwater. Both samples demonstrate heavy leachate contamination from Middle Point Landfill.

30.     A second set of samples was taken at the same two locations over a month after the first set.   Again, the results showed that NW/Outfall 2 and SE/GW locations were contaminated with leachate, including high levels of toxic PFAS.

31.     PFAS are a large group of manufactured chemicals that do not occur naturally in the environment. The stable carbon-fluorine bonds that make PFAS such pervasive industrial and consumer products also result in their persistence in the environment. PFAS do not biodegrade, and there is no known environmental breakdown mechanism for many of these chemicals. As a result, they remain in the environment indefinitely. PFAS are readily absorbed by animals, including humans, and tend to bioaccumulate with repeated exposure.   PFAS are also highly mobile and water soluble; they leach from soil to groundwater, making groundwater and surface water particularly vulnerable to contamination. A major source of human exposure to PFAS is through ingestion of contaminated drinking water.

32. Perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS") are the most studied PFAS, and, while they have been largely phased out by industry, they are persistent and remain in landfills and the environment, in general, for a long time.

33. Landfill companies, such as Defendants, have long known that leachate at MSWLs is contaminated with some level of PFAS.

34. When humans ingest PFAS, the chemicals bind to plasma proteins in the blood and are readily absorbed by and distributed throughout the body, where they resist biotransformation and have long half-lives in the body.

35. Research indicates that exposure to PFAS is associated with a variety of adverse health outcomes, including cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The EPA recently concluded that PFOA is likely to be carcinogenic to humans and has set Lifetime Drinking Water Health Advisories for PFOA and PFOS at levels below the detection levels of these chemicals in water. EPA is expected to promulgate Maximum Contaminant Level (MCL) limits for these and other PFAS in drinking water in 2023. As a result, public drinking water systems, such as that owned and operated by the City, will have to routinely test for PFAS in their drinking water and meet the MCL limits.

**Noxious Odorous Gases Released into the Community from the Landfill.**

36. For years, there have been widespread complaints in the community about noxious gases and odors from MPL. These complaints markedly increased over the last few years. In June and July of 2021, Defendants claimed that odor complaints were declining and would "soon to be a thing of the past." At the time, Defendants assured officials and the public they were about to "complete" a 5-year strategic plan developed in 2018 to address gas, odor, and leachate problems.

37.     On September 20, 2021, the City opened an online complaint portal for odors from the landfill. The purpose was to gain credible and timely information about whether odor complaints were declining as Defendants had claimed. Over the next twelve weeks, the City received approximately 836 detailed odor complaints.  By February 2022, the complaints were ongoing and passing 1,000.  By April 2022, complaints had passed 2,000.

38.     Citizen complaints detail harsh odors from gases invading homes, yards, the car while driving, and causing headaches.  Many detail that the odors made it impossible to open windows or enjoy their homes and property. Many note the wind direction consistent at the time with odors coming from the landfill.  About a third note a physical effect and concerns for their health.  Many describe physical effects such as being awakened in night by the harsh odors, and the onset of headaches, nausea, and burning eyes and noses. One citizen noted being "so sick of this problem" and had "reported it to Middle Point directly for 1.5 years to no avail" and characterized it as a "constant disruption."  The odor problem has been and is occurring in many parts of the City—at private residences, schools, businesses, churches, and recreation areas, including the Walter Hill Recreation Area managed by the City.

39.     Previously, Defendants had blamed the City's sewer collection system as the cause of widespread odor complaints.  Without any basis, State regulatory officials at the Tennessee Department of Environment and Conservation ("TDEC") had also blamed the City and its sewer and wastewater treatment facilities which are located roughly 3.5 miles from the landfill.  As a result of these allegations, the City instituted a monitoring program at its own expense to determine whether City facilities could be the source of the odors.

40.     In addition to the monitoring program, in February 2022, the City conducted an environmental assessment of odorous gases in the area with an outside consultant from Texas.

41.     The consultant tracked and assessed odors in the area of the landfill for four days. He tracked detectable odors at ground-level and in real-time from residences located in and adjacent to the City limits and included directly investigating sewer vents in the area as a possible source.

42.     During this assessment, strong odors were tracked in real time from MPL at Landfill Road, near Cell 10 (on the east side of the landfill), to residential areas nearby.  The odors plainly originated, strongly, at the landfill.  City sewer vents near residences south of the landfill were ruled out as a source of odors.  Embedded below is a screen shot of the location where odors were tracked on Landfill Road.



43.     Repeatedly, the City's outside consultant identified not only a sour/rotting trash odor near the open working face of the landfill but also a different, harsh chemical odor typical of leachate.  This odor was identified at various days, times, and locations along Landfill Road near

Cell 10. Among other things, he observed a strong odor consistent along Landfill Road where surface breakouts of leachate and/or gases were visible, along with eroded slopes and unattended construction/maintenance areas.

44. The consultant also utilized a forward-looking infrared ("FLIR") camera. The FLIR camera detects gases including sulfur dioxide, methane, and nitrous oxide. Sulfur dioxide gas has a foul odor and is dangerous to humans. At MPL, the camera revealed massive plumes of gas, not otherwise visible to the human eye, repeatedly lofting from the top of both enclosed flares at the tank farm on the west side of the landfill. Defendants have long claimed the enclosed flares "destroy" the landfill gas collected at the tank farm from the extraction systems. Despite this claim, massive, uncombusted gas plumes were visible at both enclosed flares from multiple off-site vantage points over multiple days and times.

45. Defendants dismissed the FLIR footage as showing nothing more than trace amounts.

46. Subsequent initial air cannister sampling at locations with significant odors, including along Landfill Road and locations off-site, confirmed the presence of landfill gas chemicals, including, but not limited to, aldehydes, ketones, alcohols, and reduced sulfur compounds, all of which are odorous gases. Samples also confirmed known carcinogenic chemicals, such as benzenes, and a probable human carcinogen, methylene chloride. A sample taken at the Walter Hill Recreation Area confirmed, among other things, propene, hydrogen sulfide, acetone, 2-Butanone (also known as MEK), all consistent with landfill gas, and similar to the sample results taken at other locations surrounding MPL, off-site with odors, and downwind of the landfill operations.

47. Months earlier in July of 2021, the EPA had also observed emissions at the tank farm indicating operational problems. With Defendants' officials present, the EPA also used a type of FLIR camera at the MPL tank farm and documented a "long trail-off of significant amount of unburned hydrocarbon plumes from both flares." The EPA questioned whether the gas flow rates exceeded flare capacity, and noted the same condition was not seen at other landfills. Another trail of gas emissions was detected coming from the hatches of leachate tanks, also at the tank farm. The visible gases include, among other things, methane that has no odor, and sulfur dioxide, which is odorous.

48. Plaintiff is informed and believes that the gas flow captured at the tank farm exceeds the capacity of the two flares and/or that the enclosed flares have been inadequately designed, maintained and operated to "destroy" the gas before it escapes to the community. In addition, Plaintiff alleges the overall gas collection and control system is and has been inadequate, poorly maintained, and otherwise failing their intended purpose, i.e., the capture and transmission of landfill gases for destruction at the tank farm.

**MPL Is Not a Typical Municipal Solid Waste Landfill.**

49. MPL is not a typical municipal solid waste landfill. For decades, Middle Point accepted hundreds of types of industrial waste, and millions of tons of it. Examples include resins, paint sludges, industrial sludges from coal tar to aluminum hydroxide, soils contaminated with PCBs, soils contaminated with petroleum/diesel waste, soils with "low-level radiation" waste, gypsum wallboard, "off-spec" plastics, metal shavings, asbestos, and industrial absorbents.

50. Defendants accepted one highly reactive and dangerous type of industrial waste generated from secondary aluminum smelter ("SAS") processing. Defendants accepted

approximately 700,000 tons of it. SAS waste is commonly known to cause an aluminum waste reaction ("AWR") in a landfill.

51.    SAS waste is high in salts and metals, is highly corrosive, and reacts violently with water.

52.    Tennessee solid waste regulations allow MSWLs to accept "special waste" that is either dangerous or difficult to manage and allows the waste generator to make its own determination of whether an industrial waste is "hazardous." By law, hazardous waste is prohibited at any MSWL.

53.    By 2007, BFI (then owned by Allied Waste Industries) considered the SAS waste so reactive and problematic that BFI characterized it as "hazardous" to MSW landfills. BFI and Republic[2] were both aware by that time that SAS waste reacts violently with liquid (including rain or moisture) and produces an exothermic reaction with many follow-on consequences.

54.    The exothermic AWR from SAS waste cannot be stopped or cooled with water. Instead, liquids of any type drive the heat reaction, much like putting water on a grease fire. The AWR that results from SAS contact with liquids is known to produce high heat, higher than normal gas temperatures, higher volumes of landfill gas, higher than normal leachate generation, more concentrated and corrosive leachate content, higher than normal pressure adjacent to the reacting mass of waste, settlement or damage to the liner under or adjacent to the reacting mass of waste, and "unique" or "noxious odors" that create a public nuisance. The reaction drives a complex vapor and liquid process that results in the production of more leachate than is typical at a MSWL. All of these consequences had been seen before 2007 at the Countywide Landfill in Stark County,

---

[2] BFI was owned by Allied Waste Industries, Inc., until 2008, when Allied Waste Industries was acquired by and merged into Republic Services, Inc.

Ohio, which was and continues to be managed by Republic Services, Inc., directly and through a subsidiary.

55. In total, the Countywide Landfill received fewer tons SAS waste than MPL. Nevertheless, the SAS had triggered an AWR at Countywide as early as 2001, which caused widespread community odor complaints and unusually high gas temperatures in several cells and ultimately intervention by the EPA. As early as 2005 and 2006, Republic was undertaking costly actions at Countywide including redesigning and repairing gas collection systems, monitoring increasing gas well temperatures, and installing new gas combustion flares. Moreover, by that time, Republic had stopped a practice called "leachate recirculation" because it worsened the exothermic reaction. Recirculation essentially sprays leachate back onto the waste pile which delays and avoids the expense of collecting and removing it.

56. In 2008, Republic Services, Inc. acquired and merged with Allied Waste Industries, Inc. making Republic the new owner and manager of BFI and MPL. Republic had extensive experience managing the AWR at municipal landfills by the time it took over MPL which was already demonstrably having its own AWR problem.

57. By 2009, Defendants were aware that MPL's landfill gases contained atypical and high concentrations of hydrogen, that MPL's leachate contained high levels of ammonia, and that MPL was experiencing rising landfill gas temperatures. Moreover, Defendants had observed steam pushing up from voids burning in the fill. All of these are key indicators of the AWR process.

58. By 2009 and 2010, Defendants were aware that extraordinary and expensive steps would need to be taken if they were to manage the AWR at MPL. For example, Defendants began by prematurely capping an AWR hot spot at MPL using a geomembrane cover with its own gas system to prevent build up under the cap. Defendants also recognized the need, among other

17

things, to expand and redesign the gas collection and control system ("GCCS"), expand leachate collection and treatment, and monitor gas temperatures (especially those rising above 160° F).

59. A dangerous consequence of the AWR is high gas temperatures above the 160° F benchmark recognized in federal regulations. The high temperatures at MPL resulted in leachate boiling up through the waste mass and gas temperatures high enough to melt or "pinch" gas extraction equipment requiring replacement with steel components. By 2020 and 2021, BFI had officially identified 34 gas wells as "AWR," meaning that these wells were tied to and indicative of the exothermic reaction. Sixty-six (66) temperature readings taken 2020 and 2021 from 14 of the 34 AWR gas wells measured above 170° F with the highest at 193.4° F. Plaintiff is informed and believes that dozens of other wells should be designated by Defendants as "AWR" due to high temperatures but, to date, they have not been.

60. Another consequence of the AWR is the change of landfill gas composition. Methane decreases while other atypical landfill gases, such as carbon monoxide, hydrogen, ammonia, and acetylene, increase. The reaction can progress to a subsurface fire that burns until it is contained or the fuel supply is exhausted.

61. The AWR may also damage the synthetic landfill liner. The heat from the reaction desiccates the soil and/or burns through the protective liner of the landfill, allowing leachate to drain out and contaminate groundwater and/or allowing the waste to shift or drop out of the liner.

62. MPL was originally permitted at an unusually shallow depth of approximately 15 feet to avoid shallow groundwater identified immediately below.

63. Middle Tennessee is underlain with a "karst" geology, which is characterized by a complex maze of open conduits, channels given to dissolution, and caves with groundwater traveling at different elevations in different directions.

64.     The shallow depth of groundwater at MPL and the karst geology make the groundwater very susceptible to contamination by landfill leachate and allow contaminated groundwater to flow long distances with relatively little dilution.

65.     At all relevant times after 2008, Republic maintained a list of landfills with an AWR, or other unique problems requiring special attention. MPL was on that list.

**A History of Failing to Prevent and Manage the AWR Consequences at MPL.**

66.     By 2003, Defendants were documenting elevated gas temperatures at MPL.

67.     By 2007, Defendants were so concerned about exothermic reactions from the AWR that they stopped accepting SAS waste at their landfills. In fact, BFI went to federal court to void a contractual obligation to continue accepting SAS waste at a landfill in East Tennessee. BFI prevailed.  Defendants accepted the last loads of SAS waste at MPL in 2007.

68.     By 2011, Defendants had clear evidence that MPL had an ongoing AWR.  BFI documented a "hot void" that had burned an opening down into the waste pile large enough to cause concern that operations equipment would fall into the void.

69.     By 2014, Defendants had created a special operating plan solely to address the AWR consequences, and to "ensure … public safety."  However, in subsequent years, Defendants delayed and avoided the infrastructure and operational expenses needed to avoid the consequences of the aluminum waste reaction. As a result, since at least 2020 (if not earlier), the gas, odor, and leachate problems have outpaced the solutions.

70.     By 2018, Defendants were aware that the reaction was ongoing and uncontrolled based on multiple key indicators particularly related to leachate and gas.

71. In 2018, the leachate total annual volume had increased by approximately 26% from the prior year, 2017.[3] This increase was a significant and key indicator of an expanding aluminum waste reaction and increasing costs for Defendants to manage it.

72. The following year, 2019, leachate volume increased by roughly 10 million gallons, or approximately 27%.

73. Two consecutive years of double-digit leachate volume increases, which added another 18 million gallons for BFI to pretreat as an industrial discharger to the City sewer system, was a clear indication to Defendants that AWR-related problems were getting worse, not better, and that Defendants' AWR prevention and management costs going forward would increase.

74. The inadequacy or failures of the landfill GCCS was further evident by 2020 when landfill gas was literally bursting from the landfill surface at exceedingly large amounts in a 'whack-a-mole' fashion. In 2020, methane gas leaks at the surface were 164 times higher than the allowed limit of 500 parts per million ("ppm") on two occasions: one leak on June 10, 2020, measured at 83,897 ppm, and another leak on November 18, 2020, measured at 82,407 ppm. BFI has publicly reported methane measurements only. However, other landfill and/or AWR gases would likely have been present in these leaks, including hydrogen and carbon monoxide. The gas measurements in June and November both exceeded the lower explosive limit for methane. Explosion risk from landfill gas is not regulated by TDEC and is not addressed in the MPL permits.

75. A year later in 2021, landfill gas continued bursting from the surface at different locations. Levels were repeatedly high on the ridge above Cell 10 and Landfill Road. On March 2, 2021, above Cell 10, surface leak gas was measured by BFI at 3,615 ppm methane. Two months

---

[3] This volume reflects the flow of leachate measured by a meter maintained by the City sewer system. It measures only the leachate discharged to the City sewer after BFI pre-treats the leachate on site at its tank farm. The actual total volume of leachate at the landfill is likely higher because leachate discharged off-site illegally or pumped out to tanks driven off-site is not included in the metered gallonage.

later, on May 14, the levels were higher still at 13,669 ppm methane. Six months later, on November 10 and 11, gas levels above Cell 10 were measured at ten to nineteen times higher than the allowable limit of 500 ppm. One measurement of 9,801.0 ppm methane was taken on the ridge above Cell 10, next to Landfill Road. Another reading was 5,305 ppm, ten (10) times over the limit and taken at the top of the landfill where it has been capped for over a decade due to the AWR. Other readings at 3,493 ppm and 1,711 ppm showed a variety of hot spots.

76. Multiple measurements of landfill gas temperatures showed levels well past 161° F. Indeed, some measurements reached or exceeded 190° F.

77. These and other factors demonstrate that BFI has done the least it could for the longest time managing the landfill, including the GCCS, leachate generation and management, and the AWR consequences all impacting the City.

**Defendants Prioritized Profits Over Expenses Necessary to Control the AWR.**

78. MPL is operated as a profitable business, not a public service. Municipal waste landfilling businesses generally operate at a 35-50% profit margin. Threats to this profit margin are avoided or eliminated. Defendants' top priority is profit, not public health or safety.

79. For years, Defendant delayed and/or avoided the expense of landfill infrastructure and improvements that needed to be performed in a timely manner to capture and contain the gas, odors, and leachate, and to reduce consequences from the ongoing AWR. Annual profits—as well as the annual bonus of MPL's general manager—would have been diminished by the expense of adequate and preventative treatment of the AWR consequences, particularly gas, odors, and leachate. The proverbial can was kicked down the road to avoid expenses that did not create revenue, allowing Defendants to spend the least amount of money addressing the AWR for the longest period of time.

80. At the same time Defendants were delaying and avoiding these operating and capital expenses, MPL's general managers responded to public outrage about ongoing odors with promises and assurances Defendants were not prepared to keep.

81. In June 2021, MPL's General Manager, Mr. Michael Classen, assured public officials that BFI was installing the "last piece" of a "5 year" strategic plan from 2018 and was about to "complete" the gas collection system improvements in or around July 2021. He further stated publicly he was "absolutely confident" the odors would end soon after these improvements were completed.

82. Legal counsel for Defendants, Mr. Ed Calloway doubled down on those assurances in writing to public officials in July of 2021, stating that in "recent months" Middle Point had "seen a significant decrease in the volume of off-site odor complaints" and "because of on-going enhancements, discussions of off-site odor at Middle Point will soon be a thing of the past." Additionally, and in response to public concerns of water pollution, Mr. Calloway stated flatly in July 2021 that "Middle Point does not contaminate the (East Fork) Stones River" and that "all surface flows of stormwater from permitted areas of the landfill are directed to retention basins for treatment before discharge."

83. Notably, the flurry of assurances from BFI coincided with a public regulatory approval process in which BFI applied for expansion of the MPL, and public objection was loud.

84. The City opened its complaint portal on September 20, 2021, to help City officials verify whether odor complaints would in fact diminish as Defendants had claimed.

85. By late November, the City had received 836 confirmed complaints about landfill odors.

86.     Seven months later, by April 2022, complaints to the City portal had passed 2,000. This is an extraordinary number of complaints.

87.     Approximately half of the complaints have come from residents within or close to the City limits. Approximately a quarter (25%) of all complaints identified an odor so strong that it caused an adverse physical reaction.

88.     The alarming number and nature of noxious odorous gas complaints confirmed that Defendants had made these assurances while repeatedly failing to prevent, control, and otherwise stop noxious gases and odor from invading the community.  BFI had no reason to conclude the conditions would stop after Defendants had repeatedly delayed, ignored, and/or avoided the budget expenses necessary to preemptively reduce the AWR consequences and prevent off-site odors.

89.     TDEC has chosen not to regulate odorous gases as air pollutants. TDEC publicly maintains it has "no jurisdiction" over odor problems from landfills, including MPL. TDEC's policy decision leaves the public health and safety of City residents at Defendants' mercy, without a government agency responsible for addressing the very real costs that the gases and odors emanating from MPL have had on the community.

90.     The City confronted Defendants with the growing number of odor complaints. They responded by denying there were odor problems and countered that these odors were merely "perceived" and influenced by "past experiences" and "social media."

**Breach of Contract with City for Acceptance of Concentrated Landfill Leachate for Wastewater Treatment.**

91.     In June 1995, Plaintiff entered a contract with Jefferson Pike Landfill, Inc. ("JPL") which was wholly owned by Browning-Ferris Industries of Tennessee, Inc. at the time.  Although JPL has been an inactive entity since 1997, Plaintiff is informed and believes that all rights and interest under that contract are currently under the control of Defendants.

92.     The subject matter of the 1995 contract is the terms by which BFI would utilize the City sewer system as an industrial discharger to discharge landfill leachate to the City sewer system and wastewater treatment plant in exchange for BFI accepting the City's municipal solid waste. The City's Industrial User Discharge Permit ("IUDP") for the leachate is issued under the name of Republic Services Middle Point Landfill and is signed by the General Manager of the MPL for Republic Services, Inc.

93.     Unlike other industrial dischargers producing a wastewater from one industrial activity, landfilling at MPL over 27 years has created a discharge composed of leachate from hundreds of industrial wastes combined with domestic garbage. All those wastes percolate chemicals into a leachate waste stream that is heated and concentrated by the AWR in the MPL.

94.     Section 10 of the contract between the City and BFI states that the term of the agreement is the life of MPL, plus the post-closure period of approximately thirty (30) years. To date, the contract has not been amended.

95.     Pursuant to Section 2(a) of the contract, BFI was allowed to connect to the City sewer subject to all City ordinances, policies, regulations, and procedures as those are amended from time to time. Pursuant to Section 2(b), the City agreed to issue and renew an Industrial User Discharge Permit (IUDP) to BFI so long as: (1) BFI is in compliance with all City ordinances, policies and regulations and procedures; and (2) the IUDP has not been terminated pursuant to the provisions of Murfreesboro City Code Chapter 33. Pursuant to Section 2(c), in the event BFI violates any of the City ordinances, policies, regulations and procedures as identified in subparts (a) or (b), and its right to discharge leachate is interrupted as a result of such violation, the violation shall not interrupt or terminate BFI's obligations under paragraph 8 to provide disposal services to the City.

96.     Pursuant to Section 5 of the contract, BFI agreed to comply with all the codes, ordinances and regulations of the City, including, but not limited to, Murfreesboro City Code 33-2.1.1, and any amendments thereto after the date of the agreement.  Section 5 expressly recognizes that the City is required to enforce its codes, ordinances, and regulations, and such good faith enforcement is not a breach of the agreement by the City.

97.     As amended, City Code 33-36(G)(5)(b) states in relevant part:

> It shall be the responsibility of existing Industrial Users to file new or updated data with the Director whenever: (a) the current permit period expires, (b) Prior to a substantial change in volume or character of pollutants in their discharge including the listed or characteristic hazardous waste for which the Industrial User has submitted an initial notification under Tennessee Rule 1200-4-14-.12(10)…

98.     The Code section quoted above places the burden squarely on each industrial user to identify substantial volume and character changes in pollutants and inform the City's Director in writing.

99.     BFI failed to advise the City that years of operational decisions at MPL have resulted in a substantial change in the volume and character of leachate discharged and that the leachate contains PFAS, which are toxic chemicals that are difficult to for the City's wastewater treatment plant to treat and put the City at risk of violating its own permit obligations in the future.

Volume Increase Violations.

100.     Defendants breached Sections 5 and 2(a) of the contract by failing to comply with the City ordinance Section 33-36(G)(5)(b). In 2018, Defendants were aware of an increase of approximately 26% in total leachate volume from 2017. Again in 2019, Defendants were aware of another increase of approximately 27% increase in volume from 2018.  The volume increase total over both years was approximately 18 million gallons of leachate.  The unusual and substantially high increase in leachate volume correspondingly creates an increase in pollutants. Defendants

failed to inform the Director of substantial pollutant volume increases prior to 2017, prior to 2018 and prior to 2019. After two years of substantial increases, Defendants failed again to inform the Director of the volume increases before the IUDP was set to expire in 2019, and before the new permit was issued on November 30, 2019.

101. The increases were substantial and expected consequences based on Defendants' experience and knowledge of grappling with the consequences of approximately 700,000 tons of SAS waste mixed into domestic and other industrial waste. By 2018, Republic had almost two decades of experience with the consequences of an AWR, such as increases in volume and corrosivity of leachate in a municipal landfill. Despite this knowledge and that the AWR is the likely cause, and would produce ongoing increases in pollutant concentration, volume and other risks, Defendants did not inform the Director of the volume increase and the reasons for it.

102. Moreover, discharges detected by the City in 2022 at the NW/Outfall 2 indicate that over continuous months, Defendants elected, instead of discharging treated leachate into the sewer system, to route untreated leachate to stormwater ponds that continuously discharge to East Fork Stones River directly across from Walter Hill Recreation Area.

Change in Pollutant Character Violations.

103. Defendants further breached Sections 5 and 2(a) of the agreement by failing to comply with the City ordinance 33-36(G)(5)(b) by failing to inform the City's Director of a change in the character of the pollutants being discharged in leachate.

104. Republic is a global national corporation with extensive environmental compliance knowledge and experience. Gross revenues for the company in 2021 were reported by Republic at approximately $13.3 billion. Republic operates approximately 198 active landfills with another 124 closed landfills in the U.S. and Puerto Rico, all of which produce leachate. Plaintiff is

26

informed and believes Republic has long been knowledgeable and informed about the pervasive and toxic nature of PFAS in municipal landfill leachate, and the fact that it inexorably will be found in landfill leachate at levels that warrant regular testing. PFAS is persistent in the environment and is not destroyed or treated by wastewater treatment processes employed by the City.

105. Defendants failed at all times to inform the Director, as required, of the presence of toxic PFAS in the leachate discharged to the City's sewer system. Defendants either knew of or willfully failed to test for and learn of the high levels of toxic PFAS in leachate from MPL.

106. Plaintiff learned of the high levels of PFAS in MPL leachate pumped to the City sewer system inadvertently when sampling leachate from MPL in order to compare it to samples taken at NW/Outfall 2 and SE/GW, both of which discharge to the East Fork Stones River. PFAS levels can be a tracer for leachate contamination from the landfill as a source.

107. Leachate samples taken by the City on two occasions in May and June of 2022 showed extremely high levels of toxic PFAS, including levels of PFOA as high as 380,000 ppt, levels of PFOS as high as 15,000 ppt, levels of PFBS as high as 21,000 ppt, and levels of PFHxA as high as 35,000 ppt. The levels of PFOA and PFOS, the two most toxic PFAS, are 15-70 times higher than those found in typical landfill leachate as reported in the publicly available literature and government reports.

108. An obligation of good faith and fair dealing is implied in every contract. Plaintiff alleges that Defendants, individually and collectively, have breached this obligation with the knowledge of, with willful ignorance of, and/or reckless disregard to the presence of PFAS in MPL leachate and the attendant risk of that disregard to the City's property interests, public health and safety, and to the City's own obligations under its permit for wastewater discharge. These

extraordinarily high levels of PFAS in raw leachate to be treated under the IUDP should have been identified by Defendants and disclosed to the City, not the other way around.

109.    These extraordinarily high levels of PFAS introduced by Defendants into the City's sewer system may affect the City's ability to comply with its wastewater permit and will likely require the City to incur expenses for additional treatment or management of its wastewater and biosolids.

## CLAIMS

### COUNT ONE: COMMON LAW PUBLIC NUISANCE

110.    Plaintiff incorporates by reference paragraphs 1-109 as if restated herein.

111.    Plaintiff owns and maintains property used by the public, including citizens of the City of Murfreesboro, and property used by the City for the benefit of the public. This property includes the public streets, sidewalks, and rights-of-way, as well as schools, an airport, recreational facilities, including the park, swimming areas, and boat ramp at the Walter Hill Recreation Area. This property also includes infrastructure, such as a drinking water treatment plant and distribution system, and a wastewater treatment plant and sewer system.

112.    Defendants have created a continuing common law public nuisance by their release of noxious odorous gases into the air from MPL. These noxious odorous gases have unreasonably interfered with and continue to unreasonably interfere with rights common to the public.

113.    Defendants have created a continuing common law public nuisance by their discharge of toxic landfill leachate, including PFAS, into the groundwater and surface water, including the East Fork Stones River. These illegal discharges have unreasonably interfered with and continue to unreasonably interfere with rights common to the public.

114.    Defendants have created a continuing common law public nuisance by their discharge of highly concentrated toxic landfill leachate, including PFAS, into the City's sewer system and wastewater treatment plant, which unreasonably interferes with rights common to the public.

115.    Defendants have long known of these noxious odorous gases and these discharges of toxic landfill leachate yet have not taken adequate action to address them.  Instead, Defendants have continued to operate and maintain the MPL in a manner producing an ongoing irreparable harm to Plaintiff and the public. As a result, Defendants should be enjoined from maintaining the nuisance and ordered to abate the nuisance.

## COUNT TWO: PRIVATE NUISANCE

116.    Plaintiff incorporates paragraphs 1-109 as if restated herein.

117.    Plaintiff owns and maintains property used by the public, including citizens of the City of Murfreesboro, and property used by the City for the benefit of the public. This property includes the public streets, sidewalks, and rights-of-way, as well as schools, an airport, recreational facilities, including the park, swimming areas, and boat ramp at the Walter Hill Recreation Area. This property also includes infrastructure, including a drinking water treatment plant and distribution system, and a wastewater treatment plant and sewer system.

118.    Defendants have created a continuing private nuisance by their release of noxious odorous gases into the air from MPL. These noxious odorous gases have unreasonably interfered with and continue to unreasonably interfere with the use and enjoyment of the City's property.

119.    Defendants have created a continuing private nuisance by their discharge of toxic landfill leachate, including PFAS, into the groundwater and surface water, including the East Fork

Stones River. These illegal discharges have unreasonably interfered with and continue to unreasonably interfere with the use and enjoyment of the City's property.

120.   Defendants have created a continuing private nuisance by their discharge of highly concentrated toxic landfill leachate, including PFAS, into the City's sewer system and wastewater treatment plant, which unreasonably interferes with the City's use and enjoyment of property.

121.   Defendants have long known of these noxious odorous gases and these discharges of toxic landfill leachate yet have not taken adequate action to address them.  Instead, Defendants have continued to operate and maintain the MPL in a manner producing an ongoing irreparable harm to Plaintiff. As a result, Defendants should be enjoined from maintaining the nuisance and ordered to abate the nuisance.

122.   As a result of the private nuisance maintained by Defendants, Plaintiff has been caused to suffer, and will continue to suffer, economic damage caused by Defendants' actions/inactions, including monitoring expenses, consultant expenses, and likely future increased expenses for wastewater treatment and drinking water treatment.

## COUNT THREE: NEGLIGENCE

123.   Plaintiff incorporates by reference paragraphs 1-109 as if restated herein.

124.   Defendants owed a general duty to Plaintiff under common law and statutory law to exercise due care in the operation and maintenance of the MPL to prevent release of noxious odorous gases into the surrounding community and to prevent the discharge of toxic leachate, including PFAS, into surface water and groundwater and into the City's sewer system.

125.   Defendants owed a specific set of duties to Plaintiff imposed by each Defendant's respective corporate and operational obligations for MPL. Those duties directed MPL operations to contain, manage, and reduce the many consequences of the AWR that exacerbate landfill gas

emissions, leachate generation, and odors, and require planning and implementation of upgrades to Defendants' own equipment and infrastructure to prevent and reduce off-site gases, odors, and leachate discharges. Many of these duties were learned and evolved from mistakes and successes at Countywide Landfill in Ohio that produced widespread, noxious and ongoing odors for the neighboring community while also producing engineering challenges for Defendant Republic.

126.    Defendants negligently breached their general duties owed to Plaintiff by, among other acts and omissions, allowing emissions of noxious odorous gases from the surface of the landfill, from ineffective enclosed flares, uncovered waste, and from surface breakouts of leachate. Defendants further breached these duties by failing to properly budget for, fund, and implement the maintenance, equipment, operational activities, infrastructure improvements, and advance planning necessary and appropriate to track, reduce, and stop off-site gases and odors.

127.    Defendants negligently breached their general duties owed to Plaintiff by, among other acts and omissions, allowing leachate to comingle with stormwater that is discharged directly to the East Fork Stones River and by allowing leachate to contaminate groundwater discharged from the landfill to the East Fork Stones River in a manner functionally equivalent to a direct discharge.

128.    Defendants violated their general duties by, among other acts and omissions, discharging concentrated toxic leachate containing PFAS into the City sewer system and wastewater treatment plant.

129.    Defendants violated their specific duties by, among other acts and omissions, recirculating leachate at MPL continuously after 2008, saving money and worsening the AWR, while knowing recirculation was against their policy for landfills with AWR.

130.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has been caused to suffer, and will continue to suffer economic damage, including monitoring expenses, consultant expenses, and likely future increased expenses for wastewater treatment and drinking water treatment.

## COUNT FOUR: PUNITIVE DAMAGES

131.    Plaintiff incorporates by reference paragraphs 1-109 as if restated herein.

132.    Defendants' recurring acts and/or omissions causing noxious odorous gases to be released from the landfill and to enter the community, including property owned by the City, constitute intentional, fraudulent, malicious, and/or reckless conduct.

133.    Despite actual knowledge that its releases of noxious odorous gases, as alleged herein, Defendants have continued to operate the MPL without proper air pollution and landfill gas and leachate controls sufficient to prevent these releases from entering the community and interfering with the City's property and rights common to the public.

134.    Despite actual knowledge that its toxic leachate has continued to be discharged to surface waters and ground water, as alleged herein, Defendants have consistently refused to take the actions necessary to prevent discharges to the East Fork Stones River that are interfering with the City's property and rights common to the public.

135.    As a result of Defendants' intentional, fraudulent, malicious, and/or reckless conduct described herein, Defendants should be liable to Plaintiff for punitive damages, in addition to compensatory damages, in an amount to be determined by the jury.

## COUNT FIVE: BREACH OF CONTRACT

136.    Plaintiff incorporates by reference paragraphs 1-109 as if restated herein.

137.     Defendant has breached the contract with the City for management of the MPL leachate by failing to comply with City ordinances, policies and regulations and procedures, as required by the contract.

138.     The language of the contract provides that the City can enforce its sewer ordinance, which provides the City with the authority to: (1) require BFI to test for PFAS (and other pollutants) in the leachate and report the finding to Plaintiff; (2) require BFI to interrupt its leachate discharge until it develops and implements adequate pretreatment to remove PFAS (and other pollutants); and/or (3) suspend or terminate the IUDP until such time as BFI develops and implements adequate pretreatment to remove PFAS (and other pollutants).

139.     The language of the contract provides that the City may enforce its ordinances, policies, regulations, and procedures without breaching the contract and without interrupting or terminating Defendants' obligations under the contract.

140.     Plaintiff seeks a declaration from the Court that the City may take necessary actions under the City Code, including those listed in Paragraph 138 above, without breaching the contract and without interrupting or terminating BFI's obligations under the contract.

141.     In addition, as a direct and proximate result of Defendants' breach, the City is entitled to past and future economic damages, including monitoring expenses, consultant expenses, and likely future increased expenses for wastewater treatment.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands trial by jury and respectfully requests that the Court grant the following relief:

(a)     Enter an injunction against Defendants under Tennessee law enjoining them from maintaining the continuing public and private nuisance they have caused, created, and maintained;

(b)     Enter an injunction against Defendants under Tennessee law requiring them to abate the continuing public and private nuisance they have caused, created, and maintained by taking all steps necessary to cease the release of noxious odorous gases from their Middle Point Landfill into the surrounding community and taking all steps necessary to cease the discharge of toxic landfill leachate, including PFAS, into the East Fork Stones River;

(c)     Enter an injunction against Defendants under Tennessee law requiring them to perform regular testing of the East Fork Stones River for PFAS at the points of leachate discharge into the river and at the City's drinking water intake;

(d)     Enter an injunction against Defendants under Tennessee law requiring them to cease the discharge of PFAS chemicals in their landfill leachate to the City of Murfreesboro's wastewater system and requiring Defendants to remove PFAS from that wastewater system;

(e)     Enter a declaration regarding the contract between the City and BFI which declares that the City can enforce its sewer use ordinance, which provides the City with the authority to: (1) require BFI to test for PFAS (and other pollutants) in the leachate and report the finding to plaintiff; (2) require BFI to interrupt its leachate discharge until it develops and implements adequate pretreatment to remove PFAs (and other pollutants); and/or (3) suspend or terminate the Industrial User Discharge Permit until such time as BFI develops and implements adequate pretreatment to remove PFAS (and other pollutants).

(f)     Enter a declaration regarding the contract between the City and BFI which declares that the City may take necessary actions under its sewer use ordinance, including those listed in Paragraph (e) above, without breaching the contract and without interrupting or terminating BFI's obligations under the contract.

(g)     Enter a judgment against Defendants for past, present, and future compensatory damages incurred and likely to be incurred by the City in an amount greater than $75,000.00, as the evidence will show;

(h)     Enter a judgment against Defendants for punitive damages in an amount sufficient to penalize them and deter them from repeating their wrongful conduct;

(i)     Award Plaintiff's attorney fees and costs; and

(j)     Award such other relief as this Court deems just, proper, and equitable.

Respectfully submitted.

*/s/ Gary A. Davis*
Gary A. Davis, #009766
DAVIS & WHITLOCK, P.C.
21 Battery Park Ave., Suite 206
Asheville, NC 28801
Tel: (828) 622-0044
Fax: (828) 398-0435
gadavis@enviroattorney.com

Elizabeth L. Murphy, #020905
21 Battery Park Ave., Suite 206
Asheville, NC 28801
Tel: (615)289-7615
elizmurphy966@msn.com

Adam F. Tucker, City Attorney, #28489
CITY OF MURFREESBORO LEGAL
DEPARTMENT
111 W Vine St.
Murfreesboro, TN 37130
Tel: (615) 849-2616
Fax: (615) 849-2662
atucker@murfreesborotn.gov

Lisa K. Helton, #23684
Mark Alexander Carver, #36754
Sherrard Roe Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN  37201
Tel: (615) 742-4200 | Fax: (615) 742-4539

lhelton@srvhlaw.com
acarver@srvhlaw.com

Attorneys for the City of Murfreesboro, Tennessee