IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CITY OF MURFREESBORO,           )
TENNESSEE,                      )
                                )
        Plaintiff,              )        NO. 3:22-cv-00605
                                )        JUDGE RICHARDSON
v.                              )
                                )
BFI WASTE SYSTEMS OF TENNESSEE, )
LLC, et al.,                    )
                                )
        Defendants.             )

**MEMORANDUM OPINION**

Pending before the Court is Defendants' motion to dismiss (Doc. No. 72, "Motion")

Counts Two, Three, and Eight for failure to state a claim upon which relief can be granted,

pursuant to Fed. R. Civ. P. 12(b)(6). Defendants filed a memorandum in support of their Motion

(Doc No. 73). Plaintiff filed a response in opposition to the Motion (Doc. No. 87,

"Response"), to which Defendants filed a reply (Doc. No. 92).

BACKGROUND[1]

Plaintiff, City of Murfreesboro, Tennessee ("Plaintiff") brought this action against

Defendants BFI Waste Systems of Tennessee, LLC ("BFI"), Republic Services of Tennessee,

LLC, and Republic Services, Inc. (collectively, "Defendants"), relating to Defendants'

management and operation of Middle Point Landfill ("MPL" or "the landfill") in Rutherford

---

[1] The facts herein are taken from Plaintiff's First Amended Complaint (Doc. No. 70, "Complaint"), which
is the operative complaint in this case. For purposes of the instant Motion, the facts in the Complaint are
accepted as true, except to the extent that they are qualified herein (as for example by "Plaintiff alleges")
to denote that they are not being taken as true but instead are set forth merely to make clear what a party
claims to be true.

County, Tennessee. Plaintiff filed its original Complaint (Doc. No. 1) on August 10, 2022. Plaintiff then filed an Amended Complaint (Doc. No. 38) on October 28, 2022, followed by Plaintiff's First Supplemental Complaint (Doc. No. 70, "Complaint") on March 15, 2023, which is the operative complaint in this action.

Defendants have mismanaged MPL, creating a source of environmental pollution in local rivers, ponds, and air. (*Id.* at ¶¶ 1, 2, 4, 6). Noxious odorous gases, stemming from Defendants' mismanagement of MPL, are released daily and have directly affected and/or damaged Plaintiff's own municipal property, including roads, recreational amenities, and public buildings. (*Id.* at ¶¶ 1, 138-39, 144–45). The odors are caused by, among other things, "failed and delayed site management, uncontrolled landfill gas emissions, ongoing leachate outbreaks, and an ongoing exothermic reaction from industrial secondary aluminum smelting ("SAS") waste." (*Id.* at ¶ 2). More than 2,300 odor complaints from the community surrounding the landfill were reported to Plaintiff between September 2021 and September 2022 alone. (*Id.* at ¶ 2).

In addition, Plaintiff operates something known as a publicly-owned treatment works ("POTW"),[2] which accepts and treats wastewater from MPL and other customers. (*Id.* at ¶¶ 202, 208). MPL's toxic landfill wastewater ("leachate")[3] is contaminated by chemicals called per- and

---

[2] Without purporting to state exactly what Plaintiff means when it refers to "publicly-owned treatment works," the Court notes that the Tennessee Hazardous Waste Regulations defines the term "Publicly owned treatment works" or "POTW" as "any device or system used in the treatment (including recycling and reclamation) of municipal sewage or industrial wastes of a liquid nature which is owned by the 'State' or a 'municipality' (as defined by Section 502(4) of CWA). This definition includes sewers, pipes, or other conveyances only if they convey wastewater to a POTW providing treatment." Rules of the Tennessee Dep't of Environment and Conservation Solid Waste Management, Ch. 400-12-1.01(1). The term "treatment works" is similarly defined by Section 212 of the Clean Water Act to include "any devices and systems used in the storage, treatment, recycling, and reclamation of municipal sewage or industrial wastes of a liquid nature." 33 U.S.C. § 1292(2)(A).

[3] According to Plaintiff, "'leachate' is a technical term referring to the liquids that pass through and/or emerge from solid waste containing soluble, suspended or miscible materials leached out of the waste. In common terms, it is also referred to as a 'witch's brew' of toxic chemicals. It typically has a distinctly harsh and noxious odor." (Doc. No. 70 at 2, n.1).

polyfluoroalkyl substances ("PFAS") that bypassed the POTW's treatment systems, causing issues with the discharge of Plaintiff's own wastewater and interfering with the use and enjoyment of Plaintiff's property. (*Id*. at ¶¶ 3, 5, 47–49, 53). The "extraordinarily high levels" of PFAS flowing into Plaintiff's sewer system also have damaged Plaintiff's sewer system and wastewater treatment plant and will likely require Plaintiff to incur expenses for additional treatment of its wastewater. (*Id*. at ¶¶ 135–36).

Plaintiff asserts causes of action for public nuisance (Count One), private nuisance (Count Two), negligence (Count Three), violations of the Clean Water Act (Counts Four, Five and Six), and violations of the Clean Air Act (Count Seven). Plaintiff also asserts a breach-of-contract claim (Count Eight) related to a 1995 agreement ("Agreement")[4] between Defendants[5] and Plaintiff that allows Defendants to discharge leachate from MPL into Plaintiff's POTW for treatment, in

---

[4] Although the Agreement is not attached to the Complaint, the Court may still consider it for purposes of ruling on the motion to dismiss. Rule 12 states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. Rule Civ. P. 12(d). However, there is an exception to this principle of Rule 12(d): "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss [without converting it into a motion for summary judgment under Rule 56] so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Doe*, 219 F. Supp. 3d at 652-53; *Blanch*, 333 F. Supp. 3d at 791-92. For consideration of such materials to be permissible while keeping the motion one under Rule 12 rather than converting it to one under Rule 56, "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018). All of the requirements necessary to consider the Agreement while keeping the Motion as a Rule 12 motion are satisfied here.

[5] The original party to the Agreement with Plaintiff was Jefferson Pike Landfill, Inc. ("JPL") which was wholly owned by BFI at the time the Agreement was executed. (Doc. No. 70 at ¶ 116). All rights and interest under that contract are currently enjoyed by Defendants. (*Id*.).

exchange for Defendants accepting Plaintiff's municipal solid waste and POTW treatment byproducts without charge. (*Id*. at ¶ 40).

Defendants now seek to dismiss Counts Two, Three, and Eight,[6] pursuant to Fed. R. Civ. P. 12(b)(6).

<u>LEGAL STANDARD</u>

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the

---

[6] Defendants also filed two additional motions to dismiss pursuant to Rule 12(b)(6) related to all but one of the other counts (i.e., all except Count One) (Doc. Nos. 74, 76), and a motion to dismiss for failure to join an indispensable party, filed pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19. (Doc. No. 78). Those other three motions remain pending. Defendants' tactic of filing three different 12(b)(6) motions strikes the Court as something the Court has never seen before, as something Defendants should think twice about before doing in the future, and as something that they should explicitly justify each time they do it in the future. Perhaps the idea was to effectively triple the number of pages allowed for briefing when moving to dismiss, without obtaining leave to exceed the general limitation (of 25 pages) for briefing a motion to dismiss; Plaintiff certainly thinks so. (Doc. No. 87 at 1). In any event, the Court is loath to require the parties to invest additional resources by requiring the briefing to be re-done in some respect(s), especially since Defendant's tactic gained it nothing at least with respect to the instant Motion.

claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty*., 799 F.3d 530, 537 (6th Cir. 2015)). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

<u>ANALYSIS</u>

The Court addresses the three challenged claims in the same order in which both sides discussed them in their respective briefing.

# I.    Negligence (Count Three)

To prevail on a negligence claim, a plaintiff must prove the following elements: "1) a duty of care owed by the defendant to the plaintiff; 2) conduct falling below the applicable standard of care amounting to a breach of that duty; 3) an injury or loss; 4) causation in fact; and 5) proximate, or legal, cause." *King v. Anderson Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013). Defendants argue that Plaintiff failed to plausibly allege as required a compensable "injury or loss" necessary to state a claim for negligence. (Doc. No. 87 at 7). This Court has previously stated:

> [T]he Court perceives that Sixth Circuit case law strongly suggests that allegations of damages can be quite general and yet still satisfy the *Iqbal/Twombly* standard. *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424-25 (finding that the plaintiffs "met this standard" by alleging in their complaint that the defendant violated the RESPA and "furthermore alleged 'damages in an amount not yet ascertained, to be proven at trial.'"). This Court has done likewise [citation in footnote]. In such cases, the allegations of damages are general indeed, and not supported by much factual matter, and yet still have been found sufficient. Likewise, although here Plaintiffs' allegations of damages are not supported by much factual matter, Plaintiffs have alleged damages of a particular nature (loss of use of vehicles), and the allegation is plausible—because, for example, it is easily inferable that someone stuck away from home could be forced, as a result of the denial of the use of his or her vehicle, to procure more costly transportation (for example, ride-share services).

*Ladd v. Nashville Booting*, LLC, No. 3:20-cv-00626, 2021 WL 3363448, at *12 (M.D. Tenn., 2021).

Despite Defendants' assertion to the contrary,[7] the Complaint alleges that Plaintiff suffered property damage, including the "loss of use and enjoyment and/or diminution of value to real

---

[7] Defendants assert that the damages plead by Plaintiff are too "speculative." (Doc. No. 73 at 9). Indeed, "damages must be *proved* 'within a reasonable degree of certainty'" to succeed on a negligence claim. *Burlison v. United States*, 2011 WL 1002808, at *8 (W.D. Tenn. Mar. 15, 2011) (quoting *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985)). But the present question is what Plaintiff needs to *allege*, and not what it needs to prove. Plaintiff need not calculate its alleged damages at this stage. Though Plaintiff will need to prove these damages at some point in the future, Plaintiff has plausibly alleged damages under the *Iqbal/Twombly* standard by alleging a loss of value in property and stating facts from which one may infer that the property value has in fact diminished.

property" and "damages to [Plaintiff's] properties due to PFAS contamination." (Doc. No. 70 at ¶ 164). The Complaint includes detailed facts to support Plaintiff's claims. For example, the Complaint alleges that the odor problem caused by the MPL "has been and is occurring in many parts of the City—at private residences, schools, businesses, churches, and recreation areas, including the Walter Hill Recreation Area managed by [Plaintiff]." (*Id*. at ¶ 61). The Complaint further alleges that the "MPL releases noxious odorous gases that linger at the [Walter Hill r]ecreation area," and that MPL "discharges toxic landfill leachate directly into the East Fork Stones River across from the boat ramp used by the public to access the river." (*Id*. at ¶ 24). As in *Ladd*, here the asserted factual matter makes it "easily inferable" that the alleged odorous gases could diminish the value of Plaintiff's property or Plaintiff's use and enjoyment of said property. The Complaint further states that the "extraordinarily high levels of PFAS introduced by Defendants into [Plaintiff's] sewer system have caused damages to [Plaintiff's] sewer system and wastewater treatment plant." (*Id*. at ¶ 136).

Defendants respond that the Complaint falls "well short of the minimum specificity needed" to show it suffered property damage. (Doc. No. 73 at 10). Defendants' arguments in response to this allegation are unpersuasive. Defendants first rely on *In re Tennessee Valley Author. Ash Spill Litigation*, 805 F. Supp. 2d 468, 491 (E.D. Tenn. 2011), for the proposition that a plaintiff must plead "actual damage" to their property to sustain a claim for negligent property damage. In that case, the court denied the defendant summary judgment on the basis that several issues of fact remained regarding causation, and, among those issues of fact was whether the plaintiffs "satisfied their burden of proving causation in regard to their pure property damage claims." *Id*. at 491. But because the motion at issue was one for summary judgment and not one to dismiss under Rule

12(b)(6), the court drew no conclusions about whether the plaintiffs had *sufficiently alleged* that the "toxic constituents" resulted in "actual damage" to property. *Id*.

In the second case on which Defendants rely, *Burlison v. United States*, No. 2:07-CV-02151-JPM, 2011 WL 1002808, *9 (W.D. Tenn. Mar. 15, 2011), the court concluded that the plaintiffs failed at a bench trial to establish a negligence claim by a preponderance of the evidence because the plaintiffs failed to offer sufficient evidence as to the value of their lost use of their equipment and the cost of reinstallation. But here, at merely the motion-to-dismiss stage, Plaintiff has no obligation to present any evidence, and relatedly, has not yet had the opportunity to conduct discovery to obtain evidence (beyond any it might otherwise have or be able to obtain) to prove its claims of property damage; to survive the instant Motion, it is sufficient for Plaintiff to allege factual matter plausibly suggesting diminution of property value—and the Court finds they have done so. Thus, the Court is unconvinced by Defendants' arguments.

Even if Plaintiff had not adequately alleged property damage, Plaintiff has alleged economic damages in the form of monitoring and consulting expenses, which are not barred by the economic loss doctrine. The Complaint alleges that "Plaintiff has been caused to suffer, and will continue to suffer . . . economic damage, including monitoring expenses, consultant expenses, and likely future increased expenses for wastewater treatment and drinking water treatment." (Doc. No. 70 at ¶ 164). Throughout its Complaint, Plaintiff alleges facts to support this contention. For example, Plaintiff states that it conducted an environmental assessment of odorous gases in the area using an outside consultant. (*Id*. at ¶¶ 63–64). In addition, Plaintiff has alleged that it has been forced to pay expenses for the cost of monitoring its online complaint portal, designed in response to odors from the landfill. (*Id*. at ¶ 60). These allegations are sufficient to give rise to a plausible claim of an injury or loss that has actually occurred from the alleged odors and/or contaminated leachate.

Defendants argue that these damages for monitoring and consulting expenses are economic damages, meaning (according to Defendants) that they are barred by the economic-loss doctrine, which "generally precludes recovery for purely economic losses in tort actions." *Milan Supply Chain Sols., Inc. v. Navistar*, Inc., 627 S.W.3d 125, 129 (Tenn. 2021). But since the filing of the parties' briefs, the Tennessee Supreme Court has made clear that the economic-loss doctrine applies only in products-liability cases. *Com. Painting Co. Inc. v. Weitz Co. LLC*, No. W201902089SCR11CV, 2023 WL 6304838, at *11 (Tenn. Sept. 28, 2023). Accordingly, because this case does not involve issues related to products liability, the economic loss doctrine does not bar Plaintiff's tort claims.

The Court therefore concludes that the allegations in the Complaint are sufficient to plausibly allege a compensable injury or loss as necessary to state a claim for negligence or negligence per se. Therefore, the Court will deny Defendants' Motion as to Count Three.

## II.     Private Nuisance (Count Two)

"Tennessee courts have defined a nuisance as 'anything which annoys or disturbs the free use of one's property, or which renders its ordinary occupation uncomfortable . . . [and] extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property.'" *Lane v. W.J. Curry & Sons*, 92 S.W.3d 355, 364 (Tenn. 2002) (quoting *Pate v. City of Martin*, 614 S.W.2d 46, 47 (Tenn. 1981)). To establish a private nuisance, a plaintiff must show the alleged nuisance "constitutes an invasion of legally protectable property interests that rises to the level of what a reasonable person with ordinary sensibilities would consider an unreasonable interference with the use and enjoyment of property." *Mitchell v. Tennessee Valley Auth*., 2015 WL 1962203, at *5 (E.D. Tenn. Apr. 30, 2015) (quoting *In re Tennessee Valley Auth*., 805 F. Supp. 2d at 488). A person is liable "only to those

to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in the normal condition and used for a normal purpose." *Id.* (quoting *Jenkins v. CSX Transp., Inc.*, 906 S.W.2d 460, 462 (Tenn. Ct. App. 1995); *see also Lane v. W.J. Curry & Sons*, 92 S.W.3d 355, 365 (Tenn. 2002) (noting the interference must be "substantial and unreasonable").

Plaintiff asserts that Defendants have created a continuing private nuisance by causing the release of odors that unreasonably interfere with the use and enjoyment of its property, and by discharging leachate that interferes with its sewer system and wastewater treatment plant, as well as the East Fork Stones River. (Doc. No. 70 at ¶¶ 145-147).

As to its private-nuisance claim stemming from odors released from the MPL, Plaintiff has alleged facts demonstrating that the odors have caused a substantial and unreasonable interference to both Plaintiff and citizens in the community. For example, Plaintiff has alleged that, in the last year alone, there have been over 2,000 complaints to the City detailing various issues caused by the harsh odors. (*See id.* at ¶¶ 59-62). But as Defendants properly point out, Plaintiff's factual allegations describe the odors interfering only with the *community's* use of Plaintiff's property, not *Plaintiff's* use,[8] and therefore the allegations related to the odors constitutes an action for public nuisance, not private nuisance.[9]

---

[8] The Court realizes that a municipal plaintiff, like Plaintiff here, is associated with the community as whole to a much greater extent than is the typical private-party plaintiff. Nevertheless, the Court is aware of no basis for treating, for purposes of a claim of private nuisance, interference with the use of the community as a whole as interference with the use of the municipal plaintiff. Thus, the Court does not afford such treatment to interference with the use of the community as a whole.

[9] The Court notes that the mere fact that a defendant's conduct may give rise to a public nuisance does not preclude a cause of action for private nuisance if the plaintiff alleges facts showing that the conduct interferes with the use or enjoyment of its own private property. *Wayne Cnty. v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 284 (Tenn. Ct. App. 1988) ("Conduct causing a public nuisance will also give rise to a private nuisance action when it interferes with the use or enjoyment of private property."). But here, Plaintiff has failed to plead specific facts demonstrating how the alleged odors have

As to its private-nuisance claim stemming from the discharge of leachate, Plaintiff has alleged (and the Court for now accepts as true) that the leachate discharges into the groundwater, affecting the City's drinking water (*Id*. at ¶¶ 24; 45–58), and that the contaminated leachate is injected into the City's POTW by MPL (*Id*. at ¶¶ 207–08). Plaintiff has not explained how the contamination of the city's drinking water has uniquely interfered with Plaintiff's use of its own property, as opposed to interfering with the use of property by members of the public generally. The injection of toxic leachate into the City's POTW, however, does interfere with Plaintiff's use of its own property (namely, its POTW).

Noting that Plaintiff seeks to recover future expenses that will arise as a result of the discharge of leachate into its groundwater, Defendants correctly observe that concern about future interference is insufficient for a nuisance claim. *See Mitchell,* 2015 WL 1962203, at *5 (quoting *Cheatham v. Shearon*, 31 Tenn. 213, 216 (1951)) ("Plaintiff's subjective concerns about the property do not provide a basis for a private nuisance claim, as 'the fears of mankind will not alone create a nuisance.'"); *State ex rel. Cunningham v. Feezell*, 218 Tenn. 17, 400 S.W.2d 716, 719 (1966) (quoting *Nashville, C. & St. L.R. v. Railroad & Public Utilities Comm.,* 161 Tenn. 592, 32 S.W.2d 1043 (1930)) (stating, in relation to a claim for nuisance, that "injunctions will not issue 'merely to relieve the fears or apprehensions of an applicant'"). But Plaintiff alleges not only these concerns, but *also* existing interference from Defendants' discharge of "extremely high levels of toxic PFAS to the Murfreesboro POTW." (Doc. No. 70 at ¶ 207). The fact that Plaintiff has alleged

---

interfered with its own use of its property. Instead, after describing the dire effects of the odors on the community members' use and enjoyment of city property, Plaintiff asserts conclusory allegations that the odors that Defendants caused to be released have interfered "with the use and enjoyment of the City properties by, not only citizens of the City, but also the City and its employees." (Doc. No. 70 at ¶ 145). Plaintiff provides no facts describing how the odor interfered with its own use and enjoyment of its property. These conclusory allegations merely recite the elements of the claim and are insufficient to meet the pleading standards set forth in *Twombly/Iqbal*.

that the effects of Defendants' actions *could* eventually worsen in the future, does not nullify Plaintiff's allegation that Defendants' actions are *currently* interfering with Plaintiff's property interest. Thus, the allegation that Defendants are currently injecting contaminated leachate into Plaintiff's POTW is sufficient to state a claim for private nuisance.

Because Plaintiff has alleged facts sufficient to support a private nuisance claim arising from Defendants' alleged injection of contaminated leachate into its POTW, the Court will deny Defendants' Motion as to Count Two.

### III.    Breach of Contract (Count Eight)

Plaintiff brings a cause of action for breach of contract for which it seeks: (1) a declaration that Plaintiff may refuse MPL's leachate without breaching the Agreement and without interrupting or terminating Defendants' obligations under the Agreement; (2) an order requiring Defendants to "develop and implement adequate pretreatment to remove PFAS" from its leachate; and (3) monetary damages. (Doc. No. 70 at 58).

Plaintiff's breach of contract claim is based on Defendants' purported noncompliance with Murfreesboro City Code ("Sewer Code") § 33-36. Paragraphs 2(a) and 5 of the Agreement require Defendants to comply with "all the codes, ordinances and regulations of the City," which, of course, includes the Sewer Code. (*Id*. at ¶¶ 120-121). The Sewer Code provides that

> *It shall be the responsibility of existing Industrial Users to file new or updated data with the Director whenever:* (a) The current permit period expires; (b) *Prior to a substantial change in the volume or character of pollutants in their discharge,* including the listed or characteristic hazardous waste for which the Industrial User has submitted initial notification under TN Rule 1200-4-14-.12(10). (c) Prior to any change of ownership or location.

Sewer Code § 33-36(G)(5)(b) (emphasis added).

Plaintiff asserts that Defendants violated the Sewer Code, and thereby breached Paragraphs 2(a) and 5 of the Agreement, by failing to properly notify Plaintiff of a

"substantial change in the volume or character of leachate discharged and that the leachate contains PFAS . . . ." (Doc. No. 70 at ¶ 124). Moreover, Plaintiff has alleged specific facts sufficient to support this contention. (*See id.* at ¶¶ 125-133). Plaintiff further asserts that the Agreement gives Plaintiff the authority to: (1) require Defendants to test for pollutants (including PFAS) in the leachate and report the test results to Plaintiff; (2) require Defendants to stop their discharge until it develops adequate pretreatment measures to remove PFAS and other pollutants; and (3) suspend or terminate the IUDP 021-A ("IUDP") permit, issued to MPL by the Murfreesboro Water and Sewer Department, until Defendants develop measures to adequately remove PFAS and other pollutants. (*Id.* at ¶ 220).

Defendants make four arguments in response, none of which persuade the Court that Plaintiff has failed to state a claim for breach of contract. The Court addresses each argument below.

1. Paragraph 5 of the Agreement does not prohibit Plaintiff from enforcing its right under the Agreement to interrupt Defendants' discharge

Defendants first argue that Plaintiff failed to plead noncompliance with the Sewer Code because, pursuant to Paragraph 5 of the Agreement, Plaintiff is prohibited from interpreting the Sewer Code in a manner that would prohibit discharge to Plaintiff from MPL under the Agreement, unless mandated to do so by state or federal law.[10] But, under

---

[10] Paragraph 5 of the Agreement states that

The City agrees, however, not (i) to adopt any new codes, ordinances or regulations, or (ii) to amend or interpret any of the existing codes, ordinances or regulations of the City in such a manner, which would conflict with or be contrary to the spirit or terms of this Agreement, or which would not allow JPL to discharge leachate from the Middle Point Landfill into the City sewer system, unless the City is mandated to do so by applicable federal or State law.

(Doc. No. 79-1 at ¶ 5).

Defendants' reasoning, Paragraph 5 would prohibit Plaintiff from taking *any* position on the Sewer Code that would result in Defendants being barred from discharging their leachate to Plaintiff. This interpretation contradicts Paragraph 2(c) of the Agreement, which clearly contemplates the possibility that Defendants' right to discharge leachate could be "interrupted" if Defendants violate the Sewer Code or other applicable ordinances. (Doc. No. 79-1 at ¶ 2(c)) ("In the event JPL violates the aforementioned ordinances, policies, regulations or procedures, *and its right to discharge leachate is interrupted as a result of such violation,* such action shall not interrupt or terminate its obligations to the City set forth in paragraph 8 of this Agreement [disposal services provided by MPL].") (emphasis added).

In light of Paragraph 2(c), the Court finds that the portion of Paragraph 5 cited by Defendants exists to ensure Plaintiff cannot arbitrarily amend or change its interpretation of a code or ordinance to prevent Defendants from being able to discharge their leachate. But if Defendants have engaged in conduct that violates an existing code or ordinance (as Plaintiff has alleged here), Paragraph 5 does not bar Plaintiff from seeking to enforce its rights under Paragraph 2(c). In other words, if Defendants have engaged in conduct that violates a code or ordinance (as Plaintiff here asserts they have), and Plaintiff responds by asserting its rights under Paragraph 2(c), resulting in the interruption of Defendants' right to discharge, Defendants cannot maintain their right to discharge on the (purported) grounds that Plaintiff's attempt to enforce its rights is an "interpretation" of the relevant code or ordinance that is impermissible under Paragraph 5.

Here, it is not an arbitrarily concocted interpretation of the Sewer Code by Plaintiff that threatens to impede Defendants' contractual right to discharge leachate to Plaintiff.

Instead, it is Defendants' alleged *noncompliance* with the Sewer Code that Plaintiff argues should allow Plaintiff (consistent with Paragraph 2(c)) to interrupt Defendants' right to discharge. Indeed, what Plaintiff seeks is clearly provided for by the terms of the Agreement and does not run afoul of Paragraph 5 or the spirit of the Agreement simply because Defendants mischaracterize Plaintiff calling out their alleged violation as "interpreting" the code in an impermissible manner.

Defendants also argue that, according to Paragraph 2(d) of the Agreement,[11] Plaintiff may not apply standards, such as those mandated by the Sewer Code,[12] to Defendants "unless reasonably required for [Plaintiff] to protect the biological treatment process of the wastewater treatment plant or meet the requirements of its National Pollutant Discharge Elimination System ("NPDES") permit and applicable federal and state regulations . . . ." (Doc. No. 79-1 at ¶ 2(d)). But Plaintiff has alleged that the leachate containing PFAS is difficult for Plaintiff's wastewater treatment plant to treat and puts Plaintiff at risk of violating its own permit obligations. (Doc. No. 70 at ¶¶ 124, 133). Thus,

---

[11] Paragraph 2(d) provides, in pertinent part:

> The City agrees to deal with JPL fairly and in good faith in all matters related to this Agreement and in providing sewer service to JPL. The City agrees that it will not apply standards to JPL unless reasonably required for the City to protect the biological treatment process of the wastewater treatment plant or meet the requirements of its National Pollutant Discharge Elimination System (hereinafter "NPDES") permit and applicable federal and State regulations (i) in requiring JPL to install a pre-treatment facility, or (ii) in establishing standards for pre-treatment by JPL.

> (Doc. No. 79-1 at ¶ 2(d)).

[12] The Agreement does not specify the precise "standards" to which it refers in Paragraph 2(d). However, the Court concludes, based on the parties' briefing, that the "standards" referred to in Paragraph 2(d) of the Agreement encompass any standards set forth in the Sewer Code. (*See* Doc. No. 87 at 21 (quoting Doc. No. 73 at 19)) ("Furthermore, Defendants argue that [Plaintiff] has not claimed the *enforcement of the City Sewer Code* is 'reasonably required by [Plaintiff] to protect the biological treatment process or meet the requirements of its NPDES permit.'") (emphasis added).

Plaintiff has plausibly alleged that enforcing the standards mandated by the Sewer Code is reasonably required to meet the obligations of its NPDES permit.

2. <u>Plaintiff has alleged facts that (accepted as true) would establish that Defendants failed to provide notice prior to a "substantial change" in the volume or character of pollutants in their discharge in violation of § 33-36(G)(5)(b)</u>

Defendants' second argument regarding the breach-of-contract claim is that Plaintiff failed to allege facts showing a "substantial change" in the volume or character of pollutants in the leachate, as required to establish a violation of § 33-36(G)(5)(b) of the Sewer Code. Section 33-36(G)(5)(b) states: "[i]t shall be the responsibility of existing Industrial Users to file new or updated data with the Director . . . (b) Prior to a substantial change in the *volume or character of pollutants* in their discharge." (Emphasis added). Plaintiff has alleged that there was an increase in the amount of leachate discharged to Plaintiff's treatment plant, which "correspondingly creates an increase in [the volume of] pollutants." (Doc. No. 70 at ¶ 125). Defendants argue that even if this were true, it would not be sufficient to prove that Defendants violated § 33-36(G)(5)(b) because (according to Defendants) a substantial change in the *overall* amount of discharge (which results in a corresponding increase in the overall volume of pollutants) does not violate § 33-36(G)(5)(b). Instead (according to Defendants), Plaintiff must allege that there was a substantial change in the volume of pollutants as a *percentage* of the discharge.

In response, Plaintiff writes:

> Defendants attempt to parse the Code section in a way that makes no sense, by reading it so that, for volume it reads, "volume … of pollutants," not "volume … in their discharge," as it was intended. The term "of pollutants" clearly goes with "character" not with volume.

(Doc. No. 87 at 23). Plaintiff, using the term "notice" as shorthand for the referenced "new or updated data," then suggests that a violation is established "by failure to provide notice of substantial changes in the volume of MPL's discharge." (*Id.*).[13]

Under Plaintiff's proposed construction, a substantial change (meaning, as relevant here, an *increase*) in the overall "volume . . . in [Defendants'] discharge," or a substantial change in the "character of pollutants in [Defendants'] discharge," without proper notice, is sufficient to violate § 33-36(G)(5)(b). As Plaintiff would have it, a violation does not require a change in the volume of pollutants as a percentage of Defendants' discharge (or, for that matter, a change in the absolute volume *of pollutants* in the discharge).

So, setting aside for the moment the concept of a change in "character" of pollutants, the first issue the Court will address with respect to § 33-36(G)(5)(b) is whether Plaintiff must allege facts plausibly suggesting that there was a substantial change (meaning, as relevant here, an increase) in the volume *of pollutants* in the discharge (as Defendants argue), or whether instead it is sufficient for Plaintiff to allege facts establishing that there was an increase in the overall amount of discharge, regardless of whether the absolute volume of pollutants increased as a result (as Plaintiff argues). In other words, does the phrase "of pollutants" attach to both "volume" and "character," (as Defendants claim), or only to character (as Plaintiff asserts)?

For multiple reasons, the Court agrees with Defendants' assertion that Plaintiff must allege facts establishing that there was a substantial change in the volume *of pollutants* in the discharge (i.e., that "of pollutants" attaches to both "volume" and "character.").

---

[13] Plaintiff also asserts that a violation is established by "failure to provide notice of substantial change in the character of the discharge." (Doc. No. 87 at 23). That is, under Plaintiff's proposed construction, a substantial change in the "character of pollutants in [Defendants'] discharge," without proper notice, alternatively would be sufficient to violate § 33-36(G)(5)(b). This alternative basis for establishing a violation is addressed below.

First, by definition a "volume" is a "volume" of *something*; the term "volume" necessarily is made with reference (implicit or explicit) to something. Under Plaintiff's interpretation of this provision of the Sewer Code, the term "volume" is not made with reference to "pollutants." But this begs the question: what is "volume" being made with reference to? Plaintiff does not say, but it seems that it means (and that it could only mean) to refer to discharge—*i.e.*, that it is a substantial change in the volume *of discharge* as to which defendants must give advance notice. But this interpretation makes no sense. Under Plaintiff's interpretation, the "of" does not refer back to "volume," and so no reference is made to the volume *of* anything. Instead, at best, reference is made to the volume "in [Defendants'] discharge"—which then begs the question: "volume *of what* in Defendants' discharge"? To that, the only conceivable answer would be, "the volume of pollutants in Defendants' discharge"; this answer, however, is entirely inconsistent with Plaintiff's view that "of pollutants" does not refer back to "volume."

Relatedly, the applicable sentence in § 33-36(G)(5)(b) is drafted such that, as a matter of basic syntax, "of pollutants" plainly seems likely to refer to both "volume" and "character." To see this more clearly, consider if one were to remove "or character" from the relevant language. Under Plaintiff's reading, § 33-36(G)(5)(b) would then read, "[i]t shall be the responsibility of existing Industrial Users to file new or updated data with the Director. . . (b) Prior to a substantial change in the *volume in their discharge.*" (Emphasis added). Under Defendants' reading, however, the Code would read, "[i]t shall be the responsibility of existing Industrial Users to file new or updated data with the Director. . . (b) Prior to a substantial change in the *volume of pollutants in their discharge.*" (Emphasis added). This reading flows much better, as it (a) reflects that a "volume" is necessarily a "volume" of *something*, and (b) makes the volume at issue a volume of something in particular that fits well after the "of"; a "volume of pollutants" makes perfect sense

in the instant context. This suggests to the Court that the words "of pollutants" refers not just to "character" but also to "volume," and thus strongly supports Defendants' argument.

The Court therefore agrees with Defendants' interpretation of § 33-36(G)(5)(b) in that the Court finds that Plaintiff must allege facts establishing a substantial change in the volume *of pollutants* in their discharge, rather than alleging merely a substantial change in the amount of overall discharge. But the Court's agreement with Defendants ends there, as Defendants go on to assert that there is only one way to show a substantial change (i.e., increase) in the volume of pollutants: by alleging facts showing an increase in the volume of pollutants as a *percentage* of the overall discharge. To the contrary, in the Court's opinion, Plaintiff may *also* make this showing by alleging a substantial change (i.e., increase) in the total amount of discharge, which (assuming a given, constant volume of pollutants as a percentage of the discharge) results in a corresponding increase in the volume of pollutants (in absolute terms). In other words, there are two ways that Plaintiff may allege facts establishing a substantial change in the volume of pollutants: either by (1) alleging a substantial change in the volume of pollutants as a percentage of the discharge (i.e., the *concentration of pollutants* within the discharge), or (2) alleging a change in the overall amount of discharge which results in a substantial change in the absolute volume of pollutants in the discharge.

For reasons the Court cannot understand, Plaintiff does not take either of these positions in its Response; instead, it insists (as discussed above) that a violation is established by failure to provide notice of a substantial change in the amount of discharge, *irrespective of how that the change affects the overall volume of pollutants in the discharge.* (*See* Doc. No. 87 at 23). Notwithstanding Plaintiff's attempts to spite itself in its *Response*, the *Complaint* sufficiently alleges that a substantial change occurred in the absolute volume of pollutants discharged by

Defendants. More specifically, the Complaint alleges that the total volume of leachate increased by approximately 26% from 2017 to 2018 and approximately 27% from 2018 to 2019. (Doc. No. 70 at ¶ 125). "This unusual and substantially high increase in total leachate volume correspondingly create[d] an increase in pollutants," which the Complaint characterizes as "substantial pollutant volume increases." (*Id*.). The Complaint further alleges that Defendants failed to inform Plaintiff of these "substantial pollutant volume increases" before they occurred. (*Id*.). Accordingly, despite the questionable arguments made by Plaintiff in its Response, the Court is satisfied that the Complaint alleges facts establishing that a substantial change in the volume of pollutants occurred and that Defendants failed to notify Plaintiff of this change before it occurred as required by § 33-36(G)(5)(b).

Defendants argue that even if notification is required for an increase in overall amount of discharge that creates a corresponding increase in the absolute volume of pollutants, Plaintiff still failed to show how Defendants breached the Code. This is true (according to Defendants) because Plaintiff was already aware of the increase in the overall amount of discharge from reports that it received from Defendants each month showing the total amount of leachate discharged from MPL into Plaintiff's sewer system. (Doc. No. 92 at 4 (citing Doc. No. 85-2)). Thus (according to Defendants), if § 33-36(G)(5)(b) required Defendants to provide notice only that the overall amount of (pollutant-containing) discharge had increased (rather than notice that the *concentration* of pollutants within the discharge had increased), then Plaintiff would have already received from these monthly reports the particular notice that actually was required, and no violation of § 33-36(G)(5)(b) would have occurred.

But this argument fails, for multiple reasons. First, the Court may not consider the documents (here, monthly flow reports attached to a declaration of Darren Gore at Doc. No. 85-2)

on which Defendants base their argument, as they are not attached to the Complaint. Generally, when ruling on a motion to dismiss, a court must limit its review to the complaint's allegations. *Berry v. United States Dep't of Lab.*, 832 F.3d 627, 637 (6th Cir. 2016). It is true that an exception to this general rule exists: courts "may look outside the four corners of the complaint and consider materials attached to a motion to dismiss if they are referred to in the complaint and central to the claim" *Id.* (citing *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997). But here, the circumstances necessary to invoke this exception are not present because the monthly reports are not even mentioned in the Complaint (nor, for that matter, can they reasonably be characterized as being "central to the claim."). Second, even if the Court could rely on the reports Defendants (unsuccessfully) urge the Court to consider, the reports are inapt because they appear to summarize total discharge amounts only *after* the discharge has occurred. Therefore, the reports would not satisfy § 33-36(G)(5)(b), which requires notice "*[p]rior to* a substantial change in the volume or character of pollutants in [Defendant's] discharge." (Emphasis added). Notice of a substantial change only after the fact is simply insufficient under § 33-36(G)(5)(b), which clearly requires advance notice. Yet another problem with the reports is that they reflect discharge amounts that occurred only during 2022 and 2023. (Doc. No. 85-2). The Complaint, however, alleges that the Defendants failed to notify Plaintiff of "substantial change[s]" that occurred in 2017, 2018, and 2019. (Doc. No. 70 at ¶ 125). Thus, even putting aside the aforementioned issues with the reports (namely, that the Court may not consider the reports, and that even if the Court somehow could consider them, they would not have provided *prior* notice of the substantial changes), the reports do not address Defendants' failure to provide Plaintiff proper notice of any substantial changes that occurred during the relevant time period of 2017 to 2019. The Court is therefore unconvinced by Defendants' argument relating to the 2022 and 2023 monthly flow reports.

Defendants also argue that Part 5 of MPL's permit, Industrial User Discharge Permit 021-A ("IUDP") issued by the Murfreesboro Water and Sewer Department, allows MPL to have an average discharge rate that is "[v]ariable." (Doc. No. 73-2 at 8). According to Defendants, given that the IUDP expressly permits a range of "variable" discharge rates, Plaintiff cannot hold Defendants accountable for a change in the volume of its discharge "based on some arbitrary threshold." (Doc. No. 73 at 21). However, even if the Court were to consider the IUDP (which, although referenced in the Complaint, is not attached thereto), the fact that the IUDP allowed for variability in the average rate of discharge does not necessarily mean that *any* increase in the amount of discharge is permissible—let alone permissible without advance notice of the increase. Under § 33-36(G)(5)(b), Plaintiff must receive notice before a "substantial change" occurs. And while Plaintiff has not delineated precisely where the permissible variability in the rate of discharge ends and a "substantial change" begins, the Court—drawing all reasonable inferences in favor of Plaintiff as required—finds it plausible that the "substantial pollutant volume increase" that allegedly resulted from increases of over 25% in the total amount of discharge falls beyond the range of variability permitted in the IUDP. (*See* Doc. No. 70 at ¶ 125). The Court therefore rejects Defendants' arguments and finds that Plaintiff has plausibly alleged that there was a substantial change in the volume *of pollutants* in the discharge of which Defendants failed to give Plaintiff notice in violation of § 33-36(G)(5)(b).

Even if Plaintiff had not adequately alleged a substantial change in the volume of pollutants, it has sufficiently alleged that Defendants violated § 33-36(G)(5)(b) by failing to inform the Director of a substantial change in the *character* of pollutants in the discharge. Notably, Defendants do not dispute that a lack of notice of a "substantial change" in the character of pollutants in the discharge would also violate this portion of the Sewer Code. However, Defendants

assert that Plaintiff has not pled facts sufficient to show a *substantial* change in the character of pollutants in the discharge. The Court disagrees. Plaintiff has alleged that Defendants' leachate contained "high levels of toxic PFAS" which Defendants "either knew of or willfully failed to test for and learn of." (*Id*. at ¶¶ 128-133). Moreover, the Complaint alleges that the presence of high levels of toxic PFAS constitutes *a change* in the character of pollutants in the discharge about which Defendants failed to inform the Director, contrary to the requirements of § 33-36(G)(5)(b). (*Id*. at ¶ 128). The Complaint also includes factual matter to support its conclusion that this change in character was "substantial." (*Id*. at ¶ 208). For example, the Complaint asserts that the levels of the two most toxic PFAS found in the discharge (based on sampling) were "15-70 times higher than those found in typical landfill leachate" (*Id*. at ¶ 132),[14] and that PFAS "is not destroyed or treated by wastewater treatment processes employed by [Plaintiff]." (*Id*. at ¶ 129).

In response, Defendants argue that "the mere fact that Plaintiff claims Defendants somehow should have known that the leachate contained PFAS does not suggest that its discharge underwent some fundamental change in its chemical composition." (Doc. No. 73 at 21). But Defendants' argument misses the mark because, under the plain terms of § 33-36(G)(5)(b), a "fundamental change in [the] chemical composition" of their discharge is not necessary. Instead, Plaintiff need only allege facts sufficient to establish that Defendants failed to notify Plaintiff before a "substantial change . . . in the character of pollutants in [Defendants'] discharge" occurred. Plaintiff has properly alleged that the pollutants in Defendants' discharge contained toxic PFAS

---

[14] Importantly, although the Complaint repeatedly uses the phrase "high levels of toxic PFAS," the "substantial change in character" appears to be the presence of *any* amount of toxic PFAS (from a baseline of zero), rather than a mere *increase* in the volume of toxic PFAS (as compared to the volume that was previously present in the discharge). This distinction is significant because the latter would not be a change in *character*, but rather a change in *volume* of pollutants under § 33-36(G)(5)(b). But here, where the alleged "change" in the character of pollutants is the very existence of toxic PFAS (which did not previously exist in the discharge at any level), the change is properly characterized as a change in character, rather than a change in volume.

which were not previously present in the discharge. Introducing a new pollutant into the mix of

pollutants within the discharge—regardless of whether already-existing pollutants underwent any

change in chemical composition—certainly constitutes a change in the character of pollutants (as

a whole) in the discharge. Therefore, this allegation, along with the factual matter to support it

described above, is sufficient to allege a substantial change in the character of pollutants. Thus,

the Court finds that Plaintiff has alleged facts sufficient to support its contention that Defendants

violated § 33-36(G)(5)(b) of the Sewer Code.

3. The administrative process provided for in the Sewer Code does not bar Plaintiff from pursuing a claim for breach of contract.

Defendants next argue that Plaintiff cannot bring a claim for breach of contract before

completing or initiating the administrative process specified in § 33-40(L) of the Sewer Code.[15]

(Doc. No. 73 at 22). The Court is not convinced by this argument, either. Certainly, it may have

been beneficial to the parties (and to the Court) for Plaintiff to have contested the Sewer Code

violations through the specified administrative process prior to filing this action. However, as

Plaintiff points out, § 33-36(G)(35) of the Sewer Code provides a variety of actions Plaintiff may

take in response to violations of the Sewer Code, "none of which are necessarily prerequisite to

another"—and none of which, the Court would add, the Agreement or Sewer Code suggests is a

prerequisite to filing the instant kind of civil action. In addition, § 33-36(G)(37) states that the

remedies provided for "in this ordinance are not exclusive." § 33-36(G)(37). And, § 33-36(G)(38)

specifically states that Plaintiff "has the legal authority to seek injunctive relief for noncompliance

by Industrial Users with Pretreatment Standards and Requirements." The instant kind of breach-

of-contract claim is therefore specifically contemplated by the Sewer Code to the extent that it

---

[15] This section provides that "[a]ny person charged with violating the IUDP or any provision of this chapter shall receive written notice of the charge from the Director of the Department or designee and given an opportunity for a hearing before the Director or designee." Murfreesboro City Code § 33-40(L).

seeks injunctive relief. Accordingly, the existence of a prescribed administrative process for dealing with such claims does not preclude Plaintiff from seeking relief from this Court prior to completing or initiating the administrative process set forth in § 33-40(L) of the Sewer Code.

Defendants further argue that permitting Plaintiff to bring its breach-of-contract claim at this time deprives Defendants of their right to due process because they did not receive notice of their alleged violation or an opportunity for a hearing prior to this lawsuit, as they are entitled to (in their opinion) by § 33-40(L) of the Sewer Code. (*See* Doc. No. 73 at 22). Section 33-40(L) provides that "[a]ny person charged with violating the IUDP or any provision of this chapter shall receive written notice of the charge from the Director of the Department or designee and given an opportunity for a hearing before the Director or designee." However, Plaintiff already provided the notice to which Defendants are entitled by way of its "Notice of Intent to File Citizen Suit Pursuant to the Federal Clean Water Act" (Doc. No. 70-1) in which Plaintiff notified Defendants about their numerous violations of the Sewer Code. Moreover, a hearing before the Director or a designee regarding an alleged violation is not automatic; rather, it is conditioned upon the timely filing of a written request by the person charged. *See* Sewer Code § 33-40(L) ("Upon receipt of a notice of violation, the person [charged with a violation] must file a written request for a hearing within ten days of receipt with the City Recorder to be entitled to a hearing."). Here, Defendants do not point to—and the Court is not otherwise aware of—any information suggesting that Defendants satisfied the steps required by § 33-40(L) such that they would be entitled to a hearing. Accordingly, Plaintiff has not improperly denied Defendants' their right to notice or a hearing under the Sewer Code.

4. <u>The declaratory and injunctive relief Plaintiff seeks is consistent with the Agreement and is not unlawful</u>

Finally, Defendants assert that Plaintiff seeks an "unlawful declaration" from the Court to remedy the alleged breach of contract. (Doc. No 73 at 23–24). Plaintiff asks the Court to grant (1) a declaration that Plaintiff may refuse MPL's leachate without breaching the Agreement and without interrupting or terminating Defendants' obligations under the Agreement; (2) an order requiring Defendants to "develop and implement adequate pretreatment to remove PFAS" from its leachate; and (3) monetary damages. (Doc. No. 70 at ¶¶ 219–223).

Defendants argue that the declaration sought by Plaintiff runs contrary to Tennessee law and basic principles of contract law because it would allow Plaintiff to stop performance while requiring Defendants to continue performing their obligations under the Agreement. (Doc. No. 73 at 24). But here, the contract itself clearly contemplates just that—a situation in which Plaintiff may stop performance and require Defendant to continue to perform. "As long as the terms of a contract are unambiguous, the contract will be enforced as written." *Ralph v. Pipkin*, 183 S.W.3d 362, 367 (Tenn. Ct. App. 2005). Paragraph 2(c) of the Agreement states

> In the event JPL violates the aforementioned ordinances, policies, regulations or procedures, and its right to discharge leachate is interrupted as a result of such violation, such action shall not interrupt or terminate its obligations to the City set forth in paragraph 8 of this Agreement [disposal services provided by MPL].

(Doc. No. 79-1 at ¶ 2(c)).

Notably, the contract uses the word "interrupted"—which connotes temporariness—rather than a word indicating permanence, such as "terminated." Accordingly, Paragraph 2(c) does not give Plaintiff the right to refuse Defendants' leachate *indefinitely* without terminating Defendants' obligations. Instead, Paragraph 2(c) dictates that if Defendants are behaving in a manner that

violates the Sewer Code, Plaintiff may *temporarily* cease acceptance of Defendants' discharge until Defendants bring their conduct back into conformance with the Sewer Code.[16]

Were the Court to deny Plaintiff relief on the basis that the injunction it seeks is inconsistent with Tennessee law or basic principles of contract law, the Court effectively would be declaring that Paragraph 2(c) also violates such laws. But Defendants make no argument that Paragraph 2(c) by its terms violates Tennessee law or that it makes the Agreement void and unenforceable as contrary to public policy.

Therefore, the Court finds that Plaintiff's request is consistent with the Agreement and does not violate Tennessee law or basic principles of law. Having rejected all four of Defendants' arguments related to Count Eight, the Court concludes that Defendants' Motion as to Count Eight will be denied.

## CONCLUSION

It remains to be seen whether Plaintiff's claims ultimately prove meritorious. But those claims are adequately stated under applicable pleading standards, despite Defendants' arguments to the contrary. Accordingly, the Motion (Doc. No. 72) will be DENIED.

An appropriate corresponding order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[16] To the extent that Defendants are concerned that Plaintiff may refuse to accept Defendants' discharge even after Defendants bring their conduct back into conformance with the Sewer Code, the Court emphasizes that such action potentially could at least violate the duty of good faith and fair dealing, which is inherent in every contract and, in essence, requires a party not to interfere with another party's rights under the contract. Restatement (Second) of Contracts § 205 cmt. d.; *Thornton v. Dutch Nats. Processing, LLC*, 629 F. Supp. 3d 777, 793–94 (M.D. Tenn. 2022) (Richardson, J.) (explaining in some detail the applicability and effect of the covenant of good faith and fair dealing).