# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

CITY OF MURFREESBORO, TENNESSEE )
)
    Plaintiff, )
)
v. )    Case No. 3:22-cv-00605
)    JUDGE RICHARDSON
BFI WASTE SYSTEMS OF TENNESSEE, )    MAGISTRATE JUDGE
LLC, REPUBLIC SERVICES OF )    NEWBERN
TENNESSEE, LLC, and REPUBLIC )
SERVICES, INC., )    JURY DEMAND
)
    Defendants. )

## PLAINTIFF'S SECOND SUPPLEMENTAL COMPLAINT

Plaintiff, City of Murfreesboro, Tennessee, ("City" or "Plaintiff"), by and through counsel, files this Second Supplemental Complaint, pursuant to Fed. R. Civ. P. 15(d), for public and private nuisance, negligence, violations of the federal Clean Water Act ("CWA"), violations of the federal Clean Air Act ("CAA"), and breach of contract against Defendants BFI Waste Systems of Tennessee, LLC, ("BFI"), Republic Services of Tennessee, LLC, and Republic Services, Inc. (both referred to as "Republic") (collectively, "Defendants"), relating to Defendants' management and operations of Middle Point Landfill ("MPL" or "the landfill") in Rutherford County, Tennessee. This Second Supplemental Complaint supersedes the First Supplemental Complaint [Doc. 70] and adds newly discovered violations of the federal Clean Water Act and Clean Air Act for which the City gave notice more than sixty days ago to Defendants and to the federal and state agencies. The Second Supplemental Complaint also includes supplementation of certain paragraphs to include occurrences and events that happened after the date of the First Supplemental Complaint (see ¶¶ 2, 3, 17, 18, 21, 22, 42, 57, 63, 64, 66, 80-83, 111, 122, 143, 191-193, 198, 205- 207, 219, 225-234, Relief Requested i, m).

## STATEMENT OF THE CASE

1.      This action is brought on behalf of Plaintiff, City of Murfreesboro, Tennessee, to address tortious and otherwise unlawful conduct by Defendants in connection with their management and operation of MPL, including: (1) the ongoing and unlawful noxious odorous gases released daily from the landfill into the surrounding community; and (2) the ongoing unlawful discharges of toxic landfill leachate[1] from the landfill to surface waters and to groundwater flowing directly into the East Fork Stones River, all of which is creating a public and private nuisance and damage to infrastructure and property managed and/or owned by the City. MPL is owned and operated by Defendants BFI and Republic. Plaintiff seeks abatement of the nuisance, remedies under the CWA and the CAA, compensatory and punitive damages, and all other appropriate relief.

2.      Between September 2021 and October 2025, more than 4,000 odor complaints from the community surrounding the landfill have been reported to the City. As of July 17, 2025, MPL is within the City of Murfreesboro's corporate limits and is immediately across the East Fork Stones River from the Walter Hill Recreation Area, which is a public park owned and operated by the City.  Thousands of City residents live within a few miles of the landfill. They, as well as nearby schools, places of worship, businesses, and various City-owned facilities and public infrastructure, are directly affected by the noxious odors.  Recent air sampling and observations confirm that the landfill is the source of these odors.  The odors are caused by, among other things, failed and delayed site management, uncontrolled landfill gas emissions, ongoing leachate

---

[1] "Leachate" is a technical term referring to the liquids that pass through and/or emerge from solid waste containing soluble, suspended or miscible materials leached out of the waste.  In common terms, it is also referred to as a "witch's brew" of toxic chemicals. It typically has a distinctly harsh and noxious odor.

2

outbreaks, and an ongoing exothermic reaction from industrial secondary aluminum smelting ("SAS") waste. Defendants' numerous failures to maintain and operate MPL in a manner consistent with good air pollution control practices for minimizing emissions are violations of the federal CAA.

3. The landfill has long had problems with leachate outbreaks and releases bypassing the leachate collection system. Recent sampling confirms three ongoing discharges of leachate from MPL into the East Fork Stones River in violation of the CWA. One discharge is directly to surface water. The other two are to groundwater, which then discharges to surface water in a manner functionally equivalent to a direct discharge. All three of these unpermitted discharges, to the surface and to groundwater, are at geographically distant locations yet match up chemically with a chloride profile characteristic of landfill leachate and match up with similar concentrations of toxic chemicals, including, but not limited to, toxic per- and polyfluoroalkyl substances ("PFAS"). PFAS include perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"), two compounds for which the United States Environmental Protection Agency ("EPA") has set Maximum Contaminant Levels for drinking water by regulation on April 10, 2024. These discharges are unpermitted discharges of pollutants and constitute significant violations of the federal CWA.

4. In addition to its claims for public nuisance and private nuisance, Plaintiff also sues for negligence arising from the Defendants' operation and maintenance of the landfill, including their failure to manage, contain, and diminish the effects of the aluminum waste reaction ("AWR") admittedly occurring at MPL. These failures exacerbate gas, odors, and leachate, all of which is and has been proximately causing damages to the City and its residents.

5.     This is also an action pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1365(a)(1), to address ongoing unlawful pollution of surface waters by the three leachate pollutant discharges which include toxic PFAS from Defendants' MPL into East Fork Stones River. Defendants have discharged and continue to discharge pollutants, including PFAS, from the MPL to the East Fork Stones River without a permit authorizing such discharges in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). Defendants are also in violation of the CWA by their discharges of highly contaminated leachate to the City's wastewater treatment plant without complying with the City's pretreatment regulations. Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and an award of costs, including attorney and expert witness fees, for Defendants' repeated and ongoing violations of the CWA.

6.     This is also an action pursuant to the citizen suit provision of the federal Clean Air Act ("CAA"), 42 U.S.C. § 7604(a)(1), for violations of emissions standards and limitations at the MPL by failing to operate its gas collection and control system ("GCCS"), including its flares, in a manner consistent with good air pollution control practices, by poorly managing leachate, and failing to consistently cover exposed waste. These recurring violations have caused or contributed to the noxious odorous gases released daily from the landfill into the surrounding community.

7.     Additionally, Plaintiff sues for Defendants' breach of a contract with the City, pursuant to which the City allows Defendants to discharge concentrated leachate from MPL into the City's sanitary sewer system. Defendants have breached this contract by failing to comply with all City ordinances and policies as an industrial discharger to the City sewer system, as required by the contract, and by breach of their obligation of good faith and fair dealing.

8. As a result of Defendants' intentional, willful, wanton, reckless, and negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff seeks an injunction ordering Defendants to abate the public and private nuisance that substantially interferes with the common rights of the public and Plaintiff's own use and enjoyment of property. Among other things, such an injunction would require Defendants to remediate and cease the release of noxious odorous gases and remediate and cease the discharge of toxic leachate and pollutants to surface and groundwaters, including into the East Fork Stones River. Plaintiff seeks to recover past and future property and economic damages as a result of the nuisance and Defendants' negligence.

9. In addition, Plaintiffs are seeking recovery of punitive damages based on the Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, including a pattern of reckless disregard for public health and safety and the unique threats posed by the exothermic AWR caused by the industrial wastes in this landfill and Defendants' ongoing and willful failure to spend monies adequate to control it.

10. With regard to Defendants' breach of contract, Plaintiff seeks a declaration from the Court that the City is entitled, pursuant to the plain wording of the contract, to enforce the provisions of its contract and to enforce its sewer use ordinance without terminating Defendants' obligations under the contract. Plaintiff also seeks an award of damages for the breach, including past and future property and economic damages.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over the CWA claims set forth in this Complaint against Defendants pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

12. This Court has subject matter jurisdiction over the CAA claims set forth in this Complaint against Defendants pursuant to Section 304(a) of the CAA, 42 U.S.C. § 7604(a), and 28 U.S.C. § 1331.

13. This Court has subject matter jurisdiction over the state law claims and parties, pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

14. In addition to its diversity jurisdiction, this Court has supplemental jurisdiction over the state law claims in this action in accordance with 28 U.S.C. § 1367(a), because they are so related to the federal claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

15. Plaintiff has complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff, on August 10, 2022, mailed a notice of intent to file suit under the CWA ("CWA Notice") to Defendants, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Tennessee Department of Environment and Conservation ("TDEC"), and the United States Attorney General (See Exhibit A, attached to this Second Supplemental Complaint and incorporated by reference herein). This CWA Notice complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since the CWA Notice was served on Defendants and these agencies.

16. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A). Plaintiff, on November 21, 2022, mailed First Addendum notice of intent to file suit under the CWA ("Nov. CWA Notice") to Defendants, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Tennessee Department of Environment and

6

Conservation ("TDEC"), and the United States Attorney General (See Exhibit B, attached to this Second Supplemental Complaint and incorporated by reference herein). This CWA Notice complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since the Nov. CWA Notice was served on Defendants and these agencies.

17. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A) Plaintiff, on January 16, 2024, mailed a Second Addendum to the August 10, 2022, notice of intent to file suit under the CWA ("Jan. CWA Notice") to Defendants, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Tennessee Department of Environment and Conservation ("TDEC"), and the United States Attorney General (See Exhibit C, attached to this Second Supplemental Complaint and incorporated by reference herein). This CWA Notice complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since the Jan. CWA Notice was served on Defendants and these agencies.

18. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A) Plaintiff, on September 15, 2025, mailed a Third Addendum to the August 10, 2022, notice of intent to file suit under the CWA ("Sept. CWA Notice") to Defendants, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Tennessee Department of Environment and Conservation ("TDEC"), and the United States Attorney General (See Exhibit D, attached to this Second Supplemental Complaint and incorporated by reference herein). This CWA Notice complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since the Sept. CWA Notice was served on Defendants and these agencies.

19.     Neither EPA nor TDEC has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or State to redress the violations of the CWA by Defendants.  In addition, neither EPA nor TDEC has commenced an administrative civil penalty action under Section 309(g)(6) of the Act, 33 U.S.C. § 1319(g)(6), or under a comparable Tennessee law, to redress the violations of the CWA by Defendants.  Any administrative action to address these violations taken by TDEC would not preempt this CWA lawsuit because Tennessee's water pollution enforcement scheme is not comparable to the enforcement provisions of the CWA.

20.     Plaintiff has complied with the pre-suit notice provisions of the CAA. Pursuant to Section 304(b) of the CAA, 42 U.S.C. § 7604(b), Plaintiff, on August 22, 2022, mailed a notice of intent to file suit under the CAA ("Aug. CAA Notice") to Defendants, the Administrator of the EPA, the Regional Administrator of the EPA, the TDEC, and the United States Attorney General (See Exhibit E, attached to this Second Supplemental Complaint and incorporated by reference herein). This Notice complied with the pre-suit notice requirements of 42 U.S.C. § 7604(b) and 40 C.F.R. Part 54. The violations identified in the notice letter have been repeated numerous times. More than 60 days have passed since the Aug. CAA Notice was served on Defendants and these agencies.

21.     Pursuant to Section 304(b) of the CAA, 42 U.S.C. § 7604(b), Plaintiff, on January 15, 2024, mailed a Supplemental Notice of Intent to file suit under the CAA ("Jan. CAA Notice") to Defendants, the Administrator of the EPA, the Regional Administrator of the EPA, the TDEC, and the United States Attorney General (See Exhibit F, attached to this Second Supplemental Complaint and incorporated by reference herein). This Notice complied with the pre-suit notice requirements of 42 U.S.C. § 7604(b) and 40 C.F.R. Part 54. The violations identified in the notice

8

letter have been repeated numerous times. More than 60 days have passed since the Jan. CAA Notice was served on Defendants and these agencies.

22.    Pursuant to Section 304(b) of the CAA, 42 U.S.C. § 7604(b), Plaintiff, on September 15, 2025, mailed a Third Notice of Intent to file suit under the CAA ("Sept. CAA Notice") to Defendants, the Administrator of the EPA, the Regional Administrator of the EPA, the TDEC, and the United States Attorney General (See Exhibit G, attached to this Second Supplemental Complaint and incorporated by reference herein). This Notice complied with the pre-suit notice requirements of 42 U.S.C. § 7604(b) and 40 C.F.R. Part 54. The violations identified in the notice letter have been repeated numerous times. More than 60 days have passed since the Sept. CAA Notice was served on Defendants and these agencies.

23.    Neither the Administrator of the EPA, nor the State of Tennessee, has commenced or is diligently prosecuting a civil action in a court of the United States or State with respect to the CAA violations alleged in this action.

24.    Plaintiff will, immediately upon receipt of a file-stamped copy of this Second Supplemental Complaint, mail a copy to the Administrator of the EPA, the Regional Administrator of the EPA, and the Attorney General of the United States.

25.    Venue is appropriate in the Middle District of Tennessee, pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations of the CWA alleged herein are located within this judicial district.

26.    Venue is appropriate in the Middle District of Tennessee, pursuant to Section 304(c) of the CAA, 42 USCA § 7604(c), because the source of the violations of the CAA alleged herein is located within this judicial district.

9

27. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because all the events and omissions alleged giving rise to the claims herein occurred in this District, the contract at issue was entered into and breached in this District, and the City is a citizen of this District.

**PARTIES**

28. Plaintiff City of Murfreesboro is a municipal corporation located within Rutherford County and properly organized under the laws of Tennessee. Plaintiff owns and maintains property used by the public, including citizens of the City, and property used by the City for the benefit of the public. This property includes the public streets, sidewalks, and rights-of-way, as well as schools, and recreational facilities, including the park, swimming areas, and boat ramp at the Walter Hill Recreation Area. The City's property also includes infrastructure, including a drinking water treatment plant and distribution system, and a wastewater treatment plant and sewer system. The Walter Hill Recreational Area is located at the northwest corner of the MPL and is within a few hundred yards of the landfill operations. MPL releases noxious odorous gases that linger at the recreation area. MPL also discharges toxic landfill leachate directly into the East Fork Stones River across from the boat ramp used by the public to access the river. The City operates a drinking water treatment plant south of the landfill and across the East Fork Stones River, which utilizes an intake pipe at that location for potable water drawn from the river. Approximately 1.2 miles upstream the City recently discovered a location where MPL is continuously discharging toxic landfill leachate through groundwater into the river. The releases of noxious odorous gases and the discharges of toxic landfill leachate directly, substantially, and unreasonably interfere with the City's use and enjoyment of property as well as interfere with rights common to the public.

29. Plaintiff is a "citizen" within the meaning of 33 U.S.C. §§ 1365(a) and 1365(g).

30. Plaintiff is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

10

31. Defendant BFI Waste Systems of Tennessee, LLC, is a for-profit limited liability company organized under the laws of the state of Delaware doing business in Tennessee with its principal office in Phoenix, Arizona.

32. Defendant Republic Services of Tennessee, LLC, is a for-profit limited liability company organized under the laws of the state of Delaware doing business in Tennessee with its principal office in Phoenix, Arizona.

33. Defendant Republic Services, Inc. is a corporation registered in Delaware doing business in Tennessee with corporate headquarters in Phoenix, Arizona. Defendant controls wholly-owned subsidiaries in Tennessee, including Defendants BFI Waste Systems of Tennessee, LLC, and Republic Services of Tennessee, LLC.

34. Defendants and their engineers and consultants have exclusive control over the design, installation, and operation of the infrastructure of this landfill, including the gas collection, management and extraction system, and the leachate collection and removal systems. Further, defendants and their agents have exclusive control over the monitoring systems for identifying off site gas migration and/or unpermitted discharges of leachate off-site to surface or groundwater.

35. Defendants are "person[s]" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

36. Defendants are "person[s]" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

## FACTUAL ALLEGATIONS

**Middle Point Landfill Location and General History.**

37. Middle Point Landfill is located on East Jefferson Pike in Rutherford County, Tennessee. It was first permitted in 1988 as a municipal solid waste landfill ("MSWL" or "MSW landfill"). At the time, it was named "Jefferson Pike Landfill." Shortly thereafter, the permit was

11

transferred to BFI and the site was renamed Middle Point Landfill. Originally, the permit authorized landfilling on 130 acres within a larger 200-acre parcel.

38. The landfill has expanded to 207 acres of fill space located inside a total 803-acre parcel with support facilities.



Figure 1: MPL Location

39. MPL is bounded to the north by East Jefferson Pike (See Figure 1, above). The western and southern boundaries are generally the East Fork Stones River. The river flows around the lower portion of the landfill, west and then north to Walter Hill Dam. MPL is bounded to the east by Landfill Road. BFI owns approximately 350 acres immediately to the east of Landfill Road, which is undeveloped and comprised of wetlands, streams, ponds, and an area referred to as "Matthews Lake." Directly south of the "Matthews Lake" area is the East Fork Stones River.

Defendants generally use the undeveloped acreage for cover soil and stormwater drainage from the landfill.

40.     MPL designed a system by which stormwater from approximately one-third of the landfill surface discharges east to the Matthews Lake area, to an "Outfall 3" at Matthews Lake. The stormwater discharge path comes off the east facing watershed on the landfill into perimeter ditches near and along Landfill Road under Landfill Road via a box culvert and along a "preferential pathway" into various surface ponds and Matthews Lake itself.  The "preferential pathway" is a term used on the engineering plans by MPL agents depicting this pathway.   Over the years, stormwater and leachate from surface break outs and sump overflows have discharged repeatedly along the "preferential pathway" created by defendants flowing east to the acreage around and including Matthews Lake, all of which drains south to East Fork Stones River.

41.     The Matthews Lake area drains south into the river approximately 1.2 miles upstream from the City's drinking water treatment intake pipe.  The City's water treatment facility is located on Sam Jared Road south of the landfill and across the river.

42.     As of July 17, 2025, MPL is within Murfreesboro's city limits. The City's Walter Hill Recreation Area is approximately 250 feet from MPL. Figure 2, below, an embedded screenshot from the City's GIS system, generally depicts the City limits in yellow and shows icons for City facilities, such as the Murfreesboro's drinking water plant and schools. The location of the Walter Hill Recreation Area is also identified.



Figure 2: City Boundaries and Properties in Relation to MPL

43.     Defendants built a tank farm on the west side of MPL next to the river. The tank farm includes treatment infrastructure for gas and leachate. These facilities are located approximately 1,200 feet from the Walter Hill Recreation Area.

44.     At the tank farm, leachate collected from a pipe system under the landfill is pre-treated and discharged to the City of Murfreesboro sewer system. In 1995, the City entered into a contract with Defendants (via their predecessor entity) to accept and treat leachate from MPL as an industrial discharger. In exchange, Defendants agreed to accept municipal solid waste generated within and collected by the City without charge. The relevant obligations of the contract are further described in Paragraphs 127-138 below.

45.     Another system at the tank farm handles landfill gas. Two enclosed flare stacks operate continuously, ostensibly to combust and destroy at each flare approximately 5,000 cubic feet per minute of landfill gas. The gas is collected from a complex network of vertical and

horizontal underground pipes constructed throughout the landfill.  Defendants claim the flares are fully compliant with all regulations and "destroy" the gas, thus removing it as a risk to the community.

46.     Stormwater runoff is generated from rain and snowmelt that flow over land and/or impervious surfaces and do not soak into the ground. To manage stormwater, Defendants generally divided the landfill into three basic watersheds with sediment ponds intended to reduce discharge of mud and sediment into the East Fork Stones River.  Sediment Pond 2 in the northwest corner utilizes a designated outfall area on the river to discharge treated stormwater.  Pond 3 on the east side drains to a culvert under Landfill Road toward the Matthews Lake acreage.

47.     The outfall for Sediment Pond 2 is referred to as "Outfall 2."  Outfall 2 is located directly across the river from the boat ramp and Walter Hill Recreation Area managed by the City.

48.     Defendants do not have a permit to discharge leachate into the river through Outfall 2 or any other location. Leachate discharges to groundwater and a surface stream or river are illegal discharges not covered or authorized by either a solid waste or stormwater permit.  Leachate must be collected in the leachate collection system and pretreated before being discharged to the City's sewer system in accordance with an Industrial User Discharge Permit issued by the City.

**Leachate Discharges to East Fork Stones River and Walter Hill Recreation Area.**

49.     In the spring of 2022, the City sampled two locations along the river for leachate from the landfill.  One location discharged directly to the river on the northwest side of MPL at or next to Outfall 2 across from the Walter Hill boat ramp (hereinafter "NW/Outfall2"). It appears on various maps, aerial views and on the ground as a discharge point downstream of and connected to several ponds on MPL property on the northwest quadrant of the landfill, including Sediment Pond 2.  The other location discharged leachate directly into the river through groundwater from

a contaminated spring at a point southeast of MPL and along a drainage path south out of the Matthews Lake area (the contaminated spring discharge is hereinafter referred to as "SE/GW"). (See Exhibit A). For several years on the eastern side of MPL, Defendants designed and utilized a "preferential pathway" for surface drainage coming off tens of landfill acres, particularly around the Cell 10 area, to flow into perimeter ditches and collect and discharge east under Landfill Road into the Matthews Lake area. This area at Matthews Lake includes "Outfall 3," and all of the area is off the permitted waste footprint but within the 350-acre parcel under the exclusive control of Defendants. Over the years, the Matthews Lake area repeatedly received and continues to receive runoff from MPL including discharges of leachate that have broken out at the surface and from overflowing sumps or other sources. The Matthews Lake is upgradient of the SE/GW location.

50. The discharge from SE/GW enters the East Fork Stones River approximately 1.2 miles upstream of the City's drinking water intake pipe.

51. Lab results from samples at both locations, NW/Outfall2 and SE/GW, show characteristics of landfill leachate, including a close match in typical leachate chloride constituents even though the locations appear to be geographically disconnected and well over a mile away from one another, at opposite corners of the landfill site. Both sample results showed exceptionally high levels of toxic per- and polyfluoroalkyl substances ("PFAS"), which are well-known constituents of landfill leachate and not likely present at such levels in surface water or groundwater. Both samples demonstrate heavy leachate contamination from Middle Point Landfill. (See Exhibit A).

52. A second set of samples was taken at the same two locations over a month after the first set. Again, the results showed that NW/Outfall 2 and SE/GW locations were contaminated with leachate, including high levels of toxic PFAS. (See Exhibit A).

53.     The City has recently identified low levels of PFAS in its finished drinking water after treatment at its drinking water treatment plant approximately 1.2 miles downstream of the SE/GW location.  The City is performing confirmatory sampling and is evaluating treatment options for removing PFAS to non-detect levels.

54.     In September and October of 2022, the City confirmed that the surface discharge from NW/Outfall2 remained connected to contaminated surface flow coming from MPL ponds into the river and during low flow, near drought conditions when there had been virtually no rain or stormwater flow for weeks.

55.     In September and October of 2022, the City found and confirmed a second contaminated spring geographically distant from the first one, SE/GW. The second contaminated spring is commonly referred to as "Bubba Spring." It is located on the bank of an unnamed tributary to the river near Outfall 2 and flows directly into the river. Bubba Spring was identified years ago by MPL engineers in landfill expansion plans as a downgradient monitoring location for groundwater contamination from MPL.  In other words, MPL engineers themselves had identified this location as a canary in the coal mine for groundwater contamination from MPL based on their own assessment of at least one path of groundwater flow from MPL.

56.     Results of lab sampling from Bubba Spring confirmed a profile of chlorides and contaminants similar to the profile of the other contaminated spring, SE/GW, and consistent with the composition of leachate.  Results also showed unusually high levels of PFAS. For example, the July levels of PFOA in the first spring at SW/GW were 280 ppt, whereas the October results of Bubba Spring were 730 ppt. (See Exhibit B).

57.     The City has continued sampling at or near the MPL Outfall 2 and the aforementioned springs since October 2022, including samples taken in December 2002,

17

September 2023, October 2023, December 2024, and June 2025. The September 2023 samples were taken during an onsite sampling event on the MPL property and included samples of an underdrain flowing under the landfill and springs on the northwest side both directed to Outfall 2. All of these samples contained high levels of PFAS. The onsite sampling also included groundwater monitoring wells showing PFAS contamination in shallow groundwater on the western side of the landfill. Details about these sampling results can be found in Exhibit C and D.

58. The results of Plaintiff's sampling to date confirm that MPL is discharging leachate with many contaminants, including toxic PFAS chemicals, from its landfill to surface waters and to discrete groundwater discharges that are geographically distant but have similar chemical fingerprints.

**PFAS Contaminants in Water.**

59. PFAS are a large group of manufactured chemicals that do not occur naturally in the environment. The stable carbon-fluorine bonds that make PFAS such pervasive industrial and consumer products also result in their persistence in the environment. PFAS do not readily biodegrade, and there is no known environmental breakdown mechanism for many of these chemicals. As a result, some PFAS remain in the environment indefinitely. PFAS are readily absorbed by animals, including humans, and tend to bioaccumulate with repeated exposure. PFAS are also highly mobile and water soluble; they leach from soil to groundwater, making groundwater and surface water particularly vulnerable to contamination. A major source of human exposure to PFAS is through ingestion of contaminated drinking water.

60. Perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS") are the most studied PFAS, and, while they have been largely phased out by industry, they are persistent and remain in landfills and the environment, in general, for a long time.

61. Landfill companies, such as Defendants, have long known that leachate at MSWLs is contaminated with some level of PFAS.

62. When humans ingest PFAS, the chemicals bind to plasma proteins in the blood and are readily absorbed by and distributed throughout the body, where they resist biotransformation and have long half-lives in the body.

63. Research indicates that exposure to PFAS is associated with a variety of adverse health outcomes, including cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. On March 14, 2023, EPA found that PFOA and PFOS are highly toxic, classified as likely carcinogens in humans.

64. On April 10, 2024, EPA promulgated drinking water standards (Maximum Contaminant Levels or MCLs) for these compounds at 4 parts per trillion ("ppt") (also nanograms per liter), which is essentially the reliable quantitation limit of these compounds in drinking water. EPA's Maximum Contaminant Level Goals for PFOA and PFOS are zero, because these compounds are considered likely human carcinogens. As a result, public drinking water systems, such as that owned and operated by the City, will have to routinely test for PFAS in their drinking water and meet the MCL limits.

**Noxious Odorous Gases Released into the Community from the Landfill.**

65. For years, there have been widespread complaints in the community about noxious gases and odors from MPL. These complaints markedly increased over the last few years.  In June and July of 2021, Defendants claimed that odor complaints were declining and would "soon to be a thing of the past." At the time, Defendants assured officials and the public they were about to "complete" a 5-year strategic plan developed in 2018 to address gas, odor, and leachate problems.

19

66. On September 20, 2021, the City opened an online complaint portal for odors from the landfill. The purpose was to gain credible and timely information about whether odor complaints were declining as Defendants had claimed. Over the next twelve weeks, the City received approximately 836 detailed odor complaints. By February 2022, the complaints were ongoing and passing 1,000. By September 2022, complaints had passed 2,300. As of October 2025, the City had received 4,000 complaints.

67. Citizen complaints detail harsh odors from gases invading homes, yards, the car while driving, and causing headaches. Many detail that the odors made it impossible to open windows or enjoy their homes and property. Many note the wind direction consistent at the time with odors coming from the landfill. About a third note a physical effect and concerns for their health. Many describe physical effects such as being awakened in night by the harsh odors, and the onset of headaches, nausea, and burning eyes and noses. One citizen noted being "so sick of this problem" and had "reported it to Middle Point directly for 1.5 years to no avail" and characterized it as a "constant disruption." The odor problem has been and is occurring in many parts of the City—at private residences, schools, businesses, churches, and recreation areas, including the Walter Hill Recreation Area managed by the City.

68. Previously, Defendants had blamed the City's sewer collection system as the cause of widespread odor complaints. Without any basis, State regulatory officials at the Tennessee Department of Environment and Conservation ("TDEC") had also blamed the City and its sewer and wastewater treatment facilities which are located roughly 3.5 miles from the landfill. As a result of these allegations, the City instituted a monitoring program at its own expense to determine whether City facilities could be the source of the odors.

20

69. In addition to the monitoring program, in February 2022, the City conducted an environmental assessment of odorous gases in the area with an outside consultant from Texas.

70. The consultant tracked and assessed odors in the area of the landfill for four days. He tracked detectable odors at ground-level and in real-time from residences located in and adjacent to the City limits and included directly investigating sewer vents in the area as a possible source.

71. During this assessment, strong odors were tracked in real time from MPL at Landfill Road, near Cell 10 (on the east side of the landfill), to residential areas nearby. The odors plainly originated, strongly, at the landfill. The City sewer vents near residences south of the landfill were ruled out as a source of odors. Figure 3 is a screen shot of the location where odors were tracked on Landfill Road.



Figure 3: Location of Odors at MPL on Landfill Road

72.     Repeatedly, the City's outside consultant identified not only a sour/rotting trash odor near the open working face of the landfill but also a different, harsh chemical odor typical of leachate. This odor was identified at various days, times, and locations along Landfill Road near Cell 10. Among other things, he observed a strong odor consistent along Landfill Road where surface breakouts of leachate was visible and/or gases were detected, along with eroded slopes and unattended construction/maintenance areas.

73.     The consultant also utilized a forward-looking infrared ("FLIR") camera. The FLIR camera detects gases including sulfur dioxide, methane, and nitrous oxide. Sulfur dioxide gas has a foul odor and is dangerous to humans. At MPL, the camera revealed massive plumes of gas, not otherwise visible to the human eye, repeatedly lofting from the top of both enclosed flares at the tank farm on the west side of the landfill. Defendants have long claimed the enclosed flares "destroy" the landfill gas collected at the tank farm from the extraction systems. Despite this claim, massive, uncombusted gas plumes were visible at both enclosed flares from multiple off-site vantage points over multiple days and times.

74.     Defendants dismissed the FLIR footage as showing nothing more than trace amounts.

75.     Subsequent initial air cannister sampling at locations with significant odors, including along Landfill Road and locations off-site, confirmed the presence of landfill gas chemicals, including, but not limited to, aldehydes, ketones, alcohols, and reduced sulfur compounds, all of which are odorous gases. Samples also confirmed known carcinogenic chemicals, such as benzene, and a likely human carcinogen, methylene chloride. A sample taken at the Walter Hill Recreation Area confirmed, among other things, propene, hydrogen sulfide, acetone, 2-Butanone (also known as MEK), all consistent with landfill gas, and similar to the

22

sample results taken at other locations surrounding MPL, off-site with odors, and downwind of the landfill operations.

76. Months earlier in July of 2021, the EPA had also observed emissions at the tank farm indicating operational problems. With Defendants' officials present, the EPA also used a type of FLIR camera at the MPL tank farm and documented a "long trail-off of significant amount of unburned hydrocarbon plumes from both flares." The EPA questioned whether the gas flow rates exceeded flare capacity, and noted the same condition was not seen at other landfills. Another trail of gas emissions was detected coming from the hatches of leachate tanks, also at the tank farm. The visible gases include, among other things, methane that has no odor, and sulfur dioxide, which is odorous.

77. Plaintiff is informed and believes that the gas flow captured at the tank farm exceeds the capacity of the two flares and/or that the enclosed flares have been inadequately designed, maintained, and operated to "destroy" the gas before it escapes to the community. In addition, Plaintiff alleges the overall gas collection and control system is and has been inadequate, poorly maintained, and otherwise failing their intended purpose, i.e., the capture and transmission of landfill gases for destruction at the tank farm.

78. As described further herein, there have been numerous occurrences of leachate outbreaks on the surface of the landfill, numerous occurrences of inadequate cover of garbage disposed of in the landfill, and numerous occurrences of erosion of the landfill cover, all of which result in noxious odorous gases being released from MPL.

79. On June 19, 2022, a portion of the MPL caught fire and burned for several hours in the area of inadequately covered waste piles. After months of leaving acres of waste visibly and inadequately uncovered for months at a time, a surface fire erupted. As a result, the State revoked

23

permission for MPL to use "alternative" daily cover instead of topsoil. In the following months, odor complaints to the City's complaint portal continued despite the increased efforts of MPL to cover trash, further indicating that the underground system for collecting and destroying landfill gas is inadequate and/or failing, significantly contributing to the noxious odorous gas emissions off the MPL site.

80. Since the First Supplemental Complaint, the City has learned that MPL has continued to emit excessive levels of landfill gas, including methane, from the surface of the landfill, with methane levels in 2022 and 2023 exceeding 400,000 ppm (limit is 500 ppm). Levels exceeded 24,000 ppm in 2024 and 18,000 ppm in 2025. Furthermore, for 47 specific locations that were rechecked, the surface emissions exceeded 500 ppm more than three times during a quarter. Other locations showed exceedances of 500 ppm methane for consecutive quarters. Methane is the regulatory indicator for surface emissions of landfill gas, but landfill gas contains other constituents, including toxic volatile organic compounds, such as the carcinogen benzene, and highly odorous compounds, such as hydrogen sulfide and methyl mercaptan.

81. The City has received numerous documents in discovery with non-public data and information about the failure of MPL to operate and maintain the landfill and the gas collection and control system in a manner consistent with good air pollution control practices for minimizing emissions. These include: excessive numbers of positive pressure gas wells, meaning that they were not under vacuum and collecting landfill gas as required; a report of hydrogen sulfide emissions from the surface of the landfill far above the odor threshold that, according to Defendants' consultant, "indicate that additional measures are needed to control the fugitive emissions in the monitored areas;" hundreds of times when gas wells exceeded maximum temperature limits; and monthly reports showing numerous recurring malfunctions of the landfill

24

gas collection system, including obstructions in gas extraction wells and gas wells full of leachate reducing gas extraction. These monthly reports also show numerous problems with the landfill cover, including leachate outbreaks on landfill slopes, erosion of landfill cover, and multiple tears and holes in the plastic cover over part of the landfill without repairs.

82. Consultants for the City performed a partial inspection and gas sampling of the landfill on February 5-6, 2024, and documented several landfill gas collection system malfunctions. These included leaking gas wellheads and wellheads with loose or missing connections emitting high concentrations of methane. These also included erosion channels and holes in the soil cover emitting high concentrations and volumes of landfill gas and numerous tears and punctures in the plastic geomembrane covers, with significant emissions of landfill gas. Landfill gas was collected at several locations with test results indicating high levels of volatile organic compounds, including benzene. The consultants detected a distinct chemical reaction (or post-combustion) odor near the edge of the plastic geomembrane cover and discovered a hole in the ground emitting landfill gas with high hydrogen concentrations and extremely high benzene concentrations. In addition, the consultants measured surface emissions of landfill gas at various locations finding hot spots with levels of methane as high as 579,927 ppm (limit is 500 ppm).

83. Since the First Supplemental Complaint the City discovered Defendants deliberately violated the design requirement for the gas collection and control system by designing the system for significantly less than the "maximum expected gas flow rate," as required by Clean Air Act rules. Defendants deliberately miscalculated the landfill gas flow rates beginning in 2016, used the false gas flow rates for their 2018 Title V Permit application to TDEC, and continued to do so with the submission of "actual emissions" to the TDEC each year from 2017 to 2023. The consequences of this miscalculation likely resulted in a grossly inadequate collection system

collecting less than 50% of landfill gas at times. The uncollected landfill gas is emitted from the MPL as fugitive emissions, which include methane, highly odorous compounds, such as hydrogen sulfide, methyl mercaptan, ethyl mercaptan, and dimethyl sulfide, and volatile organic compounds, including carcinogens, such as benzene.

**MPL Is Not a Typical Municipal Solid Waste Landfill.**

84.    MPL is not a typical municipal solid waste landfill.  For decades, Middle Point accepted hundreds of types of industrial waste, and millions of tons of it.  Examples include resins, paint sludges, industrial sludges from coal tar to aluminum hydroxide, soils contaminated with PCBs, soils contaminated with petroleum/diesel waste, soils with low-level radioactive waste, gypsum wallboard, "off-spec" plastics, metal shavings, asbestos, and industrial absorbents.

85.    Tennessee solid waste regulations allow MSWLs to accept "special waste" that is either dangerous or difficult to manage and allows the waste generator to make its own determination of whether an industrial waste is "hazardous." By law, hazardous waste is prohibited at any MSWL.

86.    Defendants accepted one highly reactive and dangerous type of industrial waste generated from secondary aluminum smelter ("SAS") processing. Defendants accepted approximately 700,000 tons of it. SAS waste is commonly known to cause an aluminum waste reaction ("AWR") in a landfill.

87.    SAS waste is high in salts and metals, is highly corrosive, and reacts violently with water.

88.    By 2007, BFI (then owned by Allied Waste Industries) considered the SAS waste so reactive and problematic that BFI characterized it as "hazardous" to MSW landfills.  BFI and

26

Republic[2] were both aware by that time that SAS waste reacts violently with liquid (including rain or moisture) and produces an exothermic reaction with many follow-on consequences.

89.     The exothermic AWR from SAS waste cannot be stopped or cooled with water. Instead, liquids of any type drive the heat reaction, much like putting water on a grease fire. The AWR that results from SAS contact with liquids is known to produce high heat, higher than normal gas temperatures, higher volumes of landfill gas, higher than normal leachate generation, more concentrated and corrosive leachate content, higher than normal pressure adjacent to the reacting mass of waste, settlement, or damage to the liner under or adjacent to the reacting mass of waste, and "unique" or "noxious odors" that create a public nuisance. The reaction drives a complex vapor and liquid process that results in the production of more leachate than is typical at a MSWL. All of these consequences had been seen before 2007 at the Countywide Landfill in Stark County, Ohio, which was and continues to be managed by Republic Services, Inc., directly and through a subsidiary.

90.     In total, the Countywide Landfill received fewer tons of SAS waste than MPL. Nevertheless, the SAS had triggered an AWR at Countywide as early as 2001, which caused widespread community odor complaints and unusually high gas temperatures in several cells and ultimately resulted in intervention by the EPA. As early as 2005 and 2006, Republic was undertaking costly actions at Countywide including redesigning and repairing gas collection systems, monitoring increasing gas well temperatures, and installing new gas combustion flares. Moreover, by that time, Republic had stopped a practice called "leachate recirculation" because it worsened the exothermic reaction. Recirculation essentially sprays leachate back onto the waste pile which delays and avoids the expense of collecting and removing it.

---

[2] BFI was owned by Allied Waste Industries, Inc., until 2008, when Allied Waste Industries was acquired by and merged into Republic Services, Inc.

91. In 2008, Republic Services, Inc., acquired and merged with Allied Waste Industries, Inc. making Republic the new owner and manager of BFI and MPL. Republic had extensive experience managing the AWR at municipal landfills by the time it took over MPL which was already demonstrably having its own AWR problem.

92. By 2009, Defendants were aware that MPL's landfill gases contained atypical and high concentrations of hydrogen, that MPL's leachate contained high levels of ammonia, and that MPL was experiencing rising landfill gas temperatures. Moreover, Defendants had observed steam pushing up from voids burning in the fill. All of these are key indicators of the AWR process.

93. By 2009 and 2010, Defendants were aware that extraordinary and expensive steps would need to be taken if they were to manage the AWR at MPL. For example, Defendants began by prematurely capping an AWR hot spot at MPL using a geomembrane cover with its own gas system to prevent build up under the cap. Defendants also recognized the need, among other things, to expand and redesign the gas collection and control system ("GCCS"), expand leachate collection and treatment, and monitor gas temperatures (especially those rising above 160° F).

94. A dangerous consequence of the AWR is high gas temperatures above the 160° F benchmark recognized in federal regulations. The high temperatures at MPL resulted in leachate boiling up through the waste mass and gas temperatures high enough to melt or "pinch" gas extraction equipment requiring replacement with steel components. By 2020 and 2021, BFI had officially identified 34 gas wells as "AWR," meaning that these wells were tied to and indicative of the exothermic reaction. Sixty-six (66) temperature readings taken 2020 and 2021 from 14 of the 34 AWR gas wells measured above 170° F with the highest at 193.4° F. Plaintiff is informed and believes that dozens of other wells should be designated by Defendants as "AWR" due to high temperatures but, to date, they have not been.

28

95.     Another consequence of the AWR is the change of landfill gas composition. Methane decreases while other atypical landfill gases, such as carbon monoxide, hydrogen, ammonia, and acetylene, increase. The reaction can progress to a subsurface fire that burns until it is contained or the fuel supply is exhausted.

96.     The AWR may also damage the synthetic landfill liner.  The heat from the reaction desiccates the soil and/or burns through the protective liner of the landfill, allowing leachate to drain out and contaminate groundwater and/or allowing the waste to shift or drop out of the liner.

97.     MPL was originally permitted at an unusually shallow depth of approximately 15 feet to avoid shallow groundwater identified immediately below.

98.     Middle Tennessee is underlain with a "karst" geology, which is characterized by a complex maze of open conduits, channels given to dissolution, and caves with groundwater traveling at different elevations in different directions.

99.     The shallow depth of groundwater at MPL and the karst geology make the groundwater very susceptible to contamination by landfill leachate and allow contaminated groundwater to flow long distances with relatively little dilution.

100.    At all relevant times after 2008, Republic maintained a list of landfills with an AWR, or other unique problems requiring special attention. MPL was on that list.

**A History of Failing to Prevent and Manage the AWR Consequences at MPL.**

101.    By 2003, Defendants were documenting elevated gas temperatures at MPL.

102.    By 2007, Defendants were so concerned about exothermic reactions from the AWR that they stopped accepting SAS waste at their landfills. In fact, BFI went to federal court to void a contractual obligation to continue accepting SAS waste at a landfill in East Tennessee. BFI prevailed.  Defendants accepted the last loads of SAS waste at MPL in 2007.

103. By 2011, Defendants had clear evidence that MPL had an ongoing AWR. BFI documented a "hot void" that had burned an opening down into the waste pile large enough to cause concern that operations equipment would fall into the void.

104. By 2014, Defendants had created a special operating plan solely to address the AWR consequences, and to "ensure … public safety." However, in subsequent years, Defendants delayed and avoided the infrastructure and operational expenses needed to avoid the consequences of the aluminum waste reaction. As a result, since at least 2020 (if not earlier), the gas, odor, and leachate problems have outpaced the solutions.

105. By 2018, Defendants were aware that the reaction was ongoing and uncontrolled based on multiple key indicators particularly related to leachate and gas.

106. In 2018, the leachate total annual volume had increased by approximately 26% from the prior year, 2017.[3] This increase was a significant and key indicator of an expanding aluminum waste reaction and increasing costs for Defendants to manage it.

107. The following year, 2019, leachate volume increased by roughly 10 million gallons, or approximately 27%.

108. Two consecutive years of double-digit leachate volume increases, which added another 18 million gallons for BFI to pretreat as an industrial discharger to the City sewer system, was a clear indication to Defendants that AWR-related problems were getting worse, not better, and that Defendants' AWR prevention and management costs going forward would increase.

109. The inadequacy or failures of the landfill GCCS were further evident by 2020 when landfill gas was literally bursting from the landfill surface at exceedingly large amounts and

---

[3] This volume reflects the flow of leachate measured by a meter maintained by the City sewer system. It measures only the leachate discharged to the City sewer after BFI pre-treats the leachate on site at its tank farm. The actual total volume of leachate at the landfill is likely higher because leachate discharged off-site illegally or pumped out to tank trucks and driven off-site is not included in the metered gallonage.

30

Defendants tried to address the problem in a 'whack-a-mole' fashion. In 2020, methane gas leaks at the surface were 164 times higher than the allowed limit of 500 parts per million ("ppm") on two occasions: one leak on June 10, 2020, measured at 83,897 ppm, and another leak on November 18, 2020, measured at 82,407 ppm. BFI has publicly reported methane measurements only. However, other landfill and/or AWR gases would likely have been present in these leaks, including hydrogen and carbon monoxide. The gas measurements in June and November both exceeded the lower explosive limit for methane. Explosion risk from landfill gas is not regulated by TDEC and is not addressed in the MPL permits.

110. A year later in 2021, landfill gas continued bursting from the surface at different locations. Levels were repeatedly high on the ridge above Cell 10 and Landfill Road. On March 2, 2021, above Cell 10, surface leak gas was measured by BFI at 3,615 ppm methane. Two months later, on May 14, the levels were higher still at 13,669 ppm methane. Six months later, on November 10 and 11, gas levels above Cell 10 were measured at ten to nineteen times higher than the allowable limit of 500 ppm. One measurement of 9,801.0 ppm methane was taken on the ridge above Cell 10, next to Landfill Road. Another reading was 5,305 ppm, ten times over the limit and taken at the top of the landfill where it has been capped for over a decade due to the AWR. Other readings at 3,493 ppm and 1,711 ppm showed a variety of hot spots.

111. In 2022 and 2023 the landfill gas leaks significantly worsened. During the first quarter of 2022 they were as high as 191,807 ppm; during the second quarter as high as 234,547 ppm; during the third quarter as high as 404,436 ppm; during the fourth quarter as high as 50,493 ppm. For 2023, the first quarter was as high as 233,835 ppm and the second as high as 472,282 ppm. The excessive surface emissions continued in 2024 and 2025.

112. Multiple measurements of landfill gas temperatures showed levels well past 161° F. Indeed, some measurements reached or exceeded 190° F.

113. These and other factors demonstrate that BFI has done the least it could for the longest time managing the landfill, including the GCCS, leachate generation and management, and the AWR consequences, all impacting the City and the residents and businesses around MPL.

**Defendants Prioritized Profits Over Expenses Necessary to Control the AWR.**

114. MPL is operated as a profitable business, not a public service. Municipal waste landfilling businesses generally operate at a 35-50% profit margin. Threats to this profit margin are avoided or eliminated. Defendants' top priority is profit, not public health or safety.

115. For years, Defendant delayed and/or avoided the expense of landfill infrastructure and improvements that needed to be performed in a timely manner to capture and contain the gas, odors, and leachate, and to reduce consequences from the ongoing AWR. Annual profits—as well as the annual bonus of MPL's general manager—would have been diminished by the expense of adequate and preventative treatment of the AWR consequences, particularly gas, odors, and leachate. The proverbial can was kicked down the road to avoid expenses that did not create revenue, allowing Defendants to spend the least amount of money addressing the AWR for the longest period of time.

116. At the same time Defendants were delaying and avoiding these operating and capital expenses, MPL's general managers responded to public outrage about ongoing odors with promises and assurances Defendants were not prepared to keep.

117. In June 2021, MPL's General Manager, Mr. Michael Classen, assured public officials that BFI was installing the "last piece" of a "5 year" strategic plan from 2018 and was about to "complete" the gas collection system improvements in or around July 2021. He further

stated publicly he was "absolutely confident" the odors would end soon after these improvements were completed.

118. Legal counsel for Defendants, Mr. Ed Callaway doubled down on those assurances in writing to public officials in July of 2021, stating that in "recent months" Middle Point had "seen a significant decrease in the volume of off-site odor complaints" and "because of on-going enhancements, discussions of off-site odor at Middle Point will soon be a thing of the past." Additionally, and in response to public concerns of water pollution, Mr. Callaway stated flatly in July 2021 that "Middle Point does not contaminate the (East Fork) Stones River" and that "all surface flows of stormwater from permitted areas of the landfill are directed to retention basins for treatment before discharge."

119. Notably, the flurry of assurances from BFI coincided with a public regulatory approval process in which BFI applied for expansion of the MPL, and public objection was loud.

120. The City opened its complaint portal on September 20, 2021, to help City officials verify whether odor complaints would in fact diminish as Defendants had claimed.

121. By late November 2021 the City had received 836 confirmed complaints about landfill odors.

122. Seven months later, by April 2022, complaints to the City portal had passed 2,000. By September 2022 complaints had exceeded 2,300. By October 2025, 4,000 complaints had been received. This is an extraordinary number of complaints.

123. Approximately half of the complaints have come from residents within or close to the City limits. Approximately a quarter (25%) of all complaints identified an odor so strong that it caused an adverse physical reaction.

124. The alarming number and nature of noxious odorous gas complaints confirmed that Defendants had made these assurances while repeatedly failing to prevent, control, and otherwise stop noxious gases and odor from invading the community. BFI had no reason to conclude the conditions would stop after Defendants had repeatedly delayed, ignored, and/or avoided the budget expenses necessary to preemptively reduce the AWR consequences and prevent off-site odors.

125. TDEC has chosen not to regulate odorous gases as air pollutants. TDEC publicly maintains it has "no jurisdiction" over odor problems from landfills, including MPL. TDEC's policy decision leaves the public health and safety of City residents at Defendants' mercy, without a government agency responsible for addressing the very real costs that the gases and odors emanating from MPL have had on the community.

126. The City confronted Defendants with the growing number of odor complaints. They responded by denying there were odor problems and countered that these odors were merely "perceived" and influenced by "past experiences" and "social media."

**Breach of Contract with City for Acceptance of Concentrated Landfill Leachate for Treatment.**

127. In June 1995, Plaintiff entered a contract with Jefferson Pike Landfill, Inc. ("JPL") which was wholly owned by Browning-Ferris Industries of Tennessee, Inc. at the time. Although JPL has been an inactive entity since 1997, Plaintiff is informed and believes that all rights and interest under that contract are currently under the control of Defendants.

128. The subject matter of the 1995 contract is the terms by which BFI would utilize the City sewer system as an industrial discharger to discharge landfill leachate to the City wastewater treatment plant in exchange for BFI accepting the City's municipal solid waste. The City's Industrial User Discharge Permit ("IUDP") for the leachate is issued under the name of Republic

34

Services Middle Point Landfill and is signed by the General Manager of the MPL for Republic Services, Inc.

129. Unlike other industrial dischargers producing a wastewater from one industrial activity, landfilling at MPL over 27 years has created a discharge composed of leachate from hundreds of industrial wastes combined with domestic garbage. All those wastes percolate chemicals into a leachate waste stream that is heated and concentrated by the AWR in the MPL.

130. Section 10 of the contract between the City and BFI states that the term of the agreement is the life of MPL, plus the post-closure period of approximately thirty years. To date, the contract has not been amended.

131. Pursuant to Section 2(a) of the contract, BFI was allowed to connect to the City sewer subject to all City ordinances, policies, regulations, and procedures as those are amended from time to time. Pursuant to Section 2(b), the City agreed to issue and renew an Industrial User Discharge Permit ("IUDP") to BFI so long as: (1) BFI is in compliance with all City ordinances, policies and regulations and procedures; and (2) the IUDP has not been terminated pursuant to the provisions of Murfreesboro City Code Chapter 33. Pursuant to Section 2(c), in the event BFI violates any of the City ordinances, policies, regulations and procedures as identified in subparts (a) or (b), and its right to discharge leachate is interrupted as a result of such violation, the violation shall not interrupt or terminate BFI's obligations under paragraph 8 to provide disposal services to the City.

132. Pursuant to Section 5 of the contract, BFI agreed to comply with all the codes, ordinances and regulations of the City, including, but not limited to, Murfreesboro City Code 33-2.1.1, and any amendments thereto after the date of the agreement. Section 5 expressly recognizes

that the City is required to enforce its codes, ordinances, and regulations, and such good faith enforcement is not a breach of the agreement by the City.

133.    As amended, City Code 33-36(G)(5)(b) states in relevant part:

It shall be the responsibility of existing Industrial Users to file new or updated data with the Director whenever: (a) the current permit period expires, (b) Prior to a substantial change in volume or character of pollutants in their discharge including the listed or characteristic hazardous waste for which the Industrial User has submitted an initial notification under Tennessee Rule 1200-4-14-.12(10) …

134.    The Code section quoted above places the burden squarely on each industrial user to identify substantial volume and character changes in pollutants and inform the City's Water Resources Director in writing.

135.    BFI violated the City's Code and thereby breached the Sections 5 and 2(a) of the contract by failing to notify the City that years of operational decisions at MPL have resulted in a substantial change in the volume and character of leachate discharged and that the leachate contains PFAS, which are toxic chemicals that are difficult for the City's wastewater treatment plant to treat and put the City at risk of violating its own permit obligations in the future.

Volume Increase Violations.

136.    Defendants breached Sections 5 and 2(a) of the contract by failing to comply with the City ordinance Section 33-36(G)(5)(b). In 2018, Defendants were aware of an increase of approximately 26% in total leachate volume from 2017. Again in 2019, Defendants were aware of another increase of approximately 27% increase in volume from 2018.  The volume increase total over both years was approximately 18 million gallons of leachate.  The unusual and substantially high increase in leachate volume correspondingly creates an increase in pollutants. Defendants failed to inform the Director of substantial pollutant volume increases prior to 2017, prior to 2018 and prior to 2019. After two years of substantial increases, Defendants failed again to inform the

36

Director of the volume increases before the IUDP was set to expire in 2019, and before the new permit was issued on November 30, 2019.

137.    The increases were substantial and expected consequences based on Defendants' experience and knowledge of grappling with the consequences of approximately 700,000 tons of SAS waste mixed into domestic and other industrial waste.  By 2018, Republic had almost two decades of experience with the consequences of an AWR, such as increases in volume and corrosivity of leachate in a municipal landfill.  Despite this knowledge and Defendants' knowledge that the AWR is the likely cause of ongoing increases in pollutant concentration, volume and other risks, Defendants did not inform the Director of the volume increase and the reasons for it.

138.    Moreover, discharges detected by the City in 2022 at the NW/Outfall 2 indicate that over continuous months, Defendants elected, instead of discharging treated leachate into the sewer system, to route untreated leachate to stormwater ponds that continuously discharge to East Fork Stones River directly across from Walter Hill Recreation Area.

Change in Pollutant Character Violations.

139.    Defendants further breached Sections 5 and 2(a) of the contract by failing to comply with the City ordinance 33-36(G)(5)(b) by failing to inform the City's Water Resources Director of a change in the character of the pollutants being discharged in leachate.

140.    Republic is a global national corporation with extensive environmental compliance knowledge and experience.  Gross revenues for the company in 2021 were reported by Republic at approximately $13.3 billion. Republic operates approximately 198 active landfills with another 124 closed landfills in the U.S. and Puerto Rico, all of which produce leachate.  Plaintiff is informed and believes Republic has long been knowledgeable and informed about the pervasive and toxic nature of PFAS in municipal landfill leachate, and the fact that it inexorably will be

found in landfill leachate at levels that warrant regular testing.  PFAS is persistent in the environment and is not destroyed or treated by wastewater treatment processes employed by the City.

141.    Defendants failed at all times to inform the Director, as required, of the presence of toxic PFAS in the leachate discharged to the City's sewer system. Defendants either knew of or willfully failed to test for and learn of the high levels of toxic PFAS in leachate from MPL.

142.    Plaintiff learned of the high levels of PFAS in MPL leachate pumped to the City sewer system inadvertently when sampling leachate from MPL in order to compare it to samples taken at NW/Outfall 2 and SE/GW, both of which discharge to the East Fork Stones River.  PFAS levels can be a tracer for leachate contamination from a landfill.

143.    Leachate samples taken by the City on two occasions in May and June of 2022 showed extremely high levels of toxic PFAS, including levels of PFOA as high as 380,000 ppt, levels of PFOS as high as 15,000 ppt, levels of PFBS as high as 21,000 ppt, and levels of PFHxA as high as 35,000 ppt.[4] Since the First Supplemental Complaint, the City has sampled the leachate from MPL three additional times, on September 19, 2023 (PFOA 8,700 ppt, PFOS 710 ppt), on January 9, 2024 (PFOA 3,400 ppt, PFOS 99 ppt), and on June 12, 2025 (PFOA 5,300 ppt, PFOS 87 ppt). The levels of PFOA and PFOS, the two most toxic PFAS, are 15-70 times higher than those found in typical landfill leachate as reported in the publicly available literature and government reports.

144.    An obligation of good faith and fair dealing is implied in every contract. Plaintiff is informed and believes that defendant Republic has been a well-informed leader in the waste

---

[4] PFAS levels are typically analyzed for and report in the parts per trillion (ppt) range, because these very low levels are considered to be toxic in drinking water. Levels in the hundreds of thousands of ppt are only found in the most highly contaminated sites.

industry with regard to the risks of PFAS contaminants in landfill leachate and either knew of the PFAS contamination in MPL leachate or chose to avoid sampling for the chemicals before passing it to the City's sewer system. Plaintiff alleges that Defendants, individually and collectively, have breached this obligation with the knowledge of, with willful ignorance of, and/or reckless disregard to the presence of PFAS in MPL leachate and the attendant risk of that disregard to the City's property interests, public health and safety, and to the City's own obligations under its permit for wastewater effluent discharge. These extraordinarily high levels of PFAS in raw leachate to be treated under the IUDP should have been identified by Defendants and disclosed to the City, not the other way around.

Discharge of Toxic Waste Violations

145. Section 33-43 of the City's Code, entitled "Damages," states in relevant part:

> Any person discharging wastes which are toxic … shall be assessed all costs for damages reasonably resulting from such discharge, including, but not limited to, … costs of repair to City property and facilities, … reasonable attorneys' fees, trial preparation expenses, expert witness fees and court costs. The damages provided for herein shall be in addition to all other fines, penalties or fees mentioned in this article.

146. Defendants have violated this Code Section and breached Sections 5 and 2(a) of the contract by discharging wastes which are toxic into the City sewer system.

147. The extraordinarily high levels of PFAS introduced by Defendants into the City's sewer system have caused damages to the City's sewer system and wastewater treatment plant and may affect the City's ability to comply with its wastewater permit and will likely require the City to incur expenses for additional treatment or management of its wastewater and biosolids.

## CLAIMS

### COUNT ONE: COMMON LAW PUBLIC NUISANCE

148. Plaintiff incorporates by reference paragraphs 1-147 as if restated herein.

149. Plaintiff owns and maintains property used by the public, including citizens of the City of Murfreesboro, and property used by the City for the benefit of the public. This property includes the public streets, sidewalks, and rights-of-way, as well as schools, an airport, recreational facilities, including the park, swimming areas, and boat ramp at the Walter Hill Recreation Area. This property also includes infrastructure, such as a drinking water treatment plant and distribution system, and a wastewater treatment plant and sewer system.

150. Defendants have created a continuing common law public nuisance by their release of noxious odorous gases into the air from MPL. These noxious odorous gases have substantially and unreasonably interfered with and continue to substantially and unreasonably interfere with rights common to the public.

151. Defendants have created a continuing common law public nuisance by their discharge of toxic landfill leachate, including PFAS, into the groundwater and surface water, including the East Fork Stones River. These illegal discharges have substantially and unreasonably interfered with and continue to substantially and unreasonably interfere with rights common to the public.

152. Defendants have created a continuing common law public nuisance by their discharge of highly concentrated toxic landfill leachate, including PFAS, into the City's sewer system and wastewater treatment plant, which substantially and unreasonably interferes with rights common to the public.

153. Defendants have long known of these noxious odorous gases and these discharges of toxic landfill leachate yet have not taken adequate action to address them. Instead, Defendants have continued to operate and maintain the MPL in a manner producing an ongoing irreparable harm to Plaintiff and the public. As a result, Defendants should be enjoined from maintaining the nuisance and ordered to abate the nuisance.

## COUNT TWO: PRIVATE NUISANCE

154. Plaintiff incorporates paragraphs 1-147 as if restated herein.

155. Plaintiff owns and maintains property used by the public, including citizens of the City of Murfreesboro, and property used by the City for the benefit of the public. This property includes the public streets, sidewalks, and rights-of-way, as well as schools, an airport, recreational facilities, including the park, swimming areas, and boat ramp at the Walter Hill Recreation Area. This property also includes infrastructure, including a drinking water treatment plant and distribution system, and a wastewater treatment plant and sewer system.

156. Defendants have created a continuing private nuisance by their release of noxious odorous gases into the air from MPL. These noxious odorous gases have migrated to the City's properties and have substantially and unreasonably interfered with and continue to substantially and unreasonably interfere with the use and enjoyment of the City's property by the City and its employees.

157. Defendants have created a continuing private nuisance by their discharge of toxic landfill leachate, including PFAS, into the groundwater and surface water, including the East Fork Stones River. These illegal discharges and the PFAS contamination of the river have substantially and unreasonably interfered with and continue to substantially and unreasonably interfere with the use and enjoyment of the City's properties along the river by the City and its employees, including

41

Walter Hill Recreation Area, and have damaged the City's drinking water treatment plant and contaminated the City's drinking water.

158. Defendants have created a continuing private nuisance by their discharge of highly concentrated toxic landfill leachate, including PFAS, into the City's sewer system and wastewater treatment plant, which has damaged and continues to damage the City's property by contamination, and substantially and unreasonably interferes with the City's use and enjoyment of its property.

159. Section 33-43 of the City's Code, entitled "Damages," states in relevant part:

> Any person discharging wastes which are toxic … shall be assessed all costs for damages reasonably resulting from such discharge, including, but not limited to, … costs of repair to City property and facilities, … reasonable attorneys' fees, trial preparation expenses, expert witness fees and court costs. The damages provided for herein shall be in addition to all other fines, penalties or fees mentioned in this article.

160. This section reinforces the City's right to recover damages due to discharge of toxic PFAS into the City's sewer system.

161. The extraordinarily high levels of PFAS introduced by Defendants into the City's sewer system have caused damages to the City's sewer system and wastewater treatment plant and may affect the City's ability to comply with its wastewater permit and will likely require the City to incur expenses for additional treatment or management of its wastewater and biosolids.

162. Defendants have long known of these noxious odorous gases and these discharges of toxic landfill leachate yet have not taken adequate action to address them. Instead, Defendants have continued to operate and maintain the MPL in a manner producing an ongoing irreparable harm to Plaintiff. As a result, Defendants should be enjoined from maintaining the nuisance and ordered to abate the nuisance.

163. As a result of the private nuisance maintained by Defendants, Plaintiff has been caused to suffer, and will continue to suffer, loss of use and enjoyment and/or diminution of value to real property, damages to the City's property by contamination with PFAS, economic damage caused by Defendants' actions/inactions, including monitoring expenses, consultant expenses, and likely future increased expenses for wastewater treatment and drinking water treatment.

## COUNT THREE: NEGLIGENCE

164. Plaintiff incorporates by reference paragraphs 1-147 as if restated herein.

165. Defendants owed a general duty to Plaintiff under common law and statutory law to exercise due care in the operation and maintenance of the MPL to prevent release of noxious odorous gases into the surrounding community and to prevent the discharge of toxic leachate, including PFAS, into surface water and groundwater and into the City's sewer system.

166. Defendants owed a specific set of duties to Plaintiff imposed by each Defendant's respective corporate and operational obligations for MPL. Those duties directed MPL operations to contain, manage, and reduce the many consequences of the AWR that exacerbate landfill gas emissions, leachate generation, and odors, and require planning and implementation of upgrades to Defendants' own equipment and infrastructure to prevent and reduce off-site gases, odors, and leachate discharges. Many of these duties were learned and evolved from mistakes and successes at Countywide Landfill in Ohio that produced widespread, noxious and ongoing odors for the neighboring community while also producing engineering challenges for Defendant Republic.

167. Defendants negligently breached their general duties owed to Plaintiff by, among other acts and omissions, allowing emissions of noxious odorous gases from the surface of the landfill, from ineffective enclosed flares, uncovered waste, and from surface breakouts of leachate. Defendants further breached these duties by failing to properly budget for, fund, and implement

43

the maintenance, equipment, operational activities, infrastructure improvements, and advance planning necessary and appropriate to track, reduce, and stop off-site gases and odors.

168. Defendants negligently breached their general duties owed to Plaintiff by, among other acts and omissions, allowing leachate to comingle with stormwater that is discharged directly to the East Fork Stones River and by allowing leachate to contaminate groundwater discharged from the landfill to the East Fork Stones River in a manner functionally equivalent to a direct discharge. More specifically as to the eastern side of Middle Point, Defendants designed and used for several years a "preferential pathway" that directed stormwater and surface break outs of leachate, particularly around Cell 10 area, to drain to perimeter roads and travel east under Landfill Road and into the Matthews Lake area which drains south to the SE/GW discharge area. This area at Matthews Lake includes "Outfall 3" which has repeatedly received discharged stormwater and leachate from Middle Point and which is off the permitted landfill space in an area that became a back-up leachate catchment area and which is upgradient from the now contaminated SE/GW location.

169. Defendants violated their general duties by, among other acts and omissions, discharging concentrated toxic leachate containing PFAS into the City sewer system and wastewater treatment plant without adequate pretreatment knowing that the City's wastewater treatment plant does not treat or destroy PFAS.

170. Defendants violated their specific duties by, among other acts and omissions, recirculating leachate at MPL continuously after 2008, saving money and worsening the AWR, while knowing recirculation was against their policy for landfills with AWR.

171. Defendants violated their specific duties by violating the City Code, as set out above in Paragraphs 131-146, including Section 33-43 of the City's Code.

172. Defendants violated their specific duties by violating the CWA and CAA as set out in Claims Four, Five, Six, and Seven herein.

173. These statutes and ordinances were each enacted to protect a class of citizens which includes the Plaintiff. The damages to Plaintiff and its properties are of the types that are prohibited by these statutes and ordinances.

174. The violations of these statutes and ordinances constitute negligence per se on the part of the Defendants.

175. As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has been caused to suffer, and will continue to suffer loss of use and enjoyment and/or diminution of value to real property, damages to the City's properties due to PFAS contamination, economic damage, including monitoring expenses, consultant expenses, and likely future increased expenses for wastewater treatment and drinking water treatment.

176. Defendants' recurring acts and/or omissions causing noxious odorous gases to be released from the landfill and to enter the community, including property owned by the City, constitute malicious, intentional, fraudulent and/or reckless conduct. At the least, Defendants have acted in reckless disregard for the consequences of their acts and/or omissions.

177. Despite knowledge of their releases of noxious odorous gases, as alleged herein, Defendants have continued to operate the MPL without proper air pollution, landfill gas, and leachate controls sufficient to prevent these releases from entering the community and interfering with the City's property and rights common to the public.

178. Despite knowledge of the AWR and its impacts on landfill liner integrity and leachate generation, Defendants have consistently refused to take the actions necessary to prevent

45

discharges to the East Fork Stones River that are interfering with the City's property and rights common to the public.

179. Defendants' recurring acts and/or omissions causing toxic landfill leachate to be discharged from the MPL to the City's sewer system and to the East Fork Stones River constitute malicious, intentional, fraudulent and/or reckless conduct. At the least, Defendants have acted in reckless disregard for the consequences of their acts and/or omissions.

180. Despite knowledge of the presence of PFAS in landfill leachate, Defendants have continued to discharge highly contaminated leachate to the City's sewer system and have consistently refused to take the actions necessary to prevent discharges to the East Fork Stones River that are interfering with the City's property and rights common to the public.

181. As a result of Defendants' malicious, intentional, fraudulent and/or reckless conduct described herein, Defendants should be liable to Plaintiff for punitive damages, in addition to compensatory damages, in an amount to be determined by the jury.

182. Based on information and belief, Defendants authorized, ratified, or approved the acts or omissions set out in this First Supplemental Complaint with knowledge or conscious or reckless disregard that the acts or omissions may result in injury.

**COUNT FOUR: VIOLATIONS OF THE FEDERAL CLEAN WATER ACT BY DISCHARGES OF POLLUTANTS TO SURFACE WATERS WITHOUT A PERMIT**

183. Plaintiff incorporates by reference paragraphs 1-147 as if restated herein.

184. Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge is in compliance with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of the terms of, an NPDES permit

issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. Each discharge not authorized by a permit, and each violation of a permit, is a violation of the CWA.

185. The State of Tennessee has been delegated authority to implement the permitting programs of the CWA by the EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b). TDEC is the state water pollution control agency for purposes of the CWA and administers statutory and regulatory provisions implementing the CWA's permitting programs within the State of Tennessee.

186. A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for the discharge of pollutants into waters of the United States without a permit in violation of Section 301 of the CWA. 33 U.S.C. § 1365(f). There is also CWA jurisdiction where pollutants are discharged from a point source to navigable surface waters through hydrologically connected groundwater, where the discharge is the "functional equivalent" of a direct discharge to navigable waters. *County of Maui v. Hawaii Wildlife, Fund*, 140 S. Ct. 1462, 1476 (2020).

187. The East Fork Stones River is waters of the United States as that term is used in the CWA and as it has been interpreted by the federal courts.

188. Per- and polyfluoroalkyl substances ("PFAS") are "pollutants" within the meaning of the CWA. 33 U.S.C. § 1362(6).

189. Defendants are, and have been, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), due to illegal unpermitted discharges of PFAS, including, but not limited to, PFOA and PFOS, from point sources into East Fork Stones River.

190. These are illegal unpermitted discharges. The requirement for an NPDES permit authorizing discharges of PFAS arose at the time that pollutants were first being discharged into surface waters, and each day since that time is a violation of the CWA. Defendants have been in

ongoing and continuous violation of the CWA, 33 U.S.C. § 1311, by discharging PFAS into East Fork Stones River without an NPDES Permit authorizing such discharges.

Direct Discharge Through Groundwater

191. The Middle Point Landfill ("MPL") has discharged and continues to discharge landfill leachate containing pollutants, including, but not limited to, per and-polyfluoroalkyl substances ("PFAS"), high chlorides, metals, sulfates, and toluene, through point sources without a permit pursuant to 33 U.S.C. § 1342. The PFAS discharged include perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), which are highly toxic substances associated with a variety of health effects at extremely low exposure levels, including kidney and testicular cancer, immune system damage, and developmental effects. The current EPA Drinking Water Maximum Contaminant Levels (MCLs) for PFOA and PFOS are 4 parts per trillion (ppt) which are almost at the level of detection for these compounds in drinking water. The Maximum Contaminant Level Goals (MCLGs) for these two compounds are zero, because they are considered likely to cause cancer in humans. EPA has also set MCLs and MCLGs for perfluorohexanesulfonate ("PFHxS") and perfluorononanoic acid ("PFNA").

192. MPL has discharged and continues to discharge, through two springs surfacing into the East Fork Stone River, high levels of PFAS and other leachate pollutants to groundwater which has a direct and identifiable connection from MPL to the East Fork Stones River. These discharges from the MPL through groundwater to surface water are functionally equivalent to a direct discharge. The first spring discharge is located on the banks of the river at 35.925231°N, -86.356987°W, labeled as SW/GW in these filings and also called Matthews Lake Spring in the First, Second and Third Addenda to the August 10, 2022, Notice of Intent to File Citizen Suit Pursuant to the Federal Clean Water Act (attached as Exhibits B, C, and D). This discharge is

48

approximately 1.2 miles upstream of the City's drinking water intake at the Stones River Water Treatment Plant. The levels of PFAS in the spring on May 17, 2022, include 280 ppt of PFOA, 5.3 ppt of PFOS, 21 ppt of PFBS, and 220 ppt of PFHxA. On June 29, 2022, the levels of PFAS in the spring include 280 ppt of PFOA, 5.5 ppt of PFOS, 21 ppt of PFBS, and 260 ppt of PFHxA. On December 29, 2022, the PFAS levels include 360 ppt of PFOA; on October 9, 2023, 220 ppt of PFOA; on December 9, 2023, 120 ppt of PFOA; on December 30, 2024, 26 ppt of PFOA; and on June 12, 2025, 170 ppt of PFOA. These PFAS have also been found in extremely high levels in leachate discharged to the City's sewer system. Other identifiable leachate pollutants include high chlorides, metals, sulfates, and toluene.

193. The second spring discharge is located on the banks of the river at 35.941877°N, -86.374156°W, labeled as Bubba Spring in the First Supplemental Complaint and discussed in Exhibits B, C, and D. This discharge is approximately 145-150 feet south (upstream) of the Walter Hill Recreation Area boat ramp. On October 4, 2022, levels of PFAS at this site registered 730 ppt of PFOA, 18 ppt of PFOS, 15 ppt PFBS, and 90 ppt of PFHxA. On December 30, 2022, the PFAS levels included 2,100 ppt of PFOA; on September 19, 2023, 750 ppt of PFOA, 27 ppt PFOS; and on January 9, 2024, 860 ppt of PFOA and 30 ppt of PFOS. On September 20, 2023, the City's consultants took samples on the MPL property at a spring location marked by sign as "Bubba Spring" at 35.94177°N, 86.37371°W, close to the Bubba Spring sampled by the City. The results include 590 ppt of PFOA and 30 ppt of PFOS. (See Exhibit C).

194. These are illegal unpermitted discharges. The requirement for an NPDES permit authorizing discharges of PFAS arose at the time that pollutants were first being discharged into surface waters, and each day since that time is a violation of the CWA. Defendants have been in

49

continuous violation of the CWA, 33 U.S.C. § 1311, by discharging PFAS into East Fork Stones River without an NPDES Permit authorizing such discharges.

195.    Defendants should be subject to an enforcement order or injunction order to cease their discharges of PFAS into East Fork Stones River without an NPDES Permit authorizing such discharges.

196.    Defendants should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

197.    For the purpose of assessing the maximum civil penalty for which Defendants are liable, each day that Defendants have discharged pollutants without a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this First Amended Complaint.

Direct Discharge Through a Drainage Channel or Outfall.

198.    MPL has discharged and continues to discharge landfill leachate containing pollutants, including, but not limited to, PFAS, high chlorides, metals, sulfates, and toluene, through a point source without a permit pursuant to 33 U.S.C. § 1342 at or near (within 100 feet) its stormwater Outfall 2 into the East Fork Stones River located at approximately 35.94177°N, 86.37404°W on the west side of the MPL.  The discharge at or near Outfall 2 is directly across the river from the City's Walter Hill Recreation Area, where boats are launched and people, including children, swim in the river. The levels of PFAS in this channel or outfall discharging to the river on May 17, 2022, include 230 ppt of PFOA, 42 ppt of PFOS, 49 ppt PFBS, and 230 ppt of PFHxA. On June 29, 2022, the levels of PFAS in this channel or outfall include 220 ppt of PFOA, 32 ppt of PFOS, 25 ppt of PFBS, and 210 ppt of PFHxA. On October 4, 2022, the levels of PFAS in this

channel or outfall included 220 ppt of PFOA, 25 ppt of PFOA, 35 ppt of PFBS, and 240 ppt of PFHxA. On December 29, 2022, the PFAS levels included 350 ppt of PFOA and 26 ppt of PFOS; on September 19, 2023, 310 ppt of PFOA, 33 ppt of PFOS; on December 29, 2024, 550 ppt of PFOA, 54 ppt of PFOS; and on June 12, 2025, 390 ppt of PFOA, 51 ppt of PFOA. (See Exhibits A, B, C, D). On September 19, 2023, the City's consultants took a sample at a location on the MPL property identified by MPL's consultants as Outfall 2 at approximately 35.941°N, 86.373°W, and the results included 330 ppt of PFOA and 31 ppt of PFOS. (See Exhibit C). Other identifiable leachate pollutants in the samples include high chlorides, metals, sulfates, and toluene.

199.    The requirement for an NPDES permit authorizing these discharges arose at the time that the MPL first knew or should have known that it is discharging leachate pollutants containing PFAS and other pollutants into surface waters.  Each day since that time is a violation of the CWA. Because these samples were taken during normal operation of the MPL, it is likely that these discharges have continued and will continue on a regular, if not constant, basis.

200.    Defendants should be subject to an enforcement order or injunction order to cease their discharges of PFAS into the East Fork Stones River without an NPDES Permit authorizing such discharges.

201.    Defendants should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

202.    For the purpose of assessing the maximum civil penalty for which Defendants are liable, each day that Defendants have discharged pollutants without a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this First Supplemental Complaint.

**COUNT FIVE: DIRECT DISCHARGES OF LANDFILL LEACHATE AND PFAS IN VIOLATION OF THE TENNESSEE GENERAL NPDES STORMWATER PERMIT AND THE CLEAN WATER ACT.**

203. Plaintiff incorporates by reference paragraphs 1-147 as if restated herein.

204. MPL's coverage under General NPDES Stormwater Permit Number No. TNR053250 ("Permit") does not authorize discharge of landfill leachate and landfill wastewater, as defined by 40 CFR Part 445.2(f). Section 1.2.3 of the Permit prohibits the discharge of stormwater discharges associated with industrial activity that are mixed with sources of non-stormwater. MPL is covered under Sector L - Stormwater Discharges Associated With Industrial Activity From Landfills and Land Application Sites, because it has received and continues to receive industrial wastes. Paragraph 2 of Sector L prohibits non-stormwater discharges. Landfill leachate and landfill wastewater are not stormwater.

205. MPL has discharged and continues to discharge landfill leachate containing pollutants, including PFAS, high chlorides, metals, sulfates, and toluene, at or near (within 100 feet) its stormwater Outfall 2 into the East Fork Stones River on the west side of the MPL. The discharge at or near Outfall 2 is directly across the river from the City's Walter Hill Recreation Area, where boats are launched and people, including children, swim in the river. The levels of PFAS in Outfall 2 on May 17, 2022, include 230 ppt of PFOA, 42 ppt of PFOS, 49 ppt PFBS, and 230 ppt of PFHxA. On June 29, 2022, the levels of PFAS in Outfall 2 include 220 ppt of PFOA, 32 ppt of PFOS, 25 ppt of PFBS, and 210 ppt of PFHxA. On October 4, 2022, the levels of PFAS in this channel or outfall included 220 ppt of PFOA, 25 ppt of PFOA, 35 ppt of PFBS, and 240 ppt of PFHxA On December 29, 2022, the PFAS levels included 350 ppt of PFOA and 26 ppt of PFOS; on September 19, 2023, 310 ppt of PFOA, 33 ppt of PFOS; on December 29, 2024, 550 ppt of PFOA, 54 ppt of PFOS; and on June 12, 2025, 390 ppt of PFOA, 51 ppt of PFOA. (See Exhibits

52

A, B, C, D). On September 19, 2023, the City's consultants took a sample at a location on the MPL property identified by MPL's consultants as Outfall 2 at approximately 35.941°N, 86.373°W, and the results included 330 ppt of PFOA and 31 ppt of PFOS. (See Exhibit C). Other identifiable leachate pollutants in the samples include high chlorides, metals, sulfates, and toluene.

206. The landfill leachate pollutants, including PFAS, discharged at or near Outfall 2 are not authorized by the NPDES Stormwater Permit, nor has MPL ever notified TDEC that landfill leachate, including PFAS, is part of its stormwater. PFAS are not natural components of stormwater, and are, instead, components of MPL's landfill leachate and landfill wastewater, as discussed in Paragraph 219, below. On at least May 17, 2022, June 29, 2022, October 4, 2022, December 29, 2022, September 19, 2023, December 29, 2024, and June 12, 2025, MPL discharged landfill leachate and landfill wastewater containing leachate pollutants, including PFAS, in violation of its General NPDES Permit. As stated in Paragraph 205, above, on September 19, 2023, the City's consultants sampled at a point identified by MPL's consultants as Outfall 2. If it is determined that the discharge channel sampled by the City's consultants on May 17, 2022,  June 29, 2022, October 4, 2022, December 29, 2022, September 19, 2023 (City location), December 29, 2024, and June 12, 2025, is not the precise location of Stormwater Outfall 2, then these discharges are a violation of the Permit because they were not through an authorized discharge point identified by MPL in its Notice of Coverage and/or Stormwater Pollution Prevention Plan.

207. On or about January 9, 2024, the City conducted additional surface water sampling on MPL's property. During this sampling event, the City discovered a stormwater outfall ultimately discharging to the East Fork Stones River that is not authorized under MPL's NPDES permit and is not identified as a discharge in MPL's Stormwater Pollution Prevention Plan. A stormwater channel, located on the southern side of MPL, discharges to a stream located at 35.92959°N, 86.37268056°W.

This stream is not directed to a sedimentation pond and ultimately discharges to the East Fork Stones River. Levels of PFAS found in the discharge include 2,000 ppt of PFOA and 40 ppt of PFOS.

208. These discharges are continuing and will continue in the future. Each day MPL continues to discharge landfill leachate and landfill wastewater containing leachate pollutants, including PFAS, through Outfall 2, or an unauthorized channel near Outfall 2, is a violation of the General NPDES Permit and the CWA. Because these samples were taken during normal operation of the MPL, it is likely that these discharges have continued and will continue on a regular, if not constant, basis.

209. In addition, MPL violated the Permit on at least the following dates by allowing landfill leachate (non-stormwater) to mix with stormwater, as shown by Tennessee Department of Environmental Conservation, ("TDEC") inspections:

- March 17, 2020, leachate from leachate containment pond entered Stormwater Pond #3 in the Matthews Lake area from which it was discharged to the East Fork Stones River.

- January 15-19, 2021, leachate entered stormwater pond on north side and was likely discharged to East Fork Stones River.

- June 16-18, 2021, leachate outbreaks on eastern sides of the landfill outside landfill cell likely entering stormwater ponds in the Matthews Lake area.

- February 22, 2022, leachate outbreak on eastern slope of Cell 10 and likely entering stormwater pond or drainage feature in the Matthews Lake area.

These leachate discharge violations are indicative of an ongoing failure to control leachate outbreaks, which inevitably mix with stormwater when there is precipitation at the MPL. The mixture of leachate and stormwater has discharged and continues to discharge from stormwater outfalls at the MPL in violation of the Permit.

210. Defendants should be subject to an enforcement order or injunction order to cease their violations of the NPDES Permit and the CWA.

211. Defendants should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

212. For the purpose of assessing the maximum civil penalty for which Defendants are liable, each day that Defendants have violated the NPDES Permit and the CWA, constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this First Amended Complaint.

**COUNT SIX: DISCHARGE OF CONCENTRATED LANDFILL LEACHATE TO THE MURFREESBORO WASTEWATER TREATMENT PLANT IN VIOLATION OF PRETREATMENT STANDARDS AND THE CLEAN WATER ACT.**

213. Plaintiff incorporates by reference paragraphs 1-147 as if restated herein.

214. Section 307(b) through (e) of the CWA, 33 U.S.C. §§ 1317(a)-(e), establish the federal pretreatment program for regulation of discharges from industrial facilities into municipally owned wastewater treatment plants, called "publicly owned treatment works" ("POTWs"). Section 307(d) of the Act, 33 U.S.C. § 1317(d), prohibits the operation of any source of discharge of pollutants into a publicly owned treatment works in violation of, amongst other things, prohibitions on discharges.

215. EPA has adopted pretreatment standards for industrial dischargers to publicly owned treatment works at 40 C.F.R. Parts 403 through 471, including both general regulations and categorical regulations for specific industrial categories.

216. Pursuant to 33 U.S.C. § 1365(f), the violation of an effluent standard or limitation for which a citizen suit may be brought includes violations of pretreatment standards under Section

55

307 of the CWA, 33 U.S.C. § 1317, including violations of local pretreatment ordinances and regulations. See 40 C.F.R. §§ 403.5(c) and (d).

217. MPL has an Industrial User Discharge Permit (IUDP 021-A) issued by the City in 2019 for the discharge of landfill leachate into the City's Publicly Owned Treatment Works, pursuant to the City's sewer use ordinance, Section 33 of the Murfreesboro City Code ("Code").

218. Section 33-36(B)(1)(e) of the Code prohibits the discharge of waters or wastes having toxic, poisonous or incompatible pollutants in such quantities as to constitute a hazard to humans or animals without obtaining authorization from the City. Section 33-36(G)(5)(b) of the Code and Part 3.C. of the IUDP requires MPL to notify the City of a substantial change in the volume or character of pollutants in the MPL discharge.

219. MPL has been discharging and continues to discharge extremely high levels of toxic PFAS to the Murfreesboro POTW. On May 24, 2022, and June 29, 2022, leachate samples taken by the City showed levels of PFOA as high as 380,000 ppt; levels of PFOS as high as 15,000 ppt; levels of PFBS as high as 21,000 ppt; and levels of PFHxA as high as 35,000 ppt. (See Exhibit A). Since the First Supplemental Complaint, the City has sampled the leachate from MPL three additional times, on September 19, 2023 (PFOA 8,700 ppt, PFOS 710 ppt), on January 9, 2024 (PFOA 3,400 ppt, PFOS 99 ppt), and on June 12, 2025 (PFOA 5,300 ppt, PFOS 87 ppt). (See Exhibits C and D). These levels of PFOA and PFOS are 15-70 times higher than those found in typical landfill leachate as reported in the publicly available literature and government reports. These levels constitute a hazard to humans and animals.

220. MPL, and the landfill industry, have known for at least 10 years that landfill leachate typically contains PFAS and that conventional POTWs, such as the one operated by the City, cannot destroy or remove PFAS. However, MPL has never obtained authorization from the

56

City to discharge these toxic, persistent, and incompatible pollutants in its leachate, in violation of Sections 33-36(B)(1)(e) of the Code. Nor has MPL notified the City of this substantial change in the character of pollutants in its discharge, as compared to information submitted to the City, in violation of Section 33-36(G)(5)(b) of the Code and Part 3.C. of the IUDP. It is unlikely that the composition has changed substantially since June 29, 2022; therefore, the violations have continued and will continue in the future as long as the PFAS discharges continue without the City's authorization.

221. Defendants should be subject to an enforcement order or injunction ordering Defendants to cease their violations of pretreatment requirements and standards.

222. Defendants should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

223. For the purpose of assessing the maximum civil penalty for which Defendants are liable, each instance of Defendants' violation of pretreatment requirements and standards constitutes a separate violation of Section 307(d) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this First Amended Complaint.

### COUNT SEVEN: VIOLATIONS OF THE FEDERAL CLEAN AIR ACT

224. Plaintiff incorporates by reference paragraphs 1-147 as if restated herein.

225. At the time of the First Supplemental Complaint, the Middle Point Landfill ("MPL") was covered by Operating Permit No. 574840 ("2020 Operating Permit"), issued on January 30, 2020, by the TDEC Air Pollution Control Division under the Tennessee Air Quality Act and the CAA. Since the First Supplemental Complaint, the permit has been renewed, and MPL is now covered by Operating Permit No. 582631 ("2025 Operating Permit"), issued on September

8, 2025. MPL is required to comply with the conditions of the applicable permit, as well as applicable provisions of the Tennessee Air Quality Act, Tenn. Code Ann. §§ 68-201-101, *et seq.*, and rules promulgated thereunder ("Tennessee Air Pollution Control Rules" or "TAPCR"), applicable provisions of regulations promulgated by the United States Environmental Protection Agency, and applicable provisions of the CAA. All of the foregoing are "emissions standards and limitations," as those terms are used in 42 U.S.C. § 7604(a)(1).

226. Under the CAA, EPA promulgated the New Source Performance Standards for New Stationary Sources ("NSPS"), including General Standards at 40 C.F.R. § 60.11 and Part WWW Standards of Performance for Municipal Solid Waste Landfills; National Emission Standards for Hazardous Air Pollutants (NESHAP), including the NESHAP General Provisions at 40 C.F.R. Part 63, Subpart A; the NESHAP for MSW Landfills at 40 C.F.R. Part 63, Subpart AAAA; and 40 C.F.R. Part 62, Subpart OOO, Federal Plan Requirements for Municipal Solid Waste Landfills. During the times relevant to this Second Supplemental Complaint, MPL has been subject to these requirements.

227. The NESHAP General Provisions, at 40 C.F.R. § 63.6(e)(l)(i), require that, "at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility, including associated air pollution control equipment, in a manner consistent with good air pollution control practices for minimizing emissions," which is determined by information that may include monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source. Prior to 2021, the NESHAP for MSW Landfills at 40 C.F.R. § 63.1995(a)(1) required the owner or operator of an MSW Landfill to comply with the requirements of the NSPS for MSW Landfills at

40 C.F.R. Part 60, Subpart WWW, which includes 40 C.F.R. § 60.11(d), which has the same language as 40 C.F.R. § 63.6(e)(l)(i).

228.    Defendants have violated 40 C.F.R. § 63.6(e)(l)(i) by failing to operate its gas collection and control system ("GCCS") in a manner consistent with good air pollution control practices, by poorly managing leachate, and failing to consistently cover exposed waste on at least the following dates:

(a) All days from June 1, 2021, to present, and ongoing. Noxious gases emitting in plumes from two (2) enclosed flares failing to destroy 98% of gas flows. Gas cloud emissions from the flares documented with forward-looking infrared cameras on June 21, 2021, by EPA, and again on February 11, 12, and 13, 2022, by City of Murfreesboro. (See Exhibit E).

(b) March 27, 2019 – Surface leachate outbreaks at the surface at two locations in Section 6, as documented by the Tennessee Department of Environment and Conservation ("TDEC") report dated March 28, 2019. (See Exhibit E).

(c) October 23 through November 27, 2019 – Surface leachate outbreaks, pooling and flowing into stormwater ditches, and off-site. Surface outbreaks of leachate found in October were rechecked on November 26 and found unabated, flowing into stormwater ditches at three (3) locations. Alarm light for leachate sump/pump near Cell 10 was on but pump turned off with leachate levels exceeding compliance levels by 144 inches. These violations were documented by the TDEC reports dated October 28 and December 1, 2019.  (See Exhibit E).

(d) January 31, 2020 – Pools of spilled leachate at the landfill tank farm, and leachate filled concrete containment around tanks, found in response to citizen complaints

59

of odor, as documented by the TDEC report dated February 7, 2020. (See Exhibit E).

(e) February 25, 2020 – Surface leachate outbreaks filling perimeter ditches, breaking onto perimeter roads at Cell 13 and 10 necessitating vacuum truck assistance, all not reported to State, as documented by the TDEC report dated February 28, 2020. Site inspections prompted in part by off-site odor complaints, including on February 24, 2020. (See Exhibit E).

(f) March 17, 2020 – Surface leachate outbreaks flowing across perimeter roads off the fill site from a berm around "temporary sump 6" constructed to contain an onsite leachate pond, as documented by the TDEC report dated March 19, 2020. (See Exhibit E).

(g) June 16, 2021 – Surface leachate outbreaks on eastern slope near Cell 10 adjacent to Landfill Road flowing into ditches and off-site, in the Matthews Lake area, as documented by the TDEC report dated June 21, 2021. (See Exhibit E).

(h) From 2018 to 2025, by emitting excessive levels of landfill gas, including methane, from the surface of the landfill, with methane levels in 2018 as high as 60,000 ppm, in 2019 as high as 22,017 ppm, in 2020 as high as 83,897 ppm, in 2021 as high as 13,669 ppm, in 2022 as high as 404,436 ppm, in 2023 as high as 472,282 ppm, in 2024 as high as 76,795 ppm, and in 2025 as high as 18,776 ppm (limit is 500 ppm). (See Exhibits F and G).

(i) From January 2019 to June 2025, excessive numbers of positive pressure gas wells. (See Exhibits F and G).

(j) May 2019, hydrogen sulfide emissions from the surface of the landfill far above the odor threshold that, according to Defendants' consultant, "indicate that additional measures are needed to control the fugitive emissions in the monitored areas;" hundreds of times when gas wells exceeded maximum temperature limits. (See Exhibit F).

(k) From March 2019 to June 2023 numerous recurring malfunctions of the landfill gas collection system as shown in monthly reports from MPL's consultants, including obstructions in gas extraction wells and gas wells full of leachate reducing gas extraction. (See Exhibit F).

(l) February 5-6, 2024, several landfill gas collection system malfunctions were documented by the City's consultants in their inspection and sampling on the MPL. These included leaking gas wellheads and wellheads with loose or missing connections emitting high concentrations of methane. These also included erosion channels and holes in the soil cover emitting high concentrations and volumes of landfill gas and numerous tears and punctures in the plastic geomembrane covers, with significant emissions of landfill gas. In addition, the consultants measured surface emissions of landfill gas at various locations finding hot spots with levels of methane as high as 579,927 ppm (limit is 500 ppm). (See Exhibit G).

229.    Condition E4-7(b)(v) of the 2020 Operating Permit states, "[f]or any location where monitored methane concentration equals or exceeds 500 parts per million above background three times within a quarterly period, a new well or other collection device shall be installed within 120 calendar days of the initial exceedance." (See 40 C.F.R. §§ 60.755(d)(v), 63.1960(c)(4)(v), 62.1670(c)(4)(v)). From May 2018 to July 2023, there were 47 specific locations that were

rechecked where the surface emissions exceeded 500 ppm more than three times during a quarter. Other locations showed exceedances of 500 ppm methane for consecutive quarters. From January 2024 to June 2025, there were numerous exceedances at the same locations over consecutive quarters. (See Exhibits F and G). For these quarterly and multi-quarter exceedances, there was no indication new wells or other collection devices were installed to reduce the surface emissions.

230. Condition E4-3. of the 2020 Operating requires the permittee to operate each interior wellhead in the collection system with … a landfill gas temperature less than 55° C (131° F). During the period January 2018 to June 2025, MPL violated this requirement hundreds of times. (See Exhibits F and G). Upon information and belief, MPL failed to correct the temperature exceedances within 15 calendar days and failed to expand the gas collection system as required in 40 C.F.R. § 60.755(a)(5). As a result, MPL committed repeated violations of the above-cited Title V and NSR Permit Conditions and applicable federal regulations, 40 C.F.R. §§ 60.753(c), (g) and § 60.755(a)(5).

231. Paragraph E4-18 of the 2020 Operating Permit requires the GCCS to meet the design requirements of 40 CFR §60.752(b)(2)(ii), including the maximum expected gas flow rate design requirement. 40 C.F.R. § 60.755(a)(1) specifies the manner in which LFG flow rate must be calculated by providing an equation and requiring it to be used where, as with MPL, the landfill is still accepting solid waste and the year-to-year solid waste acceptance rate is known. Defendants deliberately violated the design requirement for the gas collection and control system by designing the system for significantly less than the "maximum expected gas flow rate," as required by Clean Air Act rules. Defendants deliberately miscalculated the landfill gas flow rates beginning in 2016, used the false gas flow rates for their 2018 Title V Permit application to TDEC, and continued to do so with the submission of "actual emissions" to the TDEC each year from 2017 to 2023.

232.	Paragraph B4 of the 2020 Operating Permit contains a requirement for certification of permit applications and other submissions to TDEC. Defendant BFI made a false certification and violated Paragraph B4 when it submitted the 2018 Title V Permit application and when it submitted each Actual Emissions Analysis for 2017-2023 by deliberately miscalculating the LFG emissions in these application forms and reports.

233.	Paragraph B5 of the 2020 Operating Permit contains an annual compliance certification requirement. BFI's Title V Annual Compliance Certifications submitted to TDEC for years 2017-2022 falsely certified compliance with Paragraph E4-18 of the Title V Permit, which requires the GCCS to meet the design requirements of 40 CFR §60.752(b)(2)(ii), including the maximum expected gas flow rate design requirement in 40 C.F.R. §60.752(b)(2)(ii)(A)(1). BFI also omitted material information which would have shown TDEC that it did not accurately determine the maximum gas flow rate at the MPL.

234.	EPA CAA rules at 40 C.F.R. §§ 60.755(c)(5), 63.1960(c)(5), 62.16720(c)(5), require that the owner and operator of an MSW landfill with a gas collection and control system (GCCS) implement a program to monitor for cover integrity and implement cover repairs as necessary on a monthly basis. Defendants have violated these provisions by failing to maintain proper cover integrity at the landfill on at least the following dates:

(a) All days from February 11 through June 30, 2022 – Solid waste exposed and uncovered over a multi-acre working face and lacking soil or adequate alternate cover during all days up to and including and after a multi-acre fire in the working face on June 19, 2022.

(b) On June 19, 2022, a multi-acre fire in the working face occurred as a result of inadequate cover and too large of working face, as documented by TDEC report dated June 24, 2022.

(c) All days from February 11 through August 8, 2022 – Multi-acre eastern slope area facing Landfill Road lacked cover integrity with deep erosion rills for escaping odors from landfill gas leachate outbreaks.

(d) From March 2019 to June 2023, MPL's consultants' monthly reports show numerous problems with the landfill cover, including leachate outbreaks on landfill slopes, erosion of landfill cover, and multiple tears and holes in the plastic cover over part of the landfill without repairs. (See Exhibit E).

## COUNT EIGHT: BREACH OF CONTRACT

235. Plaintiff incorporates by reference paragraphs 1-147 as if restated herein.

236. Defendants have breached the contract with the City for management of the MPL leachate by failing to comply with City ordinances, policies and regulations and procedures, as required by the contract.

237. The language of the contract provides that the City can enforce its sewer ordinance, which provides the City with the authority to: (1) require BFI to test for PFAS (and other pollutants) in the leachate and report the finding to Plaintiff; (2) require BFI to interrupt its leachate discharge until it develops and implements adequate pretreatment to remove PFAS (and other pollutants); and/or (3) suspend or terminate the IUDP until such time as BFI develops and implements adequate pretreatment to remove PFAS (and other pollutants).

238.     The language of the contract provides that the City may enforce its ordinances, policies, regulations, and procedures without breaching the contract and without interrupting or terminating Defendants' obligations under the contract.

239.     Plaintiff seeks a declaration from the Court that the City may take necessary actions under the City Code, including those listed in Paragraph 237 above, without breaching the contract and without interrupting or terminating BFI's obligations under the contract.

240.     In addition, as a direct and proximate result of Defendants' breach, the City is entitled to past and future damages, including damages for contamination of its sewer system and wastewater treatment plant by PFAS, monitoring expenses, consultant expenses, and likely future increased expenses for wastewater treatment.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands trial by jury and respectfully requests that the Court grant the following relief:

(a)     Enter an injunction against Defendants under Tennessee law enjoining them from maintaining the continuing public and private nuisance they have caused, created, and maintained;

(b)     Enter an injunction against Defendants under Tennessee law requiring them to abate the continuing public and private nuisance they have caused, created, and maintained by taking all steps necessary to cease the release of noxious odorous gases from their Middle Point Landfill into the surrounding community and taking all steps necessary to cease the discharge of toxic landfill leachate, including PFAS, into the East Fork Stones River;

(c)     Enter an injunction against Defendants under Tennessee law requiring them to perform regular testing of the East Fork Stones River for PFAS at the points of leachate discharge into the river and at the City's drinking water intake;

65

(d)     Enter an injunction against Defendants under Tennessee law requiring them to cease the discharge of PFAS chemicals in their landfill leachate to the City of Murfreesboro's wastewater system and requiring Defendants to remove PFAS from that wastewater system;

(e)     Enter a declaratory judgment that Defendants have violated and are in violation of the CWA, 33 U.S.C. § 1311;

(f)     Enter an enforcement order or an injunction under the CWA ordering Defendants to cease and abate the discharge of PFAS into waters of the United States without an NPDES permit or in violation of the NPDES General Stormwater Permit, including the full remediation of the groundwater discharges and surface water discharge to East Fork Stones River;

(g)     Enter a declaratory judgment that Defendants have violated and are in violation of the CWA, 33 U.S.C. §§ 1311 and 1317, by discharging PFAS into the City's wastewater treatment plant (Public Owned Treatment Works or POTWs) in violation of industrial pretreatment requirements and standards, including the City's ordinances and rules;

(h)     Enter an enforcement order or an injunction under the CWA ordering Defendants to cease discharge of wastewater containing PFAS into the City's wastewater treatment plant in violation of industrial pretreatment requirements and standards, including the City's ordinances and rules;

(i)     Order Defendants to pay civil penalties of up to sixty-eight thousand four hundred and forty-five dollars ($68,445) per day for each day of each violation of the CWA set out in this Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a);

(j)     Award Plaintiff its costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d);

66

(k)     Enter a declaratory judgment that Defendants have violated and are in violation of 40 C.F.R. 40 C.F.R. § 60.11(d), 40 C.F.R. § 63.6(e)(l)(i), 40 C.F.R. § 63.1955(c), and 42 U.S.C. §§ 7411, 7412 by failing to operate their gas collection and control system ("GCCS"), including its flares, in a manner consistent with good air pollution control practices, by poorly managing leachate, and failing to consistently cover exposed waste;

(l)     Enter an enforcement order or an injunction under the CAA ordering Defendants to modify and improve their GCCS so that it operates in a manner consistent with good air pollution control practices to prevent the emission of noxious odorous gases beyond the MPL boundaries; to properly manage leachate so that leachate outbreaks and overflows causing noxious odorous gases are prevented; and to consistently cover exposed waste to prevent fires and the emission of noxious odorous gases;

(m)     Order Defendants to pay civil penalties of up to fifty-nine thousand one hundred fourteen dollars ($59,114) per day for each day of each violation of the CAA set out in this Complaint, pursuant to 42 U.S.C. § 7604(a);

(n)     Award Plaintiff its costs, including reasonable attorney and expert witness fees, as authorized by the CAA, 33 U.S.C. § 7604(d);

(o)     Enter a declaration regarding the contract between the City and BFI which declares that the City can enforce its sewer use ordinance, which provides the City with the authority to: (1) require BFI to test for PFAS (and other pollutants) in the leachate and report the finding to Plaintiff; (2) require BFI to interrupt its leachate discharge until it develops and implements adequate pretreatment to remove PFAS (and other pollutants); and/or (3) suspend or terminate the Industrial User Discharge Permit until such time as BFI develops and implements adequate pretreatment to remove PFAS (and other pollutants);

(p)     Enter a declaration regarding the contract between the City and BFI which declares that the City may take necessary actions under its sewer use ordinance, including those listed in Paragraph (o) above, without breaching the contract and without interrupting or terminating BFI's obligations under the contract;

(q)     Enter a judgment against Defendants for past, present, and future compensatory damages incurred and likely to be incurred by the City in an amount greater than $75,000.00, as the evidence will show;

(r)     Enter a judgment against Defendants for punitive damages in an amount sufficient to penalize them and deter them from repeating their wrongful conduct;

(s)     Award Plaintiff's attorney fees and costs; and

(t)     Award such other relief as this Court deems just, proper, and equitable.

Respectfully submitted.

*/s/ Gary A. Davis*
Gary A. Davis, #009766
Keith A. Johnston, #024134
Louis W. Ringger, III, #033674
DAVIS, JOHNSTON, & RINGGER, PC
21 Battery Park Ave., Suite 206
Asheville, NC 28801
Tel: (828) 622-0044
Fax: (828) 398-0435
gadavis@enviroattorney.com
kjohnston@enviroattorney.com
bringger@enviroattorney.com

Adam F. Tucker, City Attorney, #28489
Jennifer M. Tag, #039146
CITY OF MURFREESBORO LEGAL
DEPARTMENT
111 W Vine St.
Murfreesboro, TN 37130
Tel: (615) 849-2616
Fax: (615) 849-2662
atucker@murfreesborotn.gov

jtag@murfreesborotn.gov

Lisa K. Helton, #23684
Hunter C. Branstetter, #32004
Mark Alexander Carver, #36754
Sherrard Roe Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200 | Fax: (615) 742-4539
lhelton@srvhlaw.com
hbranstetter@srvhlaw.com
acarver@srvhlaw.com

ATTORNEYS FOR THE CITY OF
MURFREESBORO, TENNESSEE

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was served via ECF filing upon the following this 14th day of November 2025:

William G. Beck
Allyson E. Cunningham
Lathrop GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
william.beck@lathropgpm.com
allyson.cunningham@lathropgpm.com

Matthew A. Walker
Lathrop GPM LLP
155 North Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 920-3300
matt.walker@lathropgpm.com

Kayla Brewe
Lathrop GPM LLP
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri 63105
(314) 613-2800
Kayla.Brewe@lathropgpm.com

Wells Trompeter
Edward Callaway

Karolyn Perry
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, TN  37219
wells.trompeter@hklaw.com
ed.callaway@hklaw.com
karolyn.perry@hklaw.com

ATTORNEYS FOR DEFENDANTS