| | |
|---|---|
| CITY OF MURFREESBORO, TENNESSEE,<br>     Plaintiff,<br><br>v.<br><br>BFI WASTE SYSTEMS OF TENNESSEE,<br>LLC et al.,<br>     Defendants. | Case No. 3:22-cv-00605<br><br>Judge Eli J. Richardson<br>Magistrate Judge Luke A. Evans |

## **MEMORANDUM ORDER**

Defendant BFI Waste Systems of Tennessee, LLC, (BFI) has filed a motion, under Rule 21 of the Federal Rules of Civil Procedure, to sever certain claims or counterclaims that it and the City of Murfreesboro (the City) have against each other. (Doc. No. 302.) BFI also wants to sever some of the claims that it has asserted in its third-party complaint against Rutherford County (the County). BFI's proposed dividing line is the origin of alleged pollution at its landfill—pollution affecting surface water, groundwater, and wastewater should be in a separate case from pollution related to odors and gas emanating from the landfill. The City and the County oppose severance on the basis that BFI is proposing an artificial distinction that is inconsistent with common evidence of alleged landfill mismanagement. For the reasons below, the Court denies[1] the motion.

## I.      Background

Familiarity with the extensive background in this case generally is presumed, but this case concerns allegations of environmental violations at defendants' Middle Point Landfill (the Landfill) in Rutherford County, Tennessee. The theory, as alleged, is conceptually simple. The

---

[1]      A Rule 21 motion to sever claims is non-dispositive. *See, e.g., Dejesus v. Humana Ins. Co.*, No. 3:15-CV-862, 2016 WL 3630258, at *1 n.1 (W.D. Ky. June 29, 2016) (citations omitted).

Landfill has a permit to operate as a municipal solid waste landfill. (Doc. No. 227 at 11.) The Landfill has accepted solid waste from the City over many years. (Doc. No. 227 at 34–38.) A fundamental challenge in managing a landfill concerns discharges. Solid waste at a landfill rarely remains physically and chemically inert; over time, chemical reactions within the waste, plus chemical reactions from interactions with stormwater and other environmental exposures, can lead to gas discharges and liquid discharges known as "leachate." The Landfill generally has systems in place for managing liquid runoff and landfill gas. (Doc. No. 227 at 13–15.)

The City has accused defendants of creating a public and private nuisance, and of violating the federal Clean Water Act and the Clean Air Act. According to the City, the Landfill contains solid waste from which hazardous leachate liquids continually emerge. The leachate discharges allegedly "match up chemically with a chloride profile characteristic of landfill leachate and match up with similar concentrations of toxic chemicals, including, but not limited to, toxic per- and polyfluoroalkyl substances ('PFAS'). PFAS include perfluorooctanoic acid ('PFOA') and perfluorooctane sulfonate ('PFOS'), two compounds for which the United States Environmental Protection Agency ('EPA') has set Maximum Contaminant Levels for drinking water by regulation on April 10, 2024." (Doc. No. 227 at 3.) The City has alleged further that defendants have been negligent in managing an ongoing exothermic reaction from industrial secondary aluminum smelting waste. (*Id.*) Additionally, the City has received thousands of complaints about odors exiting the Landfill into surrounding neighborhoods. (Doc. No. 227 at 19–26.)

BFI, meanwhile, has filed a counterclaim against the City, and a third-party complaint against the County, for recovery costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). In the counterclaim, BFI acknowledges that the City's disposal of solid waste is a primary source of hazardous substances at the Landfill. (Doc.

No. 281 at 34–36.) BFI also alleges, however, that hazardous substances at the Landfill arrived in part through runoff from various City facilities. (Doc. No. 281 at 36–42.) BFI similarly accuses the County of impacting the levels of hazardous substances at the Landfill through discharges from a different landfill that the County manages nearby. (Doc. No. 287 at 5–10.)

BFI filed the pending motion to sever on June 25, 2026. BFI proposes segregating the allegations in this case into "water claims" involving leachate discharge and "gas claims" involving gas and odor emissions. In BFI's view, severing the water claims from the gas claims makes sense because each category of claim involves different release pathways, transport mechanisms, and locations of alleged damage. (Doc. No. 303 at 6–8.) BFI argues that the two categories of claims also involve different alleged injuries; different permits and legal frameworks; and different expert evidence. (Doc. No. 303 at 8–17; Doc. No. 312 at 4.) BFI has signaled that, upon severance, it would attempt to transfer the water claims to a multidistrict litigation (MDL) matter pending in the District of South Carolina. (Doc. No. 303 at 21.) BFI would seek transfer because it thinks that some waste that arrived at the Landfill contained residues from firefighting foam, which is the subject of the MDL.

The City and the County oppose severance. The City argues that the water and gas claims have the same factual core "because there is only one story in this case: BFI's negligent operation, neglected maintenance, and mismanagement of Middle Point Landfill." (Doc. No. 308 at 4.) The allegations of negligence play an important role in the City's opposition; while some counts in the City's second supplemental complaint arise under separate federal statutes, the first three counts are nuisance counts under state law. The City argues that both the water and gas claims combined to create a public and private nuisance and that the severance that BFI seeks would require an artificial splitting of unitary claims. Meanwhile, the County also opposes the severance that BFI

3

has proposed because all alleged environmental violations at the Landfill arose, at least in significant part, from the common facts of the Landfill's features and operation. (Doc. No. 307 at 6.) The County argues that separating water from gas claims would create an artificial distinction that—upon successful transfer to the MDL—would create two cases about the same operations at the Landfill and send those cases 500 miles apart. (Doc. No. 307 at 11.) While no motion to this effect currently is pending, the County would support a different severance—a severance of the third-party claim against it under CERCLA based on timing. (Doc. No. 307 at 5.) The County asserts that the main case is far more developed than the third-party allegations and that it cannot properly prepare its defense within the remaining schedule of the main case.

## II.      Discussion

### A.      Rule 21 Generally

In furtherance of case management, the Court may sever any claim against a party. Fed. R. Civ. P. 21. There is no formula or exhaustive list of criteria that governs adjudication of a severance motion, but courts frequently consider five factors: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for separate claims." *Parchman v. SLM Corp.*, 896 F.3d 728, 733 (6th Cir. 2018) (citation omitted). With respect to the first factor, courts should look for a logical relationship between claims and factual circumstances, and "[t]he words 'transaction or occurrence' are given a broad and liberal interpretation in order to avoid a multiplicity of suits." *LASA Per L'Industria Del Marmo Societa Per Azioni of Lasa, Italy v. Alexander*, 414 F.2d 143, 147 (6th Cir. 1969) (citations omitted). Assessing a logical relationship requires reviewing each case's unique factual circumstances. *See Cruikshank v. Berne Twp.*, No. 2:24-CV-1664, 2024 WL

4

4588777, at *2 (S.D. Ohio Oct. 28, 2024) ("This factor is typically thornier, often difficult to apply, and requires a case-by-case analysis.") (internal quotation marks and citation omitted). Courts have broad discretion when deciding whether a case should be severed. *Parchman*, 896 F.3d at 733 (citations omitted).

### B. Severance is Not Warranted Here

After reviewing the five *Parchman* factors and the overall circumstances of the case, the Court notes the importance of the Landfill as the unifying feature of every claim and counterclaim. At its core, this case is about whether BFI is mismanaging the Landfill to the point that surrounding neighborhoods are suffering from a nuisance that also violates federal environmental laws. A trial of this case would include the following evidence: the history of the Landfill; the contracts and permits established over the years that allowed solid waste to be stored at the Landfill; regulations and industry standards about how any landfill should operate; whether BFI violated those regulations and industry standards; whether violations of regulations and industry standards are manifesting themselves as contaminated water and air in violation of respective environmental regulations; and whether surrounding neighborhoods need to be compensated for suffering the effects of bad landfill management. *Cf. Hobson v. Black Mountain Mktg. & Sales LP*, No. 3:23-CV-374, 2024 WL 3908723, at *4 (E.D. Tenn. Aug. 22, 2024) (severance motion denied, where "all of the pending claims relate to the overlapping transactions and sets of facts, which will likely involve the same witnesses and documents"); *Harter v. Carondelet Health Network*, No. CV-15-00343-TUC-RM, 2017 WL 10505262, at *6 (D. Ariz. Aug. 4, 2017) (severance not warranted, where the same policy of denying sign-language interpreters to patients connected different plaintiffs who made different visits to separate hospitals); *Hodges v. Coldwell Banker Real Est. Corp.*, No. CIV A 405CV168-P-A, 2007 WL 1200118, at *3 (N.D. Miss. Apr. 19, 2007) (severance motion denied; "[t]hough each of the three groups of plaintiffs in this case may have

5

purchased different houses at different times and dealt with different people who made different fraudulent misrepresentations, what is the same is that all of the plaintiffs dealt with the alleged RICO enterprise. Proof of the entire RICO enterprise is necessary for all of the plaintiffs . . . .”). This evidence is central to all claims and counterclaims. *Cf. Parchman*, 896 F.3d at 731 (affirming severance of Telephone Consumer Protection Act claims, where different companies called different plaintiffs, meaning that each plaintiff had different transactions, witnesses, and documentary proof). The extent to which any bad management, environmental contamination, and neighborhood suffering proven at trial came from leachate liquids versus noxious gases is important, and each means of pollution would require separate data and separate expert testimony, but liquid versus gas is just the means to the end of the broader story. Breaking up the story would require repeating the core evidence twice in two different courts while simultaneously leaving out parts of the story that would give jurors full context about what is happening at the Landfill. This simultaneous repetition and redaction of the story of the Landfill's operation would not promote judicial economy and would serve no other purpose.

If the third-party complaint against the County needs to be managed differently for practical purposes than the rest of the case then the Court will consider that issue at the appropriate time when the County presents it.[2] In all other respects, this case should proceed as a unified case about the Landfill's operations.

---

[2] As of this writing, the County has not requested severance of the third-party claims but has filed a motion for an extension of discovery-related deadlines. (Doc. No. 322.)

**III.     Conclusion**

For all of the above reasons, the Court DENIES BFI's motion to sever (Doc. No. 302).

It is so ORDERED.

_____
LUKE A. EVANS
United States Magistrate Judge