IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CITY OF MURFREESBORO, TENNESSEE,<br><br>Plaintiff,<br><br>v.<br><br>BFI WASTE SYSTEMS OF TENNESSEE, LLC, et al.,<br><br>Defendants. | ) | NO. 3:22-cv-00605<br><br>JUDGE RICHARDSON |
| BFI WASTE SYSTEMS OF TENNESSEE, LLC,<br><br>Counter Plaintiff,<br><br>v.<br><br>CITY OF MURFREESBORO, TENNESSEE,<br><br>Counter Defendant. | ) | NO. 3:22-cv-00605<br><br>JUDGE RICHARDSON |
| BFI WASTE SYSTEMS OF TENNESSEE, LLC,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>RUTHERFORD COUNTY, TENNESSEE,<br><br>Third-Party Defendant. | ) | NO. 3:22-cv-00605<br><br>JUDGE RICHARDSON |

## MEMORANDUM OPINION

Pending before the Court in this action are several motions, two of which the Court will resolve herein. The first of the two is the motion to dismiss (Doc. No. 229, "First Motion to Dismiss") filed by BFI Waste Systems of Tennessee, LLC ("BFI"), Republic Services of Tennessee, LLC ("Republic Services of Tennessee"), and Republic Services, Inc. (collectively, "Defendants").[1] Via the First Motion to Dismiss, Defendants seek the dismissal of Count Six of the Second Supplemental Complaint (Doc. No. 227, "SSC") of Plaintiff, the City of Murfreesboro, Tennessee,[2] pursuant to Rule 12(b)(1).[3] Defendants have filed a memorandum (Doc. No. 230) in support of the First Motion to Dismiss. Plaintiff has filed a response (Doc. No. 254)[4] in opposition to the First Motion to Dismiss. Defendants have filed a reply (Doc. No. 260)[5] in further support of the First Motion to Dismiss.[6]

---

[1] The Court is aware that BFI is, in addition to being a defendant in this case, the (sole) counter-plaintiff and the (sole) third-party plaintiff in this action. For the sake of brevity, the Court will refer to BFI, Republic Services of Tennessee, and Republic Services Inc., collectively as "Defendants" even though one of these Defendants (BFI) has statuses in this action other than defendant.

[2] The Court is aware that the City of Murfreesboro, Tennessee is, in addition to being the Plaintiff in this case, the (sole) counter defendant in this action. Nevertheless, for the sake of brevity, the Court will refer to the City of Murfreesboro, Tennessee herein as "Plaintiff," even though it has a status in this action other than plaintiff.

[3] In the First Motion to Dismiss (and the briefing submitted in the support thereof), Defendants purport in passing to move to dismiss Count Six of the SSC alternatively pursuant to Rule 12(b)(6). (Doc. No. 229 at 1 n.1; Doc. No. 230 at 1 n.1). Defendants have neither explained how Rule 12(b)(6) applies to the arguments raised in support of the First Motion to Dismiss nor otherwise made any arguments in favor of dismissal under Rule 12(b)(6) (as opposed to dismissal under Rule 12(b)(1)), and so the Court disregards any ostensible bid for dismissal under Rule 12(b)(6) and conducts its analysis of the First Motion to Dismiss solely within the framework of Rule 12(b)(1).

[4] Attached to the response (Doc. No. 254) is an exhibit (Doc. No. 254-1) that is composed of portions of municipal ordinances that were implemented by Plaintiff.

[5] Attached to the reply (Doc. No. 260) is an exhibit (Doc. No. 260-1) that is composed of guidance issued by the Environmental Protection Agency ("EPA").

[6] As will be discussed below, the reply at Docket No. 260 was filed also in support of the other motion to dismiss (Doc. No. 231) that the Court resolves herein.

The second motion that the Court will resolve herein is the motion to dismiss (Doc. No. 231, "Second Motion to Dismiss," and, collectively with the First Motion to Dismiss, "Motions") filed (solely) by Republic Services of Tennessee. Via the Second Motion to Dismiss, Republic Services of Tennessee seeks the dismissal of Count Seven of the SSC pursuant to Rule 12(b)(1) solely to the extent that Count Seven is brought against Republic Services of Tennessee. Republic Services of Tennessee has filed a memorandum (Doc. No. 232) in support of the Second Motion to Dismiss. Plaintiff has filed a response (Doc. No. 253) in opposition to the Second Motion to Dismiss. Republic Services of Tennessee (seemingly along with BFI and Republic Services, Inc.) has filed a reply (Doc. No. 260) in further support of the Second Motion to Dismiss.[7]

For the reasons stated herein, the First Motion to Dismiss will be **GRANTED**, and the Second Motion to Dismiss will be **GRANTED**.[8]

---

[7] As discussed in the footnote above, the reply at Docket No. 260 was filed in support of *both* the First Motion to Dismiss and the Second Motion to Dismiss. Republic Services of Tennessee—the sole party that brought the Second Motion to Dismiss—is one of the parties (i.e., one of the Defendants) who brought the First Motion to Dismiss, and so the Court does not discern any fault in Republic Services of Tennessee filing a reply that is in support of both the First Motion to Dismiss and the Second Motion to Dismiss. With that said, the Court has doubts about the propriety of BFI and Republic Services, Inc.—two of the three parties (i.e., Defendants) who brought the First Motion to Dismiss—filing a reply in support of a motion (the Second Motion to Dismiss) that they did not file. In any event, and in the interests of judicial efficiency, the Court will treat the reply at Docket No. 260 as properly filed in support of both the First Motion to Dismiss and the Second Motion to Dismiss. For clarity, in discussing arguments raised in the reply (Doc. No. 260) that are in support of the First Motion to Dismiss, the Court will discuss these arguments in terms of being made by Defendants jointly. In discussing arguments raised in the reply (Doc. No. 260) that are in support of the Second Motion to Dismiss, the Court will discuss these arguments in terms of being made by Republic Services of Tennessee alone.

[8] In its responses (Doc. No. 253 at 1 n.1; Doc. No. 254 at 1 n.1), Plaintiff objects to the filing by Defendants and by Republic Services of Tennessee respectively, of two separate Rule 12 motions to dismiss (e.g., the First Motion to Dismiss and the Second Motion to Dismiss). Plaintiff roots that objection in the Court's admonition in its November 28, 2023 Memorandum Opinion (Doc. No. 144), wherein the Court stated as follows with regard to Defendants filing numerous motions to dismiss earlier in this action:

> Defendants also filed two additional motions to dismiss pursuant to Rule 12(b)(6) related to all but one of the other counts (i.e., all except Count One) (Doc. Nos. 74, 76), and a motion to dismiss for failure to join an indispensable party, filed pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19. (Doc. No. 78). Those other three motions remain

<u>BACKGROUND</u>[9]

Below, the Court will provide a brief review of the (rather tortured) procedural history of this case. The Court will then go on to review the relevant allegations in the SSC, as well as the claims asserted in the SSC against Defendants. Finally, the Court will review the First Motion to Dismiss and the Second Motion to Dismiss.

---

> pending. Defendants' tactic of filing three different 12(b)(6) motions strikes the Court as something the Court has never seen before, as something Defendants should think twice about before doing in the future, and as something that they should explicitly justify each time they do it in the future. Perhaps the idea was to effectively triple the number of pages allowed for briefing when moving to dismiss, without obtaining leave to exceed the general limitation (of 25 pages) for briefing a motion to dismiss; Plaintiff certainly thinks so. (Doc. No. 87 at 1). In any event, the Court is loath to require the parties to invest additional resources by requiring the briefing to be re-done in some respect(s), especially since Defendant's tactic gained it nothing at least with respect to the instant Motion.

(Doc. No. 144 at 4 n.6). But for two reasons, the Court does not discern that in respectively filing the First Motion to Dismiss and the Second Motion to Dismiss, Defendants jointly or Republic Services of Tennessee alone ran afoul of the Court's admonition in its November 28, 2023 Memorandum Opinion.

First, there is no indication that the First Motion to Dismiss and the Second Motion to Dismiss were separately filed as a ploy by any of the Defendants to avoid the general limitation (in the Local Rules) of 25 pages for briefing on a motion to dismiss. Indeed, the memorandum (Doc. No. 230) filed in support of the First Motion to Dismiss is just seven pages long, and the memorandum (Doc. No. 232) filed in support of the Second Motion to Dismiss is a mere five pages long.

Second, the First Motion to Dismiss and the Second Motion to Dismiss were brought by different combinations of parties. As noted above, the First Motion to Dismiss was brought by Defendants jointly, whereas the Second Motion to Dismiss was brought solely by Republic Services of Tennessee. Thus, the circumstances surrounding the filing of the First Motion to Dismiss and the Second Motion to Dismiss are markedly different than the circumstances that led to the Court's admonition in its November 28, 2023 Memorandum Opinion. These earlier circumstances involved all three Defendants filing (jointly) *four* motions to dismiss (Doc. Nos. 72, 74, 76, 78), which respectively sought the dismissal of different combinations of counts asserted in Plaintiff's First Supplemental Complaint (Doc. No. 70) or of this entire action for failure to join a purportedly indispensable party.

[9] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the SSC is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

### 1. Procedural History

This action relates to Defendants' management and operation of Middle Point Landfill ("MPL" or "the landfill") in Rutherford County, Tennessee. Plaintiff filed the original Complaint (Doc. No. 1) on August 10, 2022, the Amended Complaint (Doc. No. 38) on October 28, 2022, and the First Supplemental Complaint (Doc. No. 70) on March 15, 2023. Plaintiff and Defendants subsequently engaged in mediation that was successful as far as the negotiating individuals were concerned (Doc. No. 102; Doc. No. 209 at 1), but the settlement agreement reached at the mediation was rejected by Plaintiff's city council.[10] (Doc. No. 209 at 1). Subsequently Plaintiff filed the SSC (Doc. No. 227), which is the operative complaint in this action.[11]

---

[10] The Court realizes that (for many reasons) it cannot insist upon a party agreeing to settle or hold it against a party for declining to settle. But the Court is unable here to resist expressing its regret that the settlement agreement was not approved by Plaintiff's city council. The Court says this simply because its judicial resources are scarce, and—since the time that this case seemingly was settled via mediation by those who are the most familiar with this case and who are tasked with (and paid for) handling it—this case has consumed enormous judicial resources, with even greater consumption portended in the future. Concerned as it is about delays for other litigants in the more than 800 cases that it has, the Court naturally laments the use of copious judicial resources on a seemingly settled case. But as the expression goes, it is what it is.

[11] BFI filed a counterclaim (Doc. No. 281) against Plaintiff. BFI also filed a third-party complaint (Doc. No. 287) against Rutherford County, Tennessee. Neither of these pleadings are relevant to the disposition of the Motions, and the Court does not further discuss these pleadings herein.

## 2. Factual Background[12]

Defendants, through their management of MPL, have created a source of environmental pollution in local rivers, ponds, and air. (Doc. No. 227 at ¶¶ 1-4). The discharge of leachate[13] from MPL to surface waters and to groundwater flowing into the East Fork Stones River, as well as the emissions of noxious and odorous gases, stem from Defendants' management of MPL and have directly affected and/or damaged Plaintiff's municipal property, including roads, recreational amenities, and public buildings. (*Id.* at ¶¶ 1, 124-26, 127-44). The odorous gases are caused by, among other things, "[Defendants'] site management [at MPL], uncontrolled landfill gas emissions, ongoing leachate outbreaks, and an ongoing exothermic reaction from industrial secondary aluminum smelting ("SAS") waste." (*Id.* at ¶ 2). Furthermore, MPL "has long had problems with leachate outbreaks and releases bypassing the leachate collection system," and "[r]ecent sampling confirms three ongoing discharges of leachate from MPL into the East Fork Stones River." (*Id.* at ¶ 3).

In addition, Plaintiff operates something known as a publicly-owned treatment works ("POTW"),[14] which (as far as the Court can tell) accepts and treats wastewater from MPL and

---

[12] The facts herein are taken from the SSC. For purposes of the instant Motions, the facts in the SSC are accepted as true, except to the extent that they are qualified herein (as for example by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true.

Of note, attached to the SSC are seven exhibits, (Doc. Nos. 227-1 - 227-7), comprising copies of the notices (and supplements to these notices) sent by Plaintiff and stating its intent to bring claims under the Clean Water Act and the Clean Air Act. For reasons the Court explains further below, the Court may consider these exhibits in ruling on the Motions.

[13] As Plaintiff explains in the SSC, "'[l]eachate' is a technical term referring to the liquids that pass through and/or emerge from solid waste containing soluble, suspended or miscible materials leached out of the waste. [] It typically has a distinctly harsh and noxious odor." (Doc. No. 227 at 2 n.1).

[14] The Court discerns that Plaintiff uses the term "publicly owned treatment works" and that term's acronym (i.e., "POTW") as that term and its acronym are defined in the implementing regulations of the Clean Water Act. In relevant part, these regulations provide that the term "Publicly Owned Treatment Works or POTW

other customers. (*Id.* at ¶¶ 217, 219, 220). MPL's toxic landfill wastewater (i.e., the "leachate" mentioned above) is contaminated by chemicals called per- and polyfluoroalkyl substances ("PFAS") that bypassed the POTW's treatment systems, damaging Plaintiff's POTW, contaminating Plaintiff's drinking water, and interfering with the use and enjoyment of Plaintiff's property. (*Id.* at ¶¶ 3, 5, 51-53, 58, 157). The "extraordinarily high levels" of PFAS flowing into Plaintiff's sewer system also have damaged Plaintiff's sewer system and will likely require Plaintiff to incur expenses for additional treatment of its wastewater. (*Id.* at ¶¶ 146-47).

**3. Plaintiff's Claims**

Based on the foregoing, Plaintiff brings claims in eight counts. In Count Eight, Plaintiff asserts a breach-of-contract claim related to a 1995 agreement between Defendants and Plaintiff that allegedly allows Defendants to discharge leachate from MPL into Plaintiff's POTW for treatment, in exchange for Defendants accepting Plaintiff's municipal solid waste and POTW treatment byproducts without charge. (*Id.* at ¶¶ 44, 127-38). As for the other seven counts, Plaintiff asserts claims for public nuisance (Count One), private nuisance (Count Two), negligence (Count

---

means a treatment works as defined by section 212 of the [Clean Water] Act, which is owned by a State or municipality (as defined by section 502(4) of the [Clean Water] Act.)" 40 C.F.R. § 403.3(q). Section 212 of the Clean Water Act defines "treatment works" to include "any devices and systems used in the storage, treatment, recycling, and reclamation of municipal sewage or industrial wastes of a liquid nature [] or necessary to recycle or reuse water at the most economical cost over the estimated life of the works." 33 U.S.C. § 1292(2)(A). And Section 502(4) of the Clean Water Act defines municipality to mean "a city, town, borough, county, parish, district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes." 33 U.S.C. § 1362(4). The Court notes for context that herein when *it* uses the term POTW, it likewise uses the definition of that term provided in 40 C.F.R. § 403.3(q)—i.e., a treatment works (as defined by 33 U.S.C. § 1292(2)(A)) owned by a municipality (as defined by 33 U.S.C. § 1362(4)).

Of note, the POTW at issue in this case appears to be Plaintiff's wastewater treatment plant. (Doc. No. 227 at 55, 66, ¶¶ 5, 214).

Three), violations of the Clean Water Act (Counts Four, Five and Six), and violations of the Clean Air Act (Count Seven).[15] Each claim is brought against all Defendants.

As noted above, the First Motion to Dismiss seeks the dismissal of Count Six of the SSC in its entirety and the Second Motion to Dismiss seeks the dismissal of Count Seven of the SSC in part (i.e., as to just one of the Defendants). So, the Court next provides more fully the substance of Count Six and Count Seven.

Count Six is based on alleged violations of the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq*. (Doc. No. 227 at ¶¶ 213-223). In Count Six, Plaintiff alleges that Defendants have "discharge[d] [] concentrated landfill leachate to the Murfreesboro wastewater treatment plant [(i.e., the POTW discussed elsewhere in the SSC)] in violation of pretreatment standards and the [CWA]." (*Id.* at 55).[16] Although not the clearest count, Count Six appears to be a claim brought pursuant to 33 U.S.C. § 1365,[17] which is a provision of the CWA that permits citizen suits in certain circumstances such as where—as relevant here—a "person"[18] is (allegedly) violating an "effluent standard or limitation," as defined in the CWA or in its accompanying regulations. 33 U.S.C. § 1365(a)(1)(A). Via Count Six, Plaintiff alleges that two provisions of the Murfreesboro City Code (the "Code")[19] that Defendants are allegedly violating—namely Section 33-

[15] Plaintiff originally entered into this agreement with Jefferson Pike Landfill, Inc. (Doc. No. 227 at ¶ 127). Plaintiff alleges that all rights and interests under that contract are currently enjoyed by Defendants. (*Id.*).

[16] This quotation was taken from the header of Count Six in the SSC. The Court has altered the capitalization of this quotation.

[17] Count Six seems to be brought specifically under 33 U.S.C. § 1365(a)(1)(A).

[18] "Person" is defined in the statute as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C § 1362(5).

[19] Regrettably, in connection with the First Motion to Dismiss, an excerpt of the Code was filed at Docket No. 254-1 that, although containing Section 33-36(B)(1)(e) of the Code, does not contain Section 33-36(G)(5)(b) of the Code.

36(B)(1)(e)[20] and Section 33-36(G)(5)(b)[21] of the Code—and a provision of the Industrial User Discharge Permit ("IUDP") that Defendants are allegedly violating (namely Part 3.C. of the

A more fulsome excerpt of the Code was filed at Docket No. 59-2 in connection with a previously filed motion to dismiss (Doc. No. 59). The filing at Docket No. 59-2 contains both Section 33-36(B)(1)(e) of the Code and Section 33-36(G)(5)(b) of the Code. The Court discerns, for reasons explained more thoroughly in a later footnote, that in its adjudication of the Motions it can consider the copy of the Code at Docket No. 59-2. The Court will cite the filing at Docket No. 59-2 when quoting or discussing Section 33-36(B)(1)(e) of the Code, Section 33-36(G)(5)(b) of the Code, and the Code generally.

[20] Section 33-36(B)(1)(e) provides:

> (B) *Regulated Discharges*:
>
> > (1) Waste having any of the following characteristics may be accepted only under such conditions and/or limitations as may be established by the Director.
> > []
> > (e) Any waters or wastes having toxic, poisonous or incompatible pollutants in such quantities as to constitute a hazard to humans or animals, be deleterious to pipelines or structures, interfere with treatment processes or cause the treatment plant to violate its NPDES permit or applicable receiving water standards.

(Doc. No. 59-2 at 13, 15).

[21] Section 33-36(G)(5)(b) provides:

> (G) *Discharge Permit Required.*
>
> > (5) It shall be the responsibility of existing Industrial Users to file new or updated data with the Director []:
> > []
> > (b) Prior to a substantial change in the volume or character of pollutants in their discharge, including the listed or characteristic hazardous waste for which the Industrial User has submitted initial notification under TN Rule 1200-4-14-.12(10).

(Doc. No. 59-2 at 19, 21). This provision thus requires under certain circumstances a kind of permit (which this particular statutory provision refers to as a "Discharge Permit") that apparently is also known as an "industrial user discharge permit." As indicated above, the particular such permit at issue in this case is referred to herein as "the IUDP."

IUDP),[22] constitute (according to Plaintiff) "effluent standard[s] or limitation[s]"[23] so as to provide a basis for a CWA citizen suit.

Count Seven is based on violations of the Clean Air Act ("CAA"), 42 U.S.C. § 7401, *et seq*. (Doc. No. 227 at ¶¶ 224-34). In Count Seven, Plaintiff alleges that Defendants have violated the CAA by, among other things, violating "40 C.F.R. § 63.6(e)(l)(i) by failing to operate [their] gas collection and control system ("GCCS") in a manner consistent with good air pollution control practices, by poorly managing leachate, and failing to consistently cover exposed waste." (Doc. No. 227 at ¶ 228). Plaintiff also alleges that Defendants have violated the CAA by, among other things, violating "40 C.F.R. §§ 60.755(c)(5), 63.1960(c)(5), 62.16720(c)(5), [which] require that the owner and operator of a[] [municipal solid waste] landfill with a [] []GCCS[] implement a

[22] Plaintiff does little to explain or provide context for the IUDP other than to say that the IUDP is a permit "for the discharge of landfill leachate into [Plaintiff's POTW], pursuant to the [Plaintiff's] sewer use ordinance, Section 33 of the [Code]." (Doc. No. 227 at ¶ 127).

Regrettably, a copy of the IUDP is not attached to the SSC or to any of the briefing on the Motions. It appears that a copy of the IUDP was filed—among other places on the docket—at Docket No. 47-2 in connection with a previously filed motion to dismiss. The Court discerns, for reasons explained below, that it may consider the copy of the IUDP filed at Docket No. 47-2 in its adjudication of the Motions. A review of the filed copy of the IUDP indicates that it is a permit, issued by the Murfreesboro Water and Sewer Department to MPL, that permits MPL to discharge industrial wastewater into Plaintiff's "sanitary sewer system." (Doc. No. 47-2 at 1).

In relevant part, the IUDP provides (in Part 3.C):

> C. Discharge Characteristics
> Any significant change in the character or volume of wastewater discharge from Middle Point Landfill shall he reported to [Murfreesboro Water and Sewer Department].

(Doc. No. 47-2 at 4).

[23] As noted above (and as explained in more depth later in this memorandum opinion), 33 U.S.C. § 1365(a)(1)(A) permits a citizen suit against an entity that is alleged to be violating "an effluent standard or limitation." 33 U.S.C. § 1365(a)(1)(A). As will be discussed below, the term "effluent standard or limitation" is a term of art. The term includes various types of standards, regulations, and limits defined in the CWA and its accompanying regulations, including "pretreatment standards under [33 U.S.C. § 1317]." 33 U.S.C. § 1365(f)(4).

Here, Plaintiff seems to contend that Section 33-36(B)(1)(e) and Section 33-36(G)(5)(b) of the Code and Part 3.C. of the IUDP are "effluent standard[s] or limitation[s]" because (according to Plaintiff) they are "pretreatment standards under [33 U.S.C. § 1317]." (Doc. No. 227 at ¶ 216).

program to monitor for cover integrity and implement cover repairs as necessary on a monthly basis." (Doc. No. 227 at ¶ 234). Importantly, the claim in Count Seven appears to be brought pursuant to the CAA's citizen suit provision in 42 U.S.C. § 7604.[24]

**4. The First Motion to Dismiss and Second Motion to Dismiss**[25]

In the memorandum (Doc. No. 230) filed in support of the First Motion to Dismiss, Defendants contend that Count Six should be dismissed in its entirety pursuant to Rule 12(b)(1) because (according to Defendants) Section 33-36(B)(1)(e) and Section 33-36(G)(5)(b) of the Code and Part 3.C. of the IUDP do not constitute "effluent standard[s] or limitation[s]" (as those terms are defined in the CWA) and therefore cannot be the basis for a citizen suit to enforce the CWA under 33 U.S.C. § 1365(a)(1)(A).

In the memorandum (Doc. No. 232) filed in support of the Second Motion to Dismiss, Republic Services of Tennessee (alone) contends that Count Seven should be dismissed pursuant to Rule 12(b)(1) to the extent that Count Seven is brought against Republic Services of Tennessee because (according to Republic Services of Tennessee) Plaintiff failed to provide Republic Services of Tennessee "with the pre-suit notice required to bring a citizen suit under the CAA." (Doc. No. 232 at 1).

---

[24] The Court discusses citizen suits to enforce the CAA in more detail further below. Plaintiff appears to bring the claim in Count Seven specifically pursuant to 42 U.S.C. § 7604(a)(1), which provides that "any person may commence a civil action on his own behalf" against "any person [] who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."

Finally, the Court notes that the citizen suit provision in the CAA (i.e., 42 U.S.C. § 7604), is a different statutory provision than the citizen suit provision in the CWA. (i.e., 33 U.S.C. § 1365).

[25] As the Court explains more fulsomely in two footnotes below, Rule 12(b)(1) is the appropriate vehicle with which to raise the (purported) bases for dismissal raised in the First Motion to Dismiss and the Second Motion to Dismiss.

## LEGAL STANDARD

"Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1869)). Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for lack of subject-matter jurisdiction, which is "always a threshold determination." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014); *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). The party invoking federal jurisdiction bears the burden of proving that federal jurisdiction exists. *Global Technology, Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015); *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005).

Motions to dismiss under Rule 12(b)(1) are categorized as either facial or factual attacks. *Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). A facial attack challenges the sufficiency of the complaint's allegations, requiring the district court to take the allegations as true. *Id.* If the complaint establishes federally cognizable claims, jurisdiction exists. *Id.* A factual attack, by contrast, raises a factual controversy regarding whether subject-matter jurisdiction exists, and no presumptive truthfulness applies to the complaint's allegations when a court resolves a factual attack. *Id.* In such cases, the court may weigh conflicting evidence, including affidavits, and documents, or even conduct a limited evidentiary hearing, to determine the factual predicate for jurisdiction. *Id.*; *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003). A review of the arguments raised in support of the First Motion to Dismiss and the Second

Motion to Dismiss reveals that the Motions bring facial, rather than factual, challenges to the Court's subject-matter jurisdiction.

Given that the Court has determined that it is faced with facial attacks as to its subject-matter jurisdiction over Count Six and Count Seven of the SSC, this raises the question of what documents or filings (if any) the Court may consider outside of the SSC in resolving these facial attacks. The undersigned has previously observed in the context of a *Rule 12(b)(6)* motion to dismiss that the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Patriot Angels Consulting Corp. v. Veterans of Foreign Wars of the United States*, No. 3:24-CV-00087, 2026 WL 625680, at *5 (M.D. Tenn. Mar. 5, 2026) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). Although the foregoing proposition of law was stated in terms of a Rule 12(b)(6) motion to dismiss, the Court notes that this proposition is equally applicable to Rule 12(b)(1) motions to dismiss that bring facial challenges to a federal court's subject-matter jurisdiction. *See e.g., Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 672 (S.D. Ohio 2017) ("a facial attack on the pleading under Rule 12(b)(1) mirrors the standard of review on a motion brought under Rule 12(b)(6)."); *Giovanni v. United States Dep't of the Navy*, 433 F. Supp. 736, 741 (E.D. Pa. 2020) ("In reviewing a facial attack under Rule 12(b)(1), the Court's inquiry is limited to the allegations in the complaint, the documents referenced in or attached to the complaint, and matters in the public record."); *Gould Electronics Inc. v. United States*, 220 F.3d 169, 176 (3d. Cir. 2000) ("In reviewing a facial attack [to its subject-matter jurisdiction], the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."). *Cf. Carlsen*

*v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) ("In a facial attack, 'the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6) safeguards.'").

So, in evaluating the First Motion to Dismiss and the Second Motion to Dismiss, the Court discerns that it may consider the SSC and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the Motions so long as they are referred to in the SSC and are central to the claims contained therein. The Court proceeds accordingly.[26]

## DISCUSSION

The Court next analyzes the Motions, beginning with the First Motion to Dismiss and then turning to the Second Motion to Dismiss.

[26] Consistent with the Court's discussion above, this means that the Court may properly consider the six exhibits (Doc. Nos. 227-1 through 227-7) attached to the SSC in its adjudication of the Motions. Likewise, the Court discerns that it may consider the copy of the IUDP filed at Docket No. 47-2 because the IUDP is (1) in the record of this case, (2) referred to in the SSC and (3) central to Plaintiff's claims in the SSC, insofar as the IUDP has a provision that Plaintiff contends is a "pretreatment standard" under the CWA.

The Court also discerns that it may consider the excerpts of the Code filed at Docket No. 59-2 for two reasons, one of which is unrelated to the reasons why the Court may consider the exhibits at Docket Nos. 227-1 through 227-7 and the copy of the IUDP at Docket No. 47-2. As for the first reason the Court may consider the excerpts of the Code filed at Docket No. 59-2, it appears obvious to the undersigned that federal courts may always consider the law when ruling on a motion to dismiss (or indeed, *any* motion). *Estep v. City of Somerset, Ky*, No. CIV.A. 10-286-ART, 2011 WL 845847, *4 (E.D.Ky.2011) ("Courts can always consider the law when evaluating a motion for judgment on the pleadings."); *Rivera-Nazario v. Corporacion del Fondo del Seguro del Estado*, No. CV 14-1533(JAG), 2016 WL 11815752, at *1 (D.P.R. July 29, 2016) ("it is clearly established that a court may consider a statute in evaluating a motion to dismiss"); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) (noting that a district court may rely on "statutes" in deciding "a motion to dismiss under Rule 12(b)(6)"). As for the second reason, the Court may consider the excerpts of the Code filed at Docket No. 59-2 alternatively because (1) this particular excerpt of the Code appears in the record of the case, (2) the Code is referred to in the SSC, and (3) the Code appears central to Plaintiff's claims, insofar as Plaintiff contends that two sections of the Code are "pretreatment standards" enforceable under the CWA.

Finally, the Court may appropriately consider in its adjudication of the Motions the EPA guidance filed at Docket No. 260-1 as a "public record." *Patriot Angels Consulting Corp.*, 2026 WL 625680, at *9 n. 14 (observing that a public record is a record "that is both created by and maintained by a public (i.e., government) agency."). But although the Court *may* consider the EPA guidance filed at Docket No. 260-1, it ultimately does not find a need to consider this guidance herein and so it declines to do so.

### 1. The First Motion to Dismiss

As explained above, via the First Motion to Dismiss, Defendants contend that Count Six should be dismissed in its entirety pursuant to Rule 12(b)(1). As also noted above, via Count Six Plaintiff brings a claim alleging violations of the CWA. (Doc. No. 227 at ¶¶ 213-223). In Count Six, Plaintiff specifically alleges that Defendants have "discharge[d] [] concentrated landfill leachate to the Murfreesboro wastewater treatment plant in violation of pretreatment standards and the [CWA]." (Doc. No. 227 at 55).[27] As the Court earlier observed, Count Six appears to be a claim brought pursuant to 33 U.S.C. § 1365,[28] which is a provision of the CWA that permits citizen suits to enforce the CWA. Via Count Six, Plaintiff alleges that two provisions of the Code that Defendants are allegedly violating, namely Section 33-36(B)(1)(e) and Section 33-36(G)(5)(b) of the Code, and a provision of the IUDP that Defendants are allegedly violating, namely Part 3.C. of the IUDP, constitute "effluent standard[s] or limitation[s]" so as to sustain a CWA citizen suit under 33 U.S.C. § 1365(a)(1)(A). (Doc. No. 227 at ¶¶ 215-18, 220-21). Plaintiff specifically contends that Section 33-36(B)(1)(e) and Section 33-36(G)(5)(b) of the Code and Part 3.C. of the IUDP constitute "effluent standard[s] or limitation[s]" because they are "pretreatment standards under [33 U.S.C. § 1317]." (Doc. No. 227 at ¶ 216). Defendants disagree and contend that Section 33-36(B)(1)(e) and Section 33-36(G)(5)(b) of the Code and Part 3.C. of the IUDP are not "effluent

---

[27] The Court has altered the capitalization of this quotation, which is taken from a header in the SSC.

[28] Although the SSC suggests that Count Six (in addition to Plaintiff's other CWA claims, namely Counts Four and Five) is brought pursuant to 33 U.S.C. § 1365(a)(1) generally (Doc. No. 227 at ¶ 5), Count Six, as noted in a footnote above, seems to be brought specifically pursuant to 33 U.S.C. § 1365(a)(1)(A), which authorizes citizen suits against any person who is alleged to be in violation of an "effluent standard or limitation."

standard[s] or limitation[s]," because they are not "pretreatment standards under [33 U.S.C. § 1317]." (Doc. No. 230 at 3).[29]

Given the nature of the First Motion to Dismiss and of Count Six, below the Court will first provide a review of the CWA, including a review of citizen suits under the CWA and a review of what constitutes an "effluent standard or limitation" under the CWA. The Court will then evaluate the First Motion to Dismiss.

*a. The CWA*

The CWA "is a comprehensive water quality statute designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Ky. Waterways Alliance v. Johnson,* 540 F.3d 466, 469-70 (6th Cir.2008) (quoting *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology,* 511 U.S. 700, 704 (1994)). The CWA "provides a comprehensive scheme for regulation of water pollution from point sources." *Sierra Club v. Hamilton Cnty. Bd. of County Commr's,* 504 F.3d 634, 646 (6th Cir.2007). The CWA "'authorize[s] private enforcement of the [CWA's] provisions' and its implementing regulations" via so-called citizen suits. *Decker v. Northwest Envtl. Defense Ctr.*, 568 U.S. 597, 607 (2013) (quoting *Dept. of Energy v. Ohio*, 503 U.S. 607, 613, n. 5 (1992)). 33 U.S.C. § 1365 is the provision of the CWA governing citizen suits. It provides in relevant part (in subsection (a)):

[29] Moving to dismiss based on a (purported) failure to allege a violation of an "effluent standard or limitation" is an attack on a federal court's subject-matter jurisdiction. *See, e.g., Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 394 (5th Cir. 1985) ("Because the complaint . . . does not allege that [defendant] is 'in violation' of an effluent standard, limitation or order, ... [plaintiffs] fail to state allegations sufficient to support jurisdiction in this case."); *Holy Cross Neighborhood Ass'n v. U.S. Army Corps of Eng'rs*, 774 F. Supp. 2d 806, 812 (E.D. La. 2011) ("The parties dispute whether the Plaintiffs have alleged that the Corps has violated 'an effluent standard or limitation,' conferring subject matter jurisdiction upon the Court."). Accordingly, the First Motion to Dismiss is properly brought pursuant to Rule 12(b)(1). *See Wilson v. Nissan N. Am., Inc.*, No. 3:25-CV-01042, 2026 WL 1081151, at *1 (M.D. Tenn. Apr. 21, 2026) ("Challenges to subject matter jurisdiction are raised under Federal Rule of Civil procedure 12(b)(1).").

> **(a)Authorization; jurisdiction**
>
> Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf—
>
>> **(1)** against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
>>
>> **(2)** against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.
>
> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

33 U.S.C. § 1365(a). Relevant here is Section 1365(a)(1)(A)—which appears to be the specific provision of Section 1365 under which Plaintiff brings Count Six. Under that subparagraph, a "citizen"[30] may commence a civil action against any "person" who is alleged to be in violation of "an effluent standard or limitation." 33 U.S.C. § 1365(a)(1)(A). The term "effluent standard or limitation" is defined in a different provision of Section 1365, namely Section 1365(f). Section 1365(f) provides in full:

> **(f) Effluent standard or limitation**
> For purposes of this section, *the term "effluent standard or limitation under this chapter" means* (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) *prohibition, effluent standard or pretreatment standards under section*

[30] Importantly, a municipality is properly considered a citizen for the purposes of bringing a citizen suit under 33 U.S.C. § 1365(a). The CWA defines "citizen" to be "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). And the CWA defines "person" to mean "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5). In other words, a municipality, like Plaintiff, is a "citizen" who can bring a citizen suit under 33 U.S.C. § 1365(a).

> *1317 of this title*; (5) a standard of performance or requirement under section 1322(p) of this title; (6) a certification under section 1341 of this title; (7) a permit or condition of a permit issued under section 1342 of this title that is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (8) a regulation under section 1345(d) of this title.

33 U.S.C. § 1365(f) (emphasis added). Given both the nature of Count Six and the parties' respective arguments on the First Motion to Dismiss, what is relevant here is Section 1365(f)(4) and the scope of its term "pretreatment standard[]" under 33 U.S.C. § 1317. Section 1317 does not define "pretreatment standard." However, 33 U.S.C. § 1317 invests the EPA with authority "to promulgate and enforce pollutant pretreatment standards." *United States v. Dilworth*, 164 F.3d 632 (9th Cir. 1998); *United States v. Rosenblum*, No. CRIM. 07-294 JRT/FLN, 2008 WL 582356, at *8 (D. Minn. Mar. 3, 2008) ("The CWA directs EPA to promulgate regulations establishing 'pretreatment standards' for these indirect discharges into POTWs, and prohibits discharges in violation of any such pretreatment standards." (citing 33 U.S.C. §§ 1317(b)(1), (d))); 33 U.S.C. § 1317(b)(1) ("The Administrator shall [] from time to time [] publish proposed regulations establishing pretreatment standards"); 33 U.S.C. § 1317(c) ("In order to insure that any source introducing pollutants into a publicly owned treatment works [] will not cause a violation of the effluent limitations established for any such treatment works, the Administrator shall promulgate pretreatment standards."). Pursuant to this authority, the EPA has set out a definition for what constitutes a "pretreatment standard," in a series of regulations found in 40 C.F.R. § 403.[31]

---

[31] Other federal courts have invoked and relied on the definition of "pretreatment standards" established in 40 C.F.R. § 403, when adjudicating citizen suits under the CWA. *City of Memphis v. Horn Lake Creek Basin Interceptor Sewer Dist.*, No. 2:19-CV-2864-MSN-CGC, 2024 WL 4183314, at *4 (W.D. Tenn. June 3, 2024) ("In addition, § 403.5(c) authorizes the POTW to establish 'local limits,' and under § 403.5(d), such local limits constitute pretreatment standards that are federally enforceable under Section 307(d) of the CWA, 33 U.S.C. § 1317(d)."); *Inland Empire Waterkeeper v. Nature's Specialties*, No. EDCV0700476DDPFMOX, 2008 WL 11335026, at *2, *5 (C.D. Cal. June 17, 2008). The Court does so likewise herein.

40 C.F.R. § 403.3(l), defines the terms "National Pretreatment Standard, Pretreatment Standard, or Standard" as:

> any regulation containing pollutant discharge limits promulgated by the EPA in accordance with [33 U.S.C. § 1317(b) and § 1317(c)], which applies to Industrial Users. This term includes prohibitive discharge limits established pursuant to § 403.5.

40 C.F.R. § 403.3(l).[32] Turning to 40 C.F.R. § 403.5, that regulation provides, in full:

> § 403.5 National pretreatment standards: Prohibited discharges.
>
> (a) (1) General prohibitions. A User may not introduce into a POTW any pollutant(s) which cause Pass Through or Interference. These general prohibitions and the specific prohibitions in paragraph (b) of this section apply to each User introducing pollutants into a POTW whether or not the User is subject to other National Pretreatment Standards or any national, State, or local Pretreatment Requirements.
>
> (2) Affirmative Defenses. A User shall have an affirmative defense in any action brought against it alleging a violation of the general prohibitions established in paragraph (a)(1) of this section and the specific prohibitions in paragraphs (b)(3), (b)(4), (b)(5), (b)(6), and (b)(7) of this section where the User can demonstrate that:
>
> (i) It did not know or have reason to know that its Discharge, alone or in conjunction with a discharge or discharges from other sources, would cause Pass Through or Interference; and
>
> (ii)(A) A local limit designed to prevent Pass Through and/or Interference, as the case may be, was developed in accordance with paragraph (c) of this section for each pollutant in the User's Discharge that caused Pass Through or Interference, and the User was in compliance with each such local limit directly prior to and during the Pass Through or Interference; or
>
> (B) If a local limit designed to prevent Pass Through and/or Interference, as the case may be, has not been developed in accordance with paragraph (c) of this section for the pollutant(s) that caused the Pass Through or Interference, the User's Discharge directly prior to and during the Pass

[32] 40 C.F.R. § 403.3(j) defines the terms "Industrial User or User" to be "a source of Indirect Discharge." "Indirect Discharge" is then defined as "the introduction of pollutants into a POTW from any non-domestic source regulated under [33 U.S.C. §§ 1317(b), 1317(c), 1317(d)]." 40 C.F.R. § 403.3(i).

Through or Interference did not change substantially in nature or constituents from the User's prior discharge activity when the POTW was regularly in compliance with the POTW's NPDES permit requirements and, in the case of Interference, applicable requirements for sewage sludge use or disposal.

(b) Specific prohibitions. In addition, the following pollutants shall not be introduced into a POTW:

(1) Pollutants which create a fire or explosion hazard in the POTW, including, but not limited to, wastestreams with a closed cup flashpoint of less than 140 degrees Fahrenheit or 60 degrees Centigrade using the test methods specified in 40 CFR 261.21;

(2) Pollutants which will cause corrosive structural damage to the POTW, but in no case Discharges with pH lower than 5.0, unless the works is specifically designed to accommodate such Discharges;

(3) Solid or viscous pollutants in amounts which will cause obstruction to the flow in the POTW resulting in Interference;

(4) Any pollutant, including oxygen demanding pollutants (BOD, etc.) released in a Discharge at a flow rate and/or pollutant concentration which will cause Interference with the POTW.

(5) Heat in amounts which will inhibit biological activity in the POTW resulting in Interference, but in no case heat in such quantities that the temperature at the POTW Treatment Plant exceeds 40°C (104°F) unless the Approval Authority, upon request of the POTW, approves alternate temperature limits.

(6) Petroleum oil, nonbiodegradable cutting oil, or products of mineral oil origin in amounts that will cause interference or pass through;

(7) Pollutants which result in the presence of toxic gases, vapors, or fumes within the POTW in a quantity that may cause acute worker health and safety problems;

(8) Any trucked or hauled pollutants, except at discharge points designated by the POTW.

(c) When specific limits must be developed by POTW.

(1) Each POTW developing a POTW Pretreatment Program pursuant to § 403.8 shall develop and enforce specific limits to implement the

prohibitions listed in paragraphs (a)(1) and (b) of this section. Each POTW with an approved pretreatment program shall continue to develop these limits as necessary and effectively enforce such limits.

(2) All other POTW's shall, in cases where pollutants contributed by User(s) result in Interference or Pass–Through, and such violation is likely to recur, develop and enforce specific effluent limits for Industrial User(s), and all other users, as appropriate, which, together with appropriate changes in the POTW Treatment Plant's facilities or operation, are necessary to ensure renewed and continued compliance with the POTW's NPDES permit or sludge use or disposal practices.

(3) Specific effluent limits shall not be developed and enforced without individual notice to persons or groups who have requested such notice and an opportunity to respond.

(4) POTWs may develop Best Management Practices (BMPs) to implement paragraphs (c)(1) and (c)(2) of this section. Such BMPs shall be considered local limits and Pretreatment Standards for the purposes of this part and [33 U.S.C. § 1317(d)].

(d) Local limits. Where specific prohibitions or limits on pollutants or pollutant parameters are developed by a POTW in accordance with paragraph (c) above, such limits shall be deemed Pretreatment Standards for the purposes of [33 U.S.C. § 1317(d)].

(e) EPA enforcement actions under [33 U.S.C. § 1319(f)].

If, within 30 days after notice of an Interference or Pass Through violation has been sent by EPA to the POTW, and to persons or groups who have requested such notice, the POTW fails to commence appropriate enforcement action to correct the violation, EPA may take appropriate enforcement action under the authority provided in [33 U.S.C. § 1319(f)].

40 C.F.R. § 403.5. The "Best Management Practices" ("BMPs") referred to in 40 C.F.R. § 403.5(c)(4) are defined in 40 C.F.R. § 403.3(e) as:

schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to implement the prohibitions listed in § 403.5(a)(1) and (b). BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw materials storage.

40 C.F.R. § 403.3(e).[33] The upshot is that 40 C.F.R § 403.5 authorizes the establishment of "'local limits,' and under [40 C.F.R.] § 403.5(d), such local limits constitute pretreatment standards that are federally enforceable under Section 307(d) of the CWA, 33 U.S.C. § 1317." *Horn Lake Creek Basin Interceptor Sewer Dist.*, 2024 WL 4183314, at *4. Specifically, 40 C.F.R. § 403.5(d) makes "local limits" enforceable as "pretreatment standards"[34] where those limits are (1) "specific prohibitions or limits on pollutants or pollutant parameters"[35] and (2) "developed [] in accordance

---

[33] Another similar, but distinct, definition of BMP is provided in 40 C.F.R. § 122.2. That particular definition provides that BMPs are "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of 'waters of the United States.'" 40 C.F.R. § 122.2. Ultimately, the Court does not discern that that particular definition is relevant to the Court's adjudication of the First Motion to Dismiss, because it does not apply to any part of the C.F.R. implicated by the First Motion to Dismiss. *See* 40 C.F.R. § 122.2 ("The following definitions apply to parts 122, 123, and 124 [of the C.F.R.]").

[34] When the Court herein refers to something—like a "local limit" or BMP—being "enforceable as a pretreatment standard, " the reference is shorthand for something more comprehensive; what the Court means is that the thing is a "pretreatment standard" for purposes of 33 U.S.C. § 1317 and thus constitutes an "effluent standard or limitation," 33 U.S.C. § 1365(f)(4), a violation of which can sustain a CWA citizen suit under 33 U.S.C. § 1365(a)(1)(A).

[35] No definition of "specific" is set forth in 40 C.F.R. § 403, so the Court looks to the ordinary meaning of the word "specific" to interpret the regulations in 40 C.F.R. § 403. *Garrison v. Dutcher*, No. 1:07-CV-642, 2010 WL 1658880, at *5 (W.D. Mich. Mar. 22, 2010) ("Where a statute or regulation does not define a term, the court looks to the ordinary meaning of the term."), *report and recommendation adopted*, No. 1:07-CV-642, 2010 WL 1658744 (W.D. Mich. Apr. 23, 2010). And when ascertaining the ordinary meaning of a term, courts frequently turn to dictionaries. *In re Dow Corning Corp.*, 237 B.R. 380, 401 (Bankr. E.D. Mich. 1999). According to one online dictionary, "specific" means "constituting or falling into a specifiable category," "restricted to a particular individual, situation, relation, or effect" or "free from ambiguity." Specific, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/specific (last accessed September 1, 2026). According to another, "specific" means "Explicitly set forth; definite." Specific, TheFreeDictionary.com, https://www.thefreedictionary.com/specific (last accessed September 1, 2026). So, the Court understands "specific" in the context of 40 C.F.R § 403.5 to mean something that is definite and free from ambiguity. The Court realizes, however, that this is less than helpful because it just begs the question of what "definite" and "ambiguity" mean, and the Court suspects (without spending the time to confirm) that those terms sometimes are defined using, in the case of the former term, "specific" as a synonym, and, in the case of the latter term, "specificity" as an antonym—in which case these definitions collectively are merely circular. Nevertheless, the Court notes, for whatever it is worth, that when it concludes below that a standard is not "specific," it is likewise concluding that the standard likewise is not "definite" and not "free from ambiguity."

Of note, the Court treats the word "specific" in 40 C.F.R. § 403.5(d) as modifying "prohibitions [on pollutants],"*and* "limits on pollutants," *and* "pollutant parameters." The Court does so based on the so-

with [40 C.F.R. § 403.5(c)]."[36] And 40 C.F.R. § 403.5(c)—in provisions that do not discuss BMPs in particular—authorizes the imposition of "specific limits" or "specific effluent limits" on pollutants. 40 C.F.R. §§ 403.5(c)(1-3). The part of 40 C.F.R. § 403.5(c) that *does* discuss BMPs in particular (namely, 40 C.F.R. § 403.5(c)(4)) provides for the establishment of BMPs to *implement* 40 C.F.R. § 403.5(c)(1-2) and makes clear that such implementing BMPs are enforceable as "Pretreatment Standards." 40 C.F.R. § 403.5(c)(4).[37]

The Court next turns to evaluating the First Motion to Dismiss.

---

called "series-qualifier" canon of statutory construction, which provides "that a modifier at the beginning or end of a series of terms modifies all the terms [in that series]." *United States v. Mateen*, 764 F.3d 627, 633 n. 1 (6th Cir. 2014) (Clay, J., concurring). In other words, the Court reads 40 C.F.R. § 403.5(d) to provide, more precisely: "Where specific prohibitions [on pollutants] or [specific] limits on pollutants or [specific] pollutant parameters are developed [] in accordance with [40 C.F.R. § 403.5(c)], such limits shall be deemed Pretreatment Standards for the purposes of [33 U.S.C. § 1317(d)]."

[36] The Court notes the lack of clarity as to what it means for "specific prohibitions or limits on pollutants or pollutant parameters" to be developed "in *accordance* with [40 C.F.R. § 403.5(c)]." 40 C.F.R. § 403.5(d) (emphasis added). But based on a holistic reading of 40 C.F.R. § 403.5(c), the Court concludes that for "specific prohibitions or limits on pollutants or pollutant parameters" to be developed "in *accordance* with [40 C.F.R. § 403.5(c)]," at the very least two requirements must be met. Namely, (1) these prohibitions or limits must be "developed" with "individual notice to persons or groups who have requested such notice and an opportunity to respond," 40 C.F.R. § 403.5(c)(3), as contemplated by 40 C.F.R. § 403.5(c)(3), and (2) these "specific prohibitions or limits on pollutants or pollutant parameters" must actually impose the "specific limits" and "specific effluent limits" contemplated by 40 C.F.R. §§ 403.5(c)(1-3). Ultimately, no party raises the issue of whether Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code and Part 3.C. of the IUDP were developed with "individual notice to persons or groups who have requested such notice and an opportunity to respond," 40 C.F.R. § 403.5(c)(3)), and so the Court does not address this issue herein. However, the Court *does* address whether Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code (although *not* Part 3.C. of the IUDP, as explained in a footnote below) were developed in accordance with 40 C.F.R. § 403.5(c), to the extent that the Court examines whether Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code actually impose "specific limits," and "specific effluent limits" within the meaning of 40 C.F.R. §§ 403.5(c)(1-3).

[37] The Court notes that 40 C.F.R. § 403.5(d) suggests that "local limits" are enforceable as "pretreatment standards" only if developed by a POTW in particular, and 40 C.F.R. § 403.5(c)(4) contemplates that BMPs are enforceable as "pretreatment standards" only if developed by a POTW in particular. The parties do not explicitly address whether Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code and Part 3.C. of the IUDP were developed *by a POTW*. Rather, the parties seem to assume (without explanation) that Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code and Part 3.C. of the IUDP were developed by a POTW. (Doc. No. 230 at 5; Doc. No. 254 at 4, 7). So, the Court assumes *arguendo* that Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code and Part 3.C. of the IUDP were developed by a POTW.

*b. Analysis of the First Motion to Dismiss*

In support of the First Motion to Dismiss, Defendants argue that Count Six must be dismissed because (according to Defendants) Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code and Part 3.C. of the IUDP are not enforceable as "pretreatment standards." (Doc. No. 230 at 3-5). Plaintiff resists this conclusion, arguing that Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code constitute (or prescribe) either "local limits" enforceable under 40 C.F.R. § 403.5(d) as "pretreatment standards" or BMPs enforceable under 40 C.F.R. § 403.5(c)(4) as "pretreatment standards." (Doc. No. 254 at 3-10).[38] Defendants disagree, contending that Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code are not "specific enough to be local limits," and that Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code are not "'BMPs' under any relevant definition." (Doc. No. 260 at 4).

Thus, the question is whether Sections 33-36(B)(1)(e) and (G)(5)(b) of the Code are (or prescribe) "local limits" or BMPs enforceable under 40 C.F.R. §§ 403.5(d) or (c)(4), respectively, as "pretreatment standards."

Regrettably, there appears to be little (if any) case law addressing what constitutes a "local limit" that is enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard" or what constitutes a BMP that is enforceable under 40 C.F.R. § 403.5(c)(4) as a "pretreatment standard." And so, in its evaluation of the First Motion to Dismiss, the Court is relegated to relying almost

[38] Plaintiff does not address Defendants' arguments regarding Part 3.C. of the IUDP, and so the Court treats Plaintiff as conceding that Part 3.C. of the IUDP is not enforceable as a "pretreatment standard." *See ARJN #3 v. Cooper*, 517 F. Supp. 3d 732, 750 (M.D. Tenn. 2021) ("By failing to respond to Defendants' argument regarding [certain of] Plaintiffs' [] claims, Plaintiffs have indeed abandoned [these] claims."); *Crosby v. Bazos*, No. 2:22-CV-716, 2022 WL 2713899, at *2 (S.D. Ohio July 13, 2022) ("By not responding, Plaintiff has conceded Defendants' argument."). So, the Court accepts Defendants' contention that Part 3.C. of the IUDP is not enforceable as a "pretreatment standard."

entirely on the regulatory language of 40 C.F.R. § 403.5. Below, the Court will begin by examining Section 33-36(B)(1)(e) of the Code and then turn to Section 33-36(G)(5)(b) of the Code.

i. Section 33-36(B)(1)(e)

Section 33-36(B)(1)(e) of the Code provides that "[a]ny waters or wastes having toxic, poisonous or incompatible pollutants in such quantities as to constitute a hazard to humans or animals, be deleterious to pipelines or structures, interfere with treatment processes or cause the treatment plant to violate its NPDES permit or applicable receiving water standards," may "be accepted only under such conditions and/or limitations as may be established by the Director."[39]

---

[39] "Director" is defined in the Code as the "Director of the Murfreesboro Water & Sewer Department or authorized deputy, agent or representative of the Director." (Doc. No. 59-2 at 3).

As for the Code's reference here to NPDES permit," the Code defines "NPDES permit" to mean "the permit issued to a POTW pursuant to Section 402 of the Act (33 USC 1342)." (Doc. No. 59-2 at 4). This definition is mirrored in 40 C.F.R. § 403.3(n), which provides that an "NPDES Permit" is "a permit issued to a POTW pursuant to section 402 of the Act [(i.e., 33 U.S. Code § 1342)]." "NPDES," in turn, is an acronym of "National Pollutant Discharge Elimination System." (Doc. No. 59-2 at 2, 3); 33 U.S. Code § 1342. In its response to the First Motion to Dismiss, Plaintiff discusses in passing its "NPDES permit." (*See e.g.,* Doc. No. 254 at 5, ("[Section 33-36(B)(1)(e)] is a local limit in that it specifically restricts a defined category of pollutants, namely, those that constitute a hazard to humans or animals or that would cause a violation of the NPDES permit.")). It is unclear to the Court what specific NPDES permit Plaintiff is referring to in its response (or for that matter what specific NPDES permit is implicated by Section 33-36(B)(1)(e)). Indeed, judging by the allegations in the SSC, more than one NPDES permit may be relevant to this action. (Doc. No. 227 at ¶ 206 (referring to the "NPDES Stormwater Permit" and the "General NPDES Permit.")). In any event, although it is true that 40 C.F.R. § 403.5(c)(2) contemplates the imposition of "*specific effluent limits*" specifically to "ensure renewed and continued compliance with the POTW's NPDES permit," (emphasis added), consistent with the Court's discussion in the body of this memorandum opinion, the Court fails to see how Section 33-36(B)(1)(e) in any way constitutes (or prescribes) a "*specific effluent limit*" so as to be developed in accordance with 40 C.F.R. § 403.5(c)(2), let alone how Section 33-36(B)(1)(e) constitutes (or prescribes) a specific prohibition on pollutants, specific limit on pollutants or a specific pollutant parameter under 40 C.F.R. § 403.5(d), so as to be a "local limit" that is enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard."

Of note, the Court is aware that 33 U.S.C. § 1365(f)(7) provides that an "effluent standard or limitation" can be established (or prescribed in) an NPDES permit. With that said, Plaintiff does not assert that Section 33-36(B)(1)(e) is an "effluent standard or limitation" on the basis of 33 U.S.C. § 1365(f)(7)—which makes sense because Section 33-36(B)(1)(e) is of course not itself an NPDES permit—and so the Court does not discern that Section 33-36(B)(1)(e) is an "effluent standard or limitation" on the basis of 33 U.S.C. § 1365(f)(7).

(Doc. No. 59-2 at 13, 15, hereinafter "Section 33-36(B)(1)(e) Standard")). The Court does not discern that the Section 33-36(B)(1)(e) Standard either constitutes (or prescribes) a "local limit" or a BMP enforceable as a "pretreatment standard," for several reasons.

For starters, as noted above "local limits" are enforceable as "pretreatment standards" under 40 C.F.R. § 403.5(d) if (and only if) those limits are (1) "*specific* prohibitions or limits on pollutants or pollutant parameters" and (2) "developed [] *in accordance* with [40 C.F.R. § 403.5(c)]." 40 C.F.R. § 403.5(d) (emphasis added). Here there is no *specific* prohibition on pollutants, no specific limit on pollutants, and no specific pollutant parameters present in the Section 33-36(B)(1)(e) Standard. Instead, the Section 33-36(B)(1)(e) Standard provides that certain kinds of waters or wastes—namely waters or wastes "having toxic, poisonous or incompatible pollutants in such quantities as to constitute a hazard to humans or animals, be deleterious to pipelines or structures, interfere with treatment processes or cause the treatment plant to violate its NPDES permit or applicable receiving water standards" (Doc. No. 59-2 at 15)—may be accepted only under "such conditions and/or limitations as may be established by the Director." (*Id.* at 13).There is no indication here of a specific prohibition on pollutants, a specific limit on pollutants, or a specific pollutant parameter being established via the Section 33-36(B)(1)(e) Standard. Rather, there is a general requirement that certain types of waters or wastes containing unspecific amounts of pollutants cannot be accepted without undefined conditions being set by the Director. The applicable conditions (or, to be more precise, the *potentially* applicable conditions) are merely hypothetical, potential, and to be determined, and thus are the antithesis to *specific* conditions. The upshot is that the absence of a specific prohibition on pollutants, specific limit on pollutants or a specific pollutant parameter in the Section 33-36(B)(1)(e) Standard forecloses the Court from treating the Section 33-36(B)(1)(e) Standard as (or

as prescribing) a "local limit" that is enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard."

Furthermore, and leaving aside whether the Section 33-36(B)(1)(e) Standard imposes specific prohibitions on pollutants, specific limits on pollutants, or specific pollutant parameters, there is no indication that the Section 33-36(B)(1)(e) Standard was developed in *accordance* with 40 C.F.R. § 403.5(c) as required for a "local limit" to be enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard." As noted in a footnote above, the Court discerns that for "specific prohibitions or limits on pollutants or pollutant parameters" to be developed in *accordance* with 40 C.F.R. § 403.5(c), they must—among other things—actually impose the types of "specific limits," and "specific effluent limits" contemplated by 40 C.F.R. §§ 403.5(c)(1-3). Here, there is no "*specific* limit" or "*specific* effluent limit" imposed by the Section 33-36(B)(1)(e) Standard. What's more, the Court observes that 40 C.F.R. § 403.5(c) is mentioned nowhere in (or in connection with) Section 33-36(B) of the Code. The absence of any such mention is especially notable because other portions of the Code *do* discuss 40 C.F.R. § 403.5(c). For example, Section 33-36(F) of the Code—a subsection of the Code entitled "Local Limits"—authorizes the Director "to establish instantaneous, Daily Maximum or Monthly Average Local Limits pursuant to 40 CFR 403.5(c)." (Doc. No. 59-2 at 17). So, the Court discerns no indication that Plaintiff even *intended* for the Section 33-36(B)(1)(e) Standard to be developed in *accordance* with 40 C.F.R. § 403.5(c), let alone that the Section 33-36(B)(1)(e) Standard actually *was* developed in accordance with 40 C.F.R. § 403.5(c). This provides an alternative basis to conclude that the Section 33-36(B)(1)(e) Standard does not constitute (and does not prescribe) a "local limit" that is enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard."

Plaintiff argues that the Section 33-36(B)(1)(e) Standard alternatively constitutes (or prescribes) a BMP and so is enforceable as a "pretreatment standard." (Doc. No. 254 at 5-6) This argument is unavailing. Not *every* BMP is enforceable under 40 C.F.R. § 403.5(c)(4) as a "pretreatment standard." Rather, a BMP is enforceable as a pretreatment standard under 40 C.F.R. § 403.5(c)(4) if (and only if) that BMP is developed to "to implement [40 C.F.R. §§ 403.5(c)(1-2)]." 40 C.F.R. § 403.5(c)(4). Here, even assuming *arguendo* that the Section 33-36(B)(1)(e) Standard constitutes (or prescribes) a BMP within the meaning of 40 C.F.R. § 403.3(e), there is *no* indication anywhere that the Section 33-36(B)(1)(e) Standard was developed to implement 40 C.F.R. §§ 403.5(c)(1-2). As noted above, 40 C.F.R. § 403.5(c) is mentioned nowhere in or in connection with Section 33-36(B) of the Code. Furthermore, 40 C.F.R. §§ 403.5(c)(1-2) contemplate the imposition of "specific limits" or "specific effluent limits." And here, there is no "*specific* limit" or "*specific* effluent limit" imposed by or even mentioned in the Section 33-36(B)(1)(e) Standard. So, the Court does not discern that the Section 33-36(B)(1)(e) Standard, even assuming that it is a BMP, was developed to *implement* 40 C.F.R. §§ 403.5(c)(1-2) so as to be enforceable under 40 C.F.R. § 403.5(c)(4) as a "pretreatment standard."

In summary, the Court discerns no basis on which to conclude that the Section 33-36(B)(1)(e) Standard either constitutes (or prescribes) a "local limit" that is enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard" or a BMP that is enforceable under 40 C.F.R. § 403.5(c)(4) as a "pretreatment standard." And so, an alleged violation of the Section 33-36(B)(1)(e) Standard is not a violation of a "pretreatment standard" and is thus not a violation of

an "effluent standard or limitation" so as to provide a basis for a citizen suit under 33 U.S.C. § 1365(a)(1)(A).[40]

ii. Section 33-36(G)(5)(b)

That leaves Section 33-36(G)(5)(b) of the Code. That subparagraph provides that "[p]rior to a substantial change in the volume or character of pollutants in their discharge, including the listed or characteristic hazardous waste for which the Industrial User has submitted initial notification under TN Rule 1200-4-14-12(10)," it is "the responsibility of existing Industrial Users to file new or updated data with the Director." (Doc. No. 59-2 at 21, hereinafter "Section 33-36(G)(5)(b) Standard").[41] As with the Section 33-36(B)(1)(e) Standard, the Court does not discern

[40] Plaintiff also argues that "[c]ourts have repeatedly found that similar sewer use ordinances [like Section 33-36(B)(1)(e)] are enforceable via CWA citizen suits" and cites two cases—*Parris v. 3M Co.*, 595 F. Supp. 3d 1288 (N.D. Ga. 2022), and *Stephens v. Koch Foods, LLC*, 667 F. Supp. 2d 768 (E.D. Tenn. 2009)—in support of this proposition. Leaving aside whether the citation of two district court cases is sufficient to support the notion that courts have "repeatedly" found something, the two cases relied on by Plaintiff fail to convince the Court to depart from its conclusions above regarding the Section 33-36(B)(1)(e) Standard —and not just because they are not binding on this Court.

First, in the portion of *Parris* on which Plaintiff relies, the district court concluded that a plaintiff had pled a *violation* of a local sewer ordinance that prohibited discharges of pollutants "in sufficient quantity to injure or interfere with any sewage treatment process, constitute a hazard to humans or animals, or create any hazard in the receiving waters of the sewage treatment plant," so as to provide a basis for a citizen suit under the CWA. 595 F. Supp. 3d at 1324. Perhaps a reader might infer from *Parris* that sewer ordinances like those prohibiting the discharges of pollutants "in sufficient quantity to injure or interfere with any sewage treatment process, constitute a hazard to humans or animals, or create any hazard in the receiving waters of the sewage treatment plant," 595 F. Supp. 3d at 1324, constitute a "local limit" or a BMP that is enforceable as a "pretreatment standard." But the district court in *Parris* did not actually consider or opine on whether the local sewer code provision at issue in that case was in fact a "local limit" or a BMP that was enforceable as a "pretreatment standard," which is of course what is at issue with respect to the First Motion to Dismiss.

Second, in the portion of *Koch Foods, LLC* on which Plaintiff relies, the district court merely outlined a portion of the CWA's statutory and regulatory scheme; it did not opine as to what was or was not an a "local limit" or BMP that was enforceable as a "pretreatment standard." 667 F. Supp. 2d at 780.

Further, and as relevant to whether the Section 33-36(B)(1)(e) Standard is a "local limit" that is enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard," neither *Parris* nor *Koch Foods, LLC* is determinative of whether the specific ordinance at issue with respect to Plaintiff's particular argument here (i.e., Section 33-36(B)(1)(e) of the Code) was developed in *accordance* with 40 C.F.R. § 403.5(c).

[41] "Industrial User" is defined in the Code as "a source of indirect discharge which does not constitute a 'discharge of pollutants' under regulations issued pursuant to Section 402 of the Act (33 USC 1342)." (Doc.

that the Section 33-36(G)(5)(b) Standard constitutes (or prescribes) a "local limit" or BMP enforceable as a "pretreatment standard."

Starting again with 40 C.F.R. § 403.5(d), as noted above, "local limits" are enforceable "pretreatment standards" under this regulation if (and only if) those limits are (1) "*specific* prohibitions or limits on pollutants or pollutant parameters" and (2) "developed [] *in accordance* with [40 C.F.R. § 403.5(c)]." 40 C.F.R. § 403.5(d) (emphasis added). There is no *specific* prohibition on pollutants, specific limit on pollutants, or specific pollutant parameters present in the Section 33-36(G)(5)(b) Standard. Rather, the Section 33-36(G)(5)(b) Standard requires an "Industrial User" (as defined in the Code), like the MPL, to provide updated information to the Director when there is a "substantial change" in the "volume or character of pollutants" in a discharge. (Doc. No. 59-2 at 21). The Court fails to see how this provision in any way constitutes a specific prohibition on pollutants, specific limit on pollutants, or a specific pollutant parameter as contemplated by 40 C.F.R. § 403.5(d). And this alone prevents the Section 33-36(G)(5)(b) Standard from constituting (or prescribing) a "local limit" that is enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard."

Furthermore, there is no indication that the Section 33-36(G)(5)(b) Standard was developed in *accordance* with 40 C.F.R. § 403.5(c) as required by 40 C.F.R. § 403.5(d) for a "local limit" to be enforceable as a "pretreatment standard." As the Court noted above, the Court discerns that

---

No. 59-2 at 3). The parties seem to assume, sometimes tacitly, that the MPL (which Defendants manage) is an "Industrial User" so as to be subject to the Section 33-36(G)(5)(b) Standard. (Doc. No. 254 at 7-8; Doc. No. 260 at 4). And so, herein the Court *arguendo* assumes likewise.

Of note, the Court (for reasons that the Court need not discuss herein) previously concluded that in connection with its *breach* of contract claim in Count Eight, Plaintiff had alleged facts sufficient to show a violation of the Section 33-36(G)(5)(b) Standard so as to have plausibly alleged a breach of contract. (Doc. No. 144 at 16). However, whether there were allegations sufficient to show a *violation* of the Section 33-36(G)(5)(b) Standard is an entirely different issue from whether the Section 33-36(G)(5)(b) Standard is enforceable as a "pretreatment standard."

"specific prohibitions or limits on pollutants or pollutant parameters" are not properly deemed to have been developed in *accordance* with 40 C.F.R. § 403.5(c) unless—among other things—they actually impose the types of "specific limits," and "specific effluent limits" contemplated by 40 C.F.R. §§ 403.5(c)(1-3). And the Section 33-36(G)(5)(b) Standard imposes no "*specific* limit" or "*specific* effluent limit." Moreover, 40 C.F.R. § 403.5(c) is mentioned nowhere in or in connection with Section 33-36(G) of the Code. The absence of such mention is especially noteworthy for the reason mentioned above with respect to Section 33-36(B) of the Code: other portions of the Code (namely Section 33-36(F)) *do* discuss 40 C.F.R. § 403.5(c). (Doc. No. 59-2 at 17). So, there is no indication that Plaintiff even *intended* for the Section 33-36(G)(5)(b) Standard to be developed in *accordance* with 40 C.F.R. § 403.5(c), let alone that the Section 33-36(G)(5)(b) Standard actually was *developed* in accordance with 40 C.F.R. § 403.5(c). And so, the Court concludes that the Section 33-36(G)(5)(b) Standard was not developed in accordance with 40 C.F.R. § 403.5(c). And this provides an alternative basis to conclude that the Section 33-36(G)(5)(b) Standard does not constitute (and does not prescribe) a "local limit" that is enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard."

Any argument by Plaintiff that the Section 33-36(G)(5)(b) Standard constitutes (or prescribes) a BMP that is enforceable as a "pretreatment standard" also fails. As noted above, a BMP is enforceable as a "pretreatment standard" under 40 C.F.R. § 403.5(c)(4) if (and only if) that BMP is developed to "to implement [40 C.F.R. §§ 403.5(c)(1-2)]." 40 C.F.R. § 403.5(c)(4). Here, even assuming *arguendo* that the Section 33-36(G)(5)(b) Standard is a BMP within the meaning of 40 C.F.R. § 403.3(e), there is *no* indication anywhere that the Section 33-36(G)(5)(b) Standard was developed to *implement* 40 C.F.R. §§ 403.5(c)(1-2). As the Court already noted above, 40 C.F.R. § 403.5(c) is mentioned nowhere in or in connection with Section 33-36(G) of the Code.

Furthermore, 40 C.F.R. §§ 403.5(c)(1-2) contemplate the imposition of "specific limits" or "specific effluent limits," and the Section 33-36(G)(5)(b) Standard imposes no "*specific* limit" or "*specific* effluent limit." So, the Court does not discern that the Section 33-36(G)(5)(b) Standard, even assuming that it is a BMP, was developed to *implement* 40 C.F.R. §§ 403.5(c)(1-2) so as to constitute a BMP that is enforceable under 40 C.F.R. § 403.5(c)(4) as a "pretreatment standard."

In summary, the Court discerns no basis on which to conclude that the Section 33-36(G)(5)(b) Standard either constitutes (or prescribes) a "local limit" enforceable under 40 C.F.R. § 403.5(d) as a "pretreatment standard" or a BMP enforceable under 40 C.F.R. § 403.5(c)(4) as a "pretreatment standard." And so, an alleged violation of the Section 33-36(G)(5)(b) Standard is not a violation of a "pretreatment standard" and is thus not a violation of an "effluent standard or limitation" capable of providing a basis for a citizen suit under 33 U.S.C. § 1365(a)(1)(A).

So, the Court concludes that neither the Section 33-36(B)(1)(e) Standard nor the Section 33-36(G)(5)(b) Standard (nor for that matter Part 3.C. of the IUDP, as explained in a footnote above) are enforceable as "pretreatment standards." Accordingly, Plaintiff has not pled a violation of an "effluent standard or limitation" under 33 U.S.C. § 1365(a)(1)(A) in connection with Count

Six.[42] Therefore, the Court lacks subject-matter jurisdiction over Count Six, the First Motion to Dismiss will be granted, and Count Six will be dismissed pursuant to Rule 12(b)(1).[43]

---

[42] Of course, the Court is aware that there are things aside from "pretreatment standards" that can constitute an "effluent standard or limitation." *See* 33 U.S.C. § 1365(f). However, Plaintiff contends that the Section 33-36(B)(1)(e) Standard and the Section 33-36(G)(5)(b) Standard are "effluent standards or limitations" solely on the basis of them being "pretreatment standards" by virtue of them constituting (or prescribing) "local limits" (as contemplated by 40 C.F.R. § 403.5(d)) or BMPs (as contemplated by 40 C.F.R. § 403.5(c)(4)). (Doc. No. 254 at 3-10). And so, the Court has limited its analysis to the question of whether the Section 33-36(B)(1)(e) Standard or the Section 33-36(G)(5)(b) Standard are "effluent standards or limitations" solely to an examination of whether these provisions constitute "pretreatment standards"—by virtue of them constituting (or prescribing)—"local limits" (as contemplated by 40 C.F.R. § 403.5(d)) or BMPs (as contemplated by 40 C.F.R. § 403.5(c)(4)). The Court believes such limitation is justified because it is the plaintiff's burden to establish subject-matter jurisdiction, *see Syswerda v. Mnuchin*, No. 20-2129, 2021 WL 5567536, at *2 (6th Cir. Sept. 23, 2021) ("The plaintiff bears the burden of establishing subject-matter jurisdiction"), and the question of whether a plaintiff has pled a violation of an "effluent standard or limitation" so as to bring a citizen suit under the CWA is a question of the Court's subject-matter jurisdiction. *See, e.g., Hamker*, 756 F.2d at 394; *Holy Cross*, 774 F. Supp. 2d at 812. That is to say, the Court declines to consider other grounds under which the Section 33-36(B)(1)(e) Standard and the Section 33-36(G)(5)(b) Standard (or for that matter Part 3.C. of the IUDP) might be "effluent standard[s] or limitation[s]" other than those asserted by Plaintiff, lest the Court relieve Plaintiff of its burden to establish subject-matter jurisdiction.

[43] Defendants also advance a poorly developed argument regarding the interplay between "Pretreatment Requirements" as defined in 40 C.F.R. § 403.3(t), and "pretreatment standards" as defined in 40 C.F.R. § 403.3(l). Without spelling it out, Defendants seem to argue that something that is a "pretreatment requirement" *cannot* (also) be a "pretreatment standard," (Doc. No. 230 at 4, 4 n.5; Doc. No. 260 at 5), meaning (according to this underdeveloped argument) that to the extent that the Section 33-36(B)(1)(e) Standard, the Section 33-36(G)(5)(b) Standard, and Part 3.C. of the IUDP constitute "pretreatment requirements," they cannot also be "pretreatment standards." Because the Court has concluded that the Section 33-36(B)(1)(e) Standard, the Section 33-36(G)(5)(b) Standard, and Part 3.C. of the IUDP are not "pretreatment standards" on grounds separate and apart from that particular argument, the Court declines to address herein the merits of this argument.

Likewise and for the same reason, to the extent that Defendants assert that the Section 33-36(B)(1)(e) Standard, the Section 33-36(G)(5)(b) Standard, and Part 3.C. of the IUDP are not "local limits" enforceable as "pretreatment standards" because they are not "*unique to an industrial user*" (like MPL) (Doc. No. 230 at 5; Doc. No. 260 at 4), the Court declines to address this assertion.

Further, in their reply (Doc. No. 260) in support of the First Motion to Dismiss, Defendants assert that "local limits" must be "specific *to [a] wastewater treatment plant*" to be enforceable as "pretreatment standards," (Doc. No. 260 at 3 (emphasis added)), and that the Section 33-36(B)(1)(e) Standard and the Section 33-36(G)(5)(b) Standard are not "local limits" enforceable as "pretreatment standards" because they are not specific to a "wastewater treatment plant." (Doc. No. 260 at 3-4). As with the previous two arguments discussed in this footnote, the Court declines to evaluate this particular argument because the Court has concluded that the Section 33-36(B)(1)(e) Standard and the Section 33-36(G)(5)(b) Standard are not "pretreatment standards" on grounds separate and apart from that particular argument.

### 2. The Second Motion to Dismiss

The Court now turns to the Second Motion to Dismiss. As explained above, in the memorandum (Doc. No. 232) filed in support of the Second Motion to Dismiss, Republic Services of Tennessee (alone) contends that Count Seven should be dismissed pursuant to Rule 12(b)(1) solely as to Republic Services of Tennessee. As also noted above, via Count Seven Plaintiff brings a claim alleging violations of the CAA pursuant to the CAA's citizen suit provision in 42 U.S.C. § 7604. (Doc. No. 227 at ¶¶ 224-234).[44] Republic Services of Tennessee contends that dismissal of Count Seven is warranted because (according to Republic Services of Tennessee) Plaintiff failed to provide Republic Services of Tennessee "with the pre-suit notice required to bring a citizen suit under the CAA." (Doc. No. 232 at 1). And thus, according to Republic Services of Tennessee, the Court lacks subject-matter jurisdiction over (and thus, pursuant to Rule 12(b)(1), must dismiss) Count Seven to the extent that Count Seven is brought against Republic Services of Tennessee.[45]

---

In any event, the Court doubts that Defendants will be very aggrieved by the Court's decision not to consider these particular arguments, given that the Court is dismissing Count Six on the grounds discussed above.

[44] As noted above, Plaintiff appears to bring Count Seven specifically pursuant to 42 U.S.C. § 7604(a)(1), which provides that "any person may commence a civil action on his own behalf" against "any person [] who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."

Of note, a municipality—like Plaintiff—is properly considered a "person" for the purposes of bringing a citizen suit under 42 U.S.C § 7604(a). *See* 42 U.S.C § 7602(e) (defining the term "person" to include "an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.").

[45] Whether the requisite notice was given in the context of a citizen suit under the CAA is a question of the Court's subject-matter jurisdiction, *see e.g., Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 175 F. Supp. 2d 1071, 1077 (E.D. Tenn. 2001) ("Strict compliance with the statutory notice requirements is a mandatory jurisdictional prerequisite to maintaining suit under the CAA and similar environmental laws."), and so a motion to dismiss based on the failure of a plaintiff to adhere to the notice requirements in the CAA is properly brought pursuant to Rule 12(b)(1). *See Freeman v. Cincinnati Gas & Elec. Co.*, No. C-1-04-781, 2005 WL 1669324, at *2, *5 (S.D. Ohio July 18, 2005) (considering a motion to dismiss for failure to comply with notice requirements under the CAA under Rule 12(b)(1)).

Plaintiff takes issue with this argument, arguing that Plaintiff satisfied the notice requirements required to bring a citizen suit under the CAA. (Doc. No. 253 at 2-4).

Given the nature of the Second Motion to Dismiss and of Count Seven, the Court will first provide a review of the CAA, including a review of citizen suits under the CAA and a review of the notice requirement to bring a citizen suit under the CAA. The Court will then evaluate the Second Motion to Dismiss.

*a. The CAA and the CAA's Notice Requirement*

The CAA, "[e]nacted in 1970 and substantially amended in 1977 and 1990," established "a comprehensive program for controlling and improving the nation's air quality through a combination of state and federal regulation." *Kentucky Res. Council, Inc. v. E.P.A.*, 467 F.3d 986, 987 (6th Cir. 2006). Like the CWA, the CAA contains a citizen-suit provision. *Fenner v. General Motors, LLC*, 113 F.4th 585, 602, 603 (6th Cir. 2024) (discussing the CAA's citizen-suit provision); 42 U.S.C § 7604 (prescribing the CAA's citizen-suit provision). As relevant here, to bring a citizen suit, a plaintiff must comply with particular requirements, including notice requirements that are found in 42 U.S.C. § 7604(b). 42 U.S.C. § 7604(b) provides notice requirements for—among other things—a CAA citizen suit brought under 42 U.S.C. § 7604(a)(1), which is the particular provision of 42 U.S.C. § 7604 under which Plaintiff brings Count Seven. In relevant part, that is in 42 U.S.C. § 7604(b)(1)(A), 42 U.S.C. § 7604(b) provides:

> **(b) Notice**
> No action may be commenced—
> **(1)**under subsection (a)(1)—
> **(A)** prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]

42 U.S.C. § 7604(b)(1)(A).[46] The EPA has promulgated certain regulations regarding the notice required under the CAA in order to bring a citizen-suit. These regulations are found in 40 C.F.R. § 54. 40 C.F.R. § 54.2 provides requirements regarding the *service* of the notice, and 40 C.F.R. § 54.3 provides requirements for what is required for the *contents* of the notice. 40 C.F.R. § 54.3 provides in relevant part, that is, in 40 C.F.R. § 54.3(b), which is the provision of 40 C.F.R. § 54.3 that the Court discerns is applicable here:

> (b) Violation of standard, limitation or order. Notices to the Administrator, States, and alleged violators regarding violation of an emission standard or limitation or an order issued with respect to an emission standard or limitation, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice.

40 C.F.R. § 54.3(b).

---

[46] The Supreme Court has recognized that numerous federal environmental laws—including the CWA and the Resource Conservation and Recovery Act ("RCRA")—contain similarly structured citizen-suit provisions modeled on the citizen-suit provision in the CAA. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 23 & n.1 (1989) (collecting environmental statutes with citizen-suit provisions modeled on the CAA, including the CWA); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987) (noting that the CWA's citizen suit provision is modeled on the CAA's similar provision). And federal courts regularly construe the citizen-suit provisions (including the notice requirements underpinning these citizen suits) of the CWA, RCRA, and CAA in gross. *See e.g., Walls v. Waste Res. Corp.*, 761 F.2d 311, 315-16 (6th Cir. 1985) (collectively interpreting the citizen-suit provisions of the CWA and RCRA and applying Supreme Court caselaw regarding the CWA's citizen-suit provision to interpret both statutes); *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 342-43 (5th Cir. 2024) (Davis, J., concurring) (relying on case law discussing notice requirement for citizen suits under the CWA in interpreting the notice requirement for citizen suits under the CAA), *cert. denied*, 145 S. Ct. 2845 (2025); *Fried v. Sungard Recovery Servs., Inc.*, 900 F. Supp. 758, 764 n.4 (E.D. Pa. 1995).

For these reasons, the Court discerns that case law interpreting the CWA's and RCRA's citizen-suit provisions (including, specifically the CWA's and RCRA's notice requirements for bringing citizen suits) can be instructive in interpreting the CAA's citizen-suit provision (including, specifically, the CAA's notice requirement for bringing a citizen suit). So, the Court herein cites caselaw discussing the CWA's and RCRA's citizen-suit provisions (and specifically the CWA's and RCRA's notice requirements) in discussing and interpreting the CAA's citizen-suit provision, and specifically the notice requirements thereto.

Importantly, "[s]trict compliance with the statutory notice requirements is a mandatory jurisdictional prerequisite to maintaining [a citizen] suit under the CAA and similar environmental laws." *National Parks Conservation Ass'n, Inc.*, 175 F. Supp. 2d at 1077. And a court may not excuse a failure to comply with the notice requirement in the CAA. *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 475 (6th Cir. 2004). "Instead, [when faced with a failure to comply with the notice requirement] the court must dismiss the [CAA citizen suit] for lack of subject matter jurisdiction." *Freeman*, 2005 WL 1669324, at *2.

*b. Analysis of the Second Motion to Dismiss*

As noted above via the Second Motion to Dismiss, Republic Services of Tennessee contends that dismissal of Count Seven to the extent that this count is brought against Republic Services of Tennessee is warranted because (according to Republic Services of Tennessee) "Plaintiff failed to provide Republic Services of Tennessee with the pre-suit notice required to bring a citizen suit under the CAA." (Doc. No. 232 at 1). Plaintiff, naturally, disagrees.

Attached to the SSC is a copy of the notice of intent (Doc. No. 227-5, "Notice") that Plaintiff (purportedly) served[47] on (in addition to certain state and federal officials) the General Manager of MPL with respect to Plaintiff's claim under the CAA. Also attached to the SSC is a

---

[47] Plaintiff asserts that it properly served the Notice (and the supplements thereto) on the General Manager of MPL. (Doc. No. 253 at 3 ("[Plaintiff] properly served its Notice Letters to the General Manager of the Middle Point Landfill."). Republic Services of Tennessee seems not to concede that service was properly effectuated. (Doc. No. 260 at 3, ("[Plaintiff's] *asserted* compliance with [the service requirements established in] 40 C.F.R. § 54.2(c) is inapposite." (emphasis added))). In these circumstances—and because, as the Court discusses below, the issue of *service* of the Notice and its supplements is not germane to the analysis of the Second Motion to Dismiss—the Court will refer to service of the Notice and the supplements thereto as having been *purportedly* effectuated.

In any event—and as the Court discusses below—whether service of the Notice (and the supplements thereto) was properly effectuated on Republic Services of Tennessee (or indeed anyone else) is not germane to the Court's analysis of whether the Notice (and the supplements thereto) were sufficient in this case. What is relevant here is not whether the Notice (and the supplements thereto) were properly *served*; what is relevant (and indeed dispositive) here is whether the *content* of the Notice (and supplements thereto) was sufficient.

copy of each of two supplements (Doc. No. 227-6, "First Supplement"; Doc. No. 227-7, "Second Supplement") that Plaintiff also (purportedly) served on (in addition to certain state and federal officials) the General Manager of MPL and that purport to supplement its Notice.[48]

The Notice is dated August 22, 2022 (Doc. No. 227-5 at 1), which is more than sixty days before the filing of Plaintiff's Amended Complaint (Doc. No. 38) (that is, October 28, 2022),[49] wherein Plaintiff, for the first time, asserted a claim alleging violations of the CAA. The Notice, in relevant part, provides:

> The purpose of this letter is to notify BFI Waste Systems of Tennessee, LLC ("BFI"), and its parent and controlling company, Republic Services, Inc. ("Republic"), that the City of Murfreesboro, Tennessee, intends to file suit in sixty (60) days under 42 U.S.C. § 7604(a)(l) of the federal Clean Air Act ("CAA") in Federal District Court for violations of emissions standards and limitations at the Middle Point Landfill.

(Doc. No. 227-5 at 1).

The First Supplement is dated January 15, 2024. The First Supplement provides in relevant part:

> The purpose of this letter is to notify BFI Waste Systems of Tennessee, LLC ("BFI"), and its parent and controlling company, Republic Services, Inc. ("Republic"), that the City of Murfreesboro, Tennessee, intends to amend its complaint against BFI and Republic or to file a new complaint within sixty (60) days under 42 U.S.C. § 7604(a)(1) of the federal Clean Air Act ("CAA") in Federal District Court for violations of emissions standards and limitations at the Middle

[48] As the Court explained in an earlier footnote, the Court may appropriately consider exhibits attached to the SSC in its adjudication of the Motions.

Of note, the First Supplement and the Second Supplement are at times referred to (or refer to themselves) as notices (rather than as *supplements to* the Notice). (Doc. No. 227-6 at 1; Doc. No. 227-7 at 1; Doc. No. 253 at 3). The Court notes that it may in fact be more precise to refer to the First Supplement and the Second Supplement as *notices* rather than as supplements to the Notice. Nevertheless, the Court herein refers to these documents as supplements *to* the Notice, rather than as notices, to avoid any confusion for the reader between the original notice (i.e., the Notice) and additional documents related to the Notice (i.e., the First Supplement and the Second Supplement).

[49] As the Court noted above, under the CAA's notice provision, a party intending to bring a citizen suit under 42 U.S.C. § 7604(a)(1) must give "adequate notice of the [alleged] violation [of the CAA] at least sixty days prior to filing suit." *Anderson v. Farmland Indus., Inc.*, 45 F. Supp. 2d 863, 865 (D. Kan. 1999).

> Point Landfill. This Notice is supplemental to the Notice [s]erved on August 22, 2022, and supplemented on September 13, 2022, and contains additional violations determined since that time.

(Doc. No. 227-6 at 1). [50]

---

[50] Plaintiff (purportedly) served the First Supplement in order to give notice of (purported) "additional violations" of the CAA, (Doc. No. 227-6 at 1), and to give notice that Plaintiff intended to amend its complaint (the operative version of which was, on January 15, 2024, the First Supplemental Complaint (Doc. No. 70)), to include these (purported) violations. (Doc. No. 227-6 at 13). Although the First Supplement indicated that Plaintiff was intending to amend its complaint (i.e., the First Supplemental Complaint) to include allegations making out new (purported) violations of the CAA within sixty (60) days of, presumably, January 15, 2024 (which is the date found on the first page of the First Supplement), Plaintiff ultimately did not amend (or for that matter even move to amend) its complaint within sixty days of January 15, 2024.

The Court is uncertain as to precisely when a plaintiff—like Plaintiff—bringing a claim under 42 U.S.C. § 7604(a)(1) must serve a new notice (or a supplement to a previously sent notice) in connection with a planned amendment of the complaint where the complaint already asserts a CAA claim under the CAA's citizen-suit provision; and the parties do not address this point in the briefing on the Second Motion to Dismiss. Judging by the existence of the First Supplement and the Second Supplement, Plaintiff certainly seems to think that a supplement to a previously filed notice (i.e., the Notice) was required (or at least advisable) at certain instances in this action (seemingly when Plaintiff was intending to amend its complaint to allege *new*, previously unalleged or noticed violations of the CAA) in connection with a planned amendment of its complaint, even where the complaint already asserted a CAA claim under the CAA's citizen-suit provision. Of note, it seems as though Plaintiff did not serve a supplement to the Notice ahead of the filing of its First Supplemental Complaint (Doc. No. 70), which was filed on March 15, 2023, although conceivably this was because the First Supplemental Complaint involved new allegations regarding violations of the *CWA* alone. (Doc. No. 68 at 2 ("Plaintiff's First Supplemental Complaint contains allegations of newly discovered Clean Water Act violations at two specific locations at the Middle Point Landfill that were discussed in the First Amended Complaint.")).

In any event, in order to resolve the Second Motion to Dismiss, the Court need not (and does not) resolve the issue of precisely when a plaintiff bringing a claim under 42 U.S.C. § 7604(a)(1) must serve a new notice (or a supplement to a previously sent notice) in connection with a planned amendment of a complaint where the complaint already asserts a CAA claim under the CAA's citizen-suit provision.

Additionally, the Court notes that a copy of the September 13, 2022, supplement to the Notice mentioned in the First Supplement was not filed as an exhibit to the SSC, and the Court was not able to locate a copy of this supplement on the docket. Although conceivably a copy of this supplement might be buried somewhere in the nearly 350-entry docket in this action, Plaintiff does not point the Court to a copy of this supplement. In any event, given that Plaintiff states that it "does not dispute that the CAA Notice Letters did not specifically name 'Republic Services of Tennessee, LLC,'" (Doc. No. 253 at 3), the Court discerns that whatever else was in the September 13, 2022, supplement to the Notice, the September 13, 2022, supplement to the Notice did not name (or otherwise mention) Republic Services of Tennessee. And so, the September 13, 2022, supplement to the Notice—whatever else it may have provided—does not change the Court's analysis of the Second Motion to Dismiss.

Finally, the Second Supplement is dated September 15, 2025, which is sixty days prior to Plaintiff seeking leave (Doc. No. 221) to file the SSC (that is, on November 14, 2025). The Second Supplement provides in relevant part:

> The purpose of this letter is to notify BFI Waste Systems of Tennessee, LLC ("BFI"), and its parent and controlling company, Republic Services, Inc. ("Republic"), that the City of Murfreesboro, Tennessee, intends to amend its First Supplemental Complaint or file a new suit in sixty (60) days under 42 U.S.C. § 7604(a)(l) of the federal Clean Air Act ("CAA") in Federal District Court for violations of emissions standards and limitations at the Middle Point Landfill. This Notice is supplemental to the Notices [s]erved on September 13, 2022, and January 15, 2024, and contains additional violations determined since that time.

(Doc. No. 227-7 at 1 (footnote omitted)).[51] [52]

At base, a cursory review of the Notice, the First Supplement and the Second Supplement reveals them to be fatally deficient with respect to the statutory and regulatory requirements for notice set out in 42 U.S.C. § 7604(b)(1)(A) and 40 C.F.R. § 54.3(b). Why? Because the Notice, the First Supplement and the Second Supplement neither name Republic Services of Tennessee as an entity to which Plaintiff purports to give notice, nor indeed mention Republic Services of Tennessee *anywhere*. Indeed, the Notice, First Supplement, and Second Supplement by their

---

[51] The Second Supplement was (purportedly) served in order to give notice of (purported) "additional violations" of the CAA, (Doc. No. 227-7 at 1), and to give notice that Plaintiff intended to amend its complaint—the operative version of which was, on September 15, 2025, the First Supplemental Complaint (Doc. No. 70)—to include these (purported) violations. (Doc. No. 227-7 at 12).

Additionally, although the Second Supplement states that it is, in part, "supplemental to the Notice[] [s]erved on September 13, 2022" (Doc. No. 227-7 at 1), the Court discerns—given the language in the First Supplement, which discusses the First Supplement as being "supplemental to the Notice [s]erved on August 22, 2022 [(i.e., the Notice)], [which was] supplemented on September 13, 2022" (Doc. No. 227-6 at 1)—that it is more accurate to say that the Second Supplement is supplemental to the notice served on August 22, 2022 (i.e., the Notice), which itself was *previously supplemented* on September 13, 2022.

[52] Of note, the SSC alleges that Plaintiff complied with the CAA's notice requirements (Doc. No. 227 at ¶¶ 20-22). The Court need not accept these allegations as true for the purpose of resolving the Second Motion to Dismiss because they are not allegations of fact, but rather legal conclusions. *See e.g., Koivukangas v. United States*, 827 F. Supp. 3d 1158, 1163-64 (D.S.D. 2026) (observing that in resolving a facial attack to its subject-matter jurisdiction, a court "must accept a plaintiff's factual allegations as true and make all inferences in the plaintiff's favor but need not accept a plaintiff's legal conclusions.").

language purport to give notice (to the effect that Plaintiff will be bringing claims under the CAA) to *only* BFI and Republic Services, Inc.

It goes almost without saying that for a notice to comply with the statutory and regulatory requirements set out in 42 U.S.C. § 7604(b)(1)(A) and 40 C.F.R. § 54.3(b), a notice must actually name the individual or entity to whom it purports to give notice—i.e., the individual or entity alleged to have violated the CAA.[53] *See Sierra Club v. DTE Energy Co.*, No. 13-CV-11103, 2013 WL 6910431, at *5 (E.D. Mich. Oct. 7, 2013) ("notice is sufficient if it identifies [] the *person* responsible for the alleged violations" (emphasis added)), *report and recommendation adopted,* No. 13-11103, 2014 WL 29127 (E.D. Mich. Jan. 3, 2014); 42 U.S.C. § 7604(b)(1)(A) (requiring notice to be given to "any alleged violator" of the CAA); 40 C.F.R. § 54.3(b) (describing notices to "alleged violators"). Indeed, the undersigned previously recognized that a notice (in that case a notice sent regarding claims to be brought under the CWA and RCRA) that neither purports to give notice to a party, nor even mentions a party is simply insufficient to satisfy the notice requirements for bringing a citizen suit against that party. *See StarLink Logistics Inc. v. ACC, LLC*, 642 F. Supp. 3d 652, 696 (M.D. Tenn. 2022) (observing that a notice that did not purport to give notice to a particular defendant or otherwise mention that particular defendant was insufficient to satisfy the pre-suit notice requirements as to that particular defendant), *aff'd in part, rev'd in part on other grounds*, 101 F.4th 431 (6th Cir. 2024). So, the Court finds that Plaintiff has failed to give Republic Services of Tennessee adequate (or indeed even any) pre-suit notice required for Plaintiff to bring the CAA claim in Count Seven against Republic Services of Tennessee in particular.

[53] As the Court noted in a footnote above, and discusses more fulsomely in a footnote below, what the Court is focusing on here is the *content* of the Notice (and the supplements thereto). This is an issue separate and apart from whether the Notice was properly *served* on Republic Services of Tennessee (or anyone else, for that matter).

Plaintiff's arguments that it did provide the required pre-suit notice to Republic Services of Tennessee are unavailing. First, Plaintiff argues that it satisfied the CAA's notice requirements as to Republic Services of Tennessee because the sufficiency of a notice hinges on whether the notice contains "sufficient information to allow Defendant[] to identify all pertinent aspects of its alleged violation without extensive investigation" (Doc. No. 253 at 3 (quoting *Starlink Logistics Inc.*, 642 F. Supp. 3d at 694 (quoting *Cooper v. Toledo Area Sanitary Dist.*, 797 F. App'x 920, 924 (6th Cir. 2019)))), and the Notice and supplements thereto "suffic[ed] to put [Republic Services of Tennessee] on notice [in line with this standard]" because the Notice (and supplements thereto) named "the corporate parent [of Republic Services of Tennessee (i.e., Republic Services, Inc.)] and the operating entity [(i.e., BFI)]" and was sent "directly to the General Manager of [MPL]." (Doc. No. 253 at 3). This argument is plainly without merit. It is true that the sufficiency of a notice hinges on whether the notice contains "sufficient information to allow [a] Defendant[ ] to identify all pertinent aspects of its [alleged] violations without extensive investigation." *Cooper*, 797 F. App'x at 924 (discussing the CWA's notice requirement). However, the Court fails to see how the Notice and supplements thereto provided *Republic Services of Tennessee* with "sufficient information to [] to identify all pertinent aspects of *its* [alleged] violations without extensive investigation," *id.* (emphasis added), when the Notice and its supplements did not even mention or otherwise identify Republic Services of Tennessee. If a notice does not even identify a party, it necessarily follows that the notice did not provide sufficient information for *that party* to identify "aspects of *its* [alleged] violations without extensive investigation." *Id.* (emphasis added). And although Plaintiff perhaps suggests otherwise, it actually does not help *at all* that the notice named "the corporate parent [of Republic Services of Tennessee (i.e., Republic Services, Inc.)] and the operating entity [(i.e., BFI)]" and was sent "directly to the General Manager of [MPL]." (Doc. No.

253 at 3). These facts suggest only that Plaintiff was directing its efforts *elsewhere,* rather than at Republic Services of Tennessee. And Plaintiff provides no basis for any suggestion that Republic Services of Tennessee's identity merges with the identity of the parties named in the Notice (or the supplements thereto) merely because it has some allegedly close relationship with those parties.

Second, to the extent Plaintiff argues that, because the notices it sent regarding the alleged violations of the *CWA* (Doc. No. 227-1 - 227-4) actually did name Republic Services of Tennessee, the Court should not dismiss Count Seven (a *CAA* claim) to the extent that Count Seven is brought against Republic Services of Tennessee, (Doc. No. 253 at 3-4), this argument borders on frivolous. Indeed, Plaintiff points the Court to no authority to suggest that a non-deficient notice sent with respect to alleged violations of the *CWA* can somehow excuse a deficient notice sent with respect to alleged violations of the *CAA*. And were the Court to accept Plaintiff's argument on this point, it would run afoul of the principle that "[s]trict compliance with the statutory notice requirements [under the CAA] is a mandatory jurisdictional prerequisite to maintaining suit under the CAA and similar environmental laws." *Nat'l Parks Conservation Ass'n, Inc.*, 175 F. Supp. 2d at 1077.[54] [55]

Accordingly, the Court finds that Plaintiff failed to provide Republic Services of Tennessee with the pre-suit notice required to bring a citizen suit under the CAA, and therefore the Court lacks subject-matter jurisdiction over Count Seven to the extent that Count Seven is brought

[54] The Court also notes that Plaintiff actually naming Republic Services of Tennessee in the notice (and supplements thereto) Plaintiff sent with respect to the CWA makes the omission of Republic Service of Tennessee, in the Notice, First Supplement and Second Supplement all the more conspicuous. If anything, it suggests that Plaintiff knew full well that it needed to, and knew how to, name Republic Services of Tennessee in a notice if it wanted to bring a citizen's suit against Republic Services of Tennessee under a particular environmental statute.

[55] Plaintiff also argues that because (according to Plaintiff) it (purportedly) effectuated *service* of the Notice, First Supplement, and Second Supplement to the General Manager of MPL in compliance with the regulations in 40 C.F.R. § 54.2, it complied with the CAA's citizen-suit notice requirement. (Doc. No. 253 at 2, 3, 4). This argument is entirely unavailing. 40 C.F.R. § 54.2 governs *service* requirements for a CAA notice. 40 C.F.R. § 54.2 does not govern any requirements for the *content* of a notice under the CAA, which is what is at issue here.

against Republic Services of Tennessee. Accordingly, the Court will grant the Second Motion to Dismiss, and Count Seven of the SSC will be dismissed pursuant to Rule 12(b)(1) to the extent that this count is brought against Republic Services of Tennessee.

## CONCLUSION

Accordingly, the First Motion to Dismiss (Doc. No. 229) and the Second Motion to Dismiss (Doc. No. 231) will be **GRANTED**. Therefore, pursuant to Rule 12(b)(1), Count Six of the SSC will be dismissed in its entirety and Count Seven of the SSC will be dismissed to the extent that it is brought against Republic Services of Tennessee, LLC.

The Court wishes to note one more thing. The papers submitted (by both parties) on the First Motion to Dismiss and the Second Motion to Dismiss were frequently opaque, difficult to understand, and, at times, close to incomprehensible. The Court has done its level best to resolve the First Motion to Dismiss and the Second Motion to Dismiss comprehensively based on the papers before it. However, the parties in this case are advised that they are in federal court and are requiring the expenditure of extensive judicial resources with this action. Going forward, the Court expects all parties in this action to put more thought, energy, and diligence into any motions, and any papers in support or opposition thereto, that they submit. Failure to do so may lead to summary denial of these motions and of any relief requested thereto, or to the Court declining to consider arguments raised in the papers filed with respect to these motions.[56]

---

[56] To the extent that the movants who brought the pending motions at Docket Nos. 285 and 304 feel that their respective motions may run afoul of the Court's warning above, they may move to withdraw their respective motions and shall be permitted to do so without prejudice to filing updated/improved versions of these particular motions.

The Court notes that the movants who brought the Motions were dangerously close to facing summary denial of the Motions owing to the quality of the briefing submitted by the movants in connection with the Motions. Ultimately, the Court declined to deny the Motions on these grounds because the Court has an independent duty to assess its own subject-matter jurisdiction, *see Bracey v. Barbour*, No. 3:12-CV-629, 2012 WL 2395171, at *4 (M.D. Tenn. June 25, 2012), and the Motions raised challenges to the Court's subject-matter jurisdiction.

An appropriate accompanying order will be entered.

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE